1  **JEFFREY M. FORSTER (SBN 50519)**
   **160 West Santa Clara Street, Suite 1100**
2  **San Jose, CA 95113**
   **Telephone:    (408) 977-3137**
3  **Facsimile:    (408) 977-3141**
   **Email:        jforstr@pacbell.net**
4
5  **STEVEN R. LEVY   (State Bar No. 103164)**
   **17670 Woodland Avenue**
   **Morgan Hill, CA 95037**
6  **Telephone:    (408) 274-7000**
   **Facsimile:    (408) 274-9000**
7  **Email:        slevy@bigfoot.com**
8  **Attorneys for Plaintiffs**
9
10                **UNITED STATES DISTRICT COURT**
11        **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
12                     **SAN JOSE DIVISION**

| | |
|---|---|
| **YU-SZE YEN; CLARICE ARNE; MIKE BAKER; JUAN BETTAGLIO AND BRENDA BETTAGLIO, individually and as Trustees of the Bettaglio Family Trust; MIKE BROGDON AND RENEE BROGDON, individually and as Trustees of the Brogdon Family Trust; DIANNE BRYSON; JAMES BRYSON; WAYNE CANTO AND CANDISE CANTO; FRANK CARBAJAL AND MEGAN CARBAJAL; KWEI CHOONG; JASON COLYAR; JIM COATES; JKAT PROPERTIES, LLC, a California limited liability company; MARK DELMAN AND KATHLEEN DELMAN; TIMOTHY GALE AND LORI GALE; ERIC GOLD; JACK GREER AND DIANE GREER; JERRY HUGHES AND RHONDA HUGHES; JEFF LAWRENCE; TINA McCRAW; BRUCE MEEKER AND DEBORAH MEEKER; MATT ROGERS AND JULIE ROGERS; DAVID SAMS; CYNTHIA SEMENOFF; BRIAN STARR AND DEBRA STARR; JEFFREY STEELE; NICOLE STEELE; LAURA STEELE; LEN TURNER  AND JAN TURNER; IRVIN URBANSKI AND YOLANDA URBANSKI; KATHY URY; MARK VAN BUHLER; BOB WINGER AND NANCY WINGER; JAMES WONG; CHARLIN YEN,**<br><br>          **Plaintiffs,** | **CASE NO.: C 08-03535 RMW**<br><br>**FOURTH AMENDED COMPLAINT INCLUDING ALTER EGO ALLEGATIONS AND COUNTS  FOR VIOLATION OF SECTION 10B AND RULE 10B-5 OF THE SECURITIES EXCHANGE ACT OF 1934; VIOLATION OF SECTION 12(A) OF THE SECURITIES ACT OF 1933; BREACH OF FIDUCIARY DUTY; BREACH OF CONTRACT; FRAUD (Misrepresentation and Concealment);  CONSPIRACY; CONSTRUCTIVE FRAUD; AND ACCOUNTING**<br><br>**Judge:**        **Hon. Ronald M. Whyte**<br>**Courtroom:**    **6 (4th Floor)**<br><br>**Case Filed:**    **July 23, 2008**<br><br>**Trial Date:**    **None**<br><br>**JURY TRIAL DEMANDED** |

1  | v.

2  | **RONALD BUCHHOLZ; CHARICE**

3  | **FISCHER, formerly known and a.k.a.,**
   | **Charice Buchholz; SOLOMON CAPITAL,**

4  | **LLC, a Nevada limited liability company;**
   | **SOLOMON CAPITAL, INC., a Nevada**

5  | **corporation; RNC HOLDINGS, LLC, a**
   | **Nevada limited liability company; LUXURY**

6  | **DEVELOPMENT FUND, LLC, a Delaware**
   | **limited liability company; EQUITY**

7  | **ENTERPRISES, INC., a California**
   | **corporation; EQUITY ENTERPRISES-**

8  | **NEVADA, INC., a Nevada corporation;**
   | **EQUITY ENTERPRISE MANAGEMENT,**

9  | **INC.; ALABANZA, INC., formerly a**
   | **California corporation; JONATHON**

10 | **VENTO; GRACE CAPITAL, LLC dba**
   | **GRACE COMMUNITIES, an Arizona limited**

11 | **liability company; DONALD ZELEZNAK;**
   | **ZELEZNAK PROPERTY MANAGEMENT,**

12 | **LLC dba KELLER WILLIAMS REALTY, an**
   | **Arizona limited liability company; Z LOFTS,**

13 | **LLC, an Arizona limited liability company;**
   | **PASTOR WILLIAM E. BUCHHOLZ;**

14 | **FAMILY COMMUNITY CHURCH, a**
   | **California corporate entity; RDB**

15 | **DEVELOPMENT, LLC, a Nevada limited**
   | **liability company; ZELTOR, LLC, a Nevada**

16 | **limited liability company; VENTO**
   | **INVESTMENTS, LLC, an Arizona limited**

17 | **liability company; VENTO FAMILY TRUST,**
   | **inclusive,**

18 | **Defendants.**

19 |

20 | Plaintiffs YU-SZE YEN; CLARICE ARNE; MIKE BAKER; JUAN BETTAGLIO AND

21 | BRENDA BETTAGLIO, INDIVIDUALLY AND AS TRUSTEES OF THE BETTAGLIO

22 | FAMILY TRUST; MIKE BROGDON AND RENEE BROGDON, INDIVIDUALLY AND AS

23 | TRUSTEES OF THE BROGDON FAMILY TRUST; DIANNE BRYSON; JAMES BRYSON;

24 | WAYNE CANTO AND CANDISE CANTO; FRANK CARBAJAL AND MEGAN

25 | CARBAJAL; KWEI CHOONG; JASON COLYAR; JIM COATES; JKAT PROPERTIES, LLC,

26 | a California limited liability company; MARK DELMAN AND KATHLEEN DELMAN;

27 | TIMOTHY GALE AND LORI GALE; ERIC GOLD; JACK GREER AND DIANE GREER;

28 | JERRY HUGHES AND RHONDA HUGHES; JEFF LAWRENCE; TINA McCRAW; BRUCE

---

1  MEEKER AND DEBORAH MEEKER; MATT ROGERS AND JULIE ROGERS; DAVID

2  SAMS; CYNTHIA SEMENOFF; BRIAN STARR AND DEBRA STARR; JEFFREY STEELE;

3  NICOLE STEELE; LAURA STEELE; LEN TURNER AND JAN TURNER; IRVIN

4  URBANSKI AND YOLANDA URBANSKI; KATHY URY; MARK VAN BUHLER; BOB

5  WINGER AND NANCY WINGER (individually and as trustees of the Robert Winger and

6  Nancy Winger Inter Vivos Trust); JAMES WONG; CHARLIN YEN; by and through their

7  attorneys, and submit their Complaint against Defendants RONALD BUCHHOLZ; CHARICE

8  FISCHER, formerly known and a.k.a., Charice Buchholz; SOLOMON CAPITAL, LLC, a

9  Nevada limited liability company; RNC HOLDINGS, LLC a Nevada limited liability company;

10  LUXURY DEVELOPMENT FUND, LLC, a Delaware limited liability company; EQUITY

11  ENTERPRISES, INC., a California corporation; EQUITY ENTERPRISES-NEVADA, INC., a

12  Nevada corporation; EQUITY ENTERPRISE MANAGEMENT, INC.; ALABANZA, INC.,

13  formerly a California corporation; JONATHON VENTO; GRACE CAPITAL, LLC, also dba

14  GRACE COMMUNITIES, an Arizona limited liability company; DONALD ZELEZNAK;

15  ZELEZNAK PROPERTY MANAGEMENT, LLC dba KELLER WILLIAMS REALTY, an

16  Arizona limited liability company; Z LOFTS, LLC, an Arizona limited liability company;

17  PASTOR WILLIAM E. BUCHHOLZ; FAMILY COMMUNITY CHURCH, a California

18  corporate entity; RDB DEVELOPMENT, LLC, a Nevada limited liability company; ZELTOR,

19  LLC, a Nevada limited liability company; VENTO INVESTMENTS, LLC, an Arizona limited

20  liability company; VENTO FAMILY TRUST; and DOES 1-100, inclusive, allege as follows.

21  **I.      INTRODUCTION AND OVERVIEW OF THE ACTION**.

22  1.      This is a civil action alleging multiple counts including violations of Section 10b and

23  Rule 10b-5 of the Securities Exchange Act of 1934 (17 C.F.R. § 240.10b-5) ("Rule 10b-5"), and

24  Section 12(a) of the Securities Act of 1933 (15 U.S.C. § 771(a)) ("Section 12(a)").

25  2.      Plaintiffs allege losses arising from real estate investments that included membership

26  interests in limited liability companies and promissory notes issued by investment funds that

27  involved multiple projects in four states over a period of years.

28  3.      Culpable activities included, but were not limited to misrepresentations and omissions as

to land costs and diversion of money related thereto; misrepresentations and omissions as to expenses and fees for services never rendered; misrepresentations and omissions as to status and conditions of purported development; under-capitalized projects and entities; cross collateralized projects and properties so as to dilute, if not destroy value; properties intentionally over-leveraged for the purpose of diversion of funds for personal gain and without the intention of using the funds as represented; taking extraordinary and unconscionable fees for services never performed and without intention of ever performing services; and taking extraordinary and unconscionable fees and/or commissions for services never rendered.

## II.   JURISDICTION AND VENUE

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, federal question jurisdiction, based on inclusion of claims arising out of Section 10b and Rule 10b-5 of the Securities Exchange Act of 1934 (17 C.F.R. § 240.10b-5) ("Rule 10b-5"); Section 12(a) of the Securities Act of 1933 (15 U.S.C. § 771(a)) ("Section 12(a)").

5.      This Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367 because the parties, events, occurrences, and transactions are so intertwined as to form a part of the same case and controversy.

6.      Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1965(a) because multiple Defendants (e.g., RONALD BUCHHOLZ and CHARICE FISCHER and entities controlled by them) transact and transacted affairs and committed many of the acts complained of in this District, directed at multiple Plaintiffs residing in this District, in Santa Clara County.

7.      The Court has personal jurisdiction over Defendants RONALD BUCHHOLZ and CHARICE FISCHER because RONALD BUCHHOLZ and CHARICE FISCHER own property in the State of California; several of the companies they manage, including, but not limited to RDB DEVELOPMENT, SOLOMON CAPITAL, and EQUITY ENTERPRISES, INC., did list and/or still list as principal business addresses in this District; and committed many of the acts complained of in Santa Clara County.

8.      This Court has jurisdiction over Defendants SOLOMON CAPITAL, LLC, and

1  SOLOMON CAPITAL, INC., because they maintained offices and/or places of business,

2  regularly conducted business, and otherwise committed many of the acts complained of in Santa

3  Clara County, California.

4  9.      This Court has jurisdiction over Defendants  RNC HOLDINGS, LLC; LUXURY

5  DEVELOPMENT FUND, LLC; EQUITY ENTERPRISES, INC.; EQUITY

6  ENTERPRISES-NEVADA, INC.; EQUITY ENTERPRISE MANAGEMENT, INC.; and

7  ALABANZA, INC., because they because they maintained offices and/or places of business,

8  regularly conducted business, and otherwise committed many of the acts complained of in Santa

9  Clara County, California.

10  10.      This Court has jurisdiction over Defendants JONATHON VENTO; GRACE

11  CAPITAL, LLC, dba GRACE COMMUNITIES; DONALD ZELEZNAK; Z LOFTS, LLC;

12  ZELEZNAK PROPERTY MANAGEMENT, LLC and also dba KELLER WILLIAMS

13  REALTY; ZELTOR, LLC, VENTO INVESTMENTS, LLC, and the VENTO FAMILY TRUST

14  (sometimes collectively and hereafter referred to as "GRACE DEFENDANTS") because they

15  conducted business in the State of California, and purposefully directed the activities complained

16  of herein toward residents of California and otherwise established contacts with California in

17  participating in and otherwise engaging in the acts complained of herein including, but not

18  necessarily limited to:

19          a.      Creating and providing written and material information knowing that the

20                  information would be used to solicit investors in California such as Plaintiffs;

21          b.      As further described below on June 8, 2005, Defendant DONALD ZELEZNAK

22                  appeared at Solomon Capital's offices in Santa Clara County and spoke at length

23                  and in detail to potential investors as part of the event at which the Luxury

24                  Development Fund Note Program Confidential Private Offering Memorandum was

25                  distributed and which contained material information provided by one or more

26                  GRACE DEFENDANTS, including representations that investor funds were

27                  intended for use in other projects of one or more of the GRACE DEFENDANTS,

28                  and specifically spoke on behalf of himself, JONATHAN VENTO, GRACE

---

1    CAPITAL, and their affiliates;

2    c.    Defendant DONALD ZELEZNAK owns real property interests in California (six

3          time share properties in Southern California), has made public appearances in

4          California purportedly speaking as an expert as to how people can use self-directed

5          IRA funds to invest in promissory notes/real estate and did in the context of

6          touting his experience as a principal of GRACE COMMUNITIES, and has

7          solicited investment from members of the public in California by advertising

8          opportunities to invest in a variety of projects including cash flow programs that

9          can pay between 12%-25% annual returns and did so in California;

10   d.    Defendant JONATHAN VENTO has used California addresses (20 Great Oaks,

11         San Jose, California 95119 (the same address used by SOLOMON CAPITAL) and

12         1529 Tanglewood Drive, Corona, California 92882 which was used from

13         December of 1989 until June of 2006 when sold), the address of 1529 Tanglewood

14         Drive, Corona, California 92882 was also used as the business address of

15         QCorporation with which JONATHAN VENTO did business;

16   e.    On the basis of California State Tax Liens levied against him (Case No.

17         9703250265 dated February 9, 1996 and Case No. 961209847 dated December 9,

18         1996), Plaintiffs are informed and believe that Defendant JONATHAN VENTO,

19         has done business in California;

20   f.    JONATHAN VENTO owned a home in Southern California from December 1989

21         to June 2006;

22   g.    JONATHAN VENTO has worked for several companies either based in or with

23         offices in California, and has numerous business contacts in California;

24   h.    In September 2004, JONATHAN VENTO filled out at least one credit application

25         using the following address: 20 Grant Oak Rd., San Jose, CA [sic] (an address

26         believed to have been intended as "20 Great Oaks" and within the forum and a

27         principal place of business of Solomon Capital during the time of some of the acts

28         complained of herein;

---

**CASE NO.: C 08-03535 RMW          FOURTH AMENDED COMPLAINT          Page 6 of 164**

i.      Both GRACE COMMUNITIES and ZELEZNAK PROPERTY MANAGEMENT
have interactive web sites, which encourage and allow users, including California
residents, to communicate with them;

j.      The press area of GRACE COMMUNITIES' website includes several articles and
advertisements in widely-distributed publications touting their properties to
California residents, some of these articles discussing the 44 Monroe project, the
Portales Place project, X Lofts, and other projects presented to potential investors
in California.

## III.   PARTIES

### A.    Plaintiffs

11.   Plaintiff, Yu-Sze Yen, is an individual residing in Santa Clara County, California,
who:

a.      During or about January 2004 on the basis of representations made regarding a
project generally known as St. Charles (in or near Chicago, Illinois) and otherwise
referred to in documents generated by Equity Enterprises, Inc., as "Dunham
Professional Plaza" and referred to in documents generated by one or more
SOLOMON CAPITAL entities as "The Courtyards of St. Charles" and via a self-
directed IRA, caused to be delivered the sum of $50,000 for a membership interest
in EENI - ST. CHARLES OFFICE INVESTORS, LLC, now known to have been
a Nevada limited liability company formed on January 8, 2004 and now having
been dissolved;

b.      Based on representations made regarding a project generally referred to as "Red
Mountain Professional Plaza" purportedly located on Gilbert Road in Mesa,
Arizona, and pursuant to a subscription agreement and other documents initiated
by Equity Enterprises, Inc., delivered the sum of $100,000 by personal check dated
November 16, 2003 payable to "Equity Enterprises" which should have resulted in
a membership interest in EENI-GILBERT OFFICE INVESTORS, LLC, a Nevada
limited liability company, funds utilizing an IRA of which she is beneficiary for

1    investment in the project generally known as Gilbert Office and Red Mountain

2    (Arizona) and, after distribution(s) (the last being in October 2008 in the amount

3    of $16,551) has a net loss of investment in the sum of or approximate sum of

4    $46,293, the balance of which is now being carried in an IRA;

5    c.    On the basis of reasonable reliance on representations made pursuant to the Luxury

6          Development Fund Note Program and Confidential Private Offering

7          Memorandum, during August 2005 began delivering funds and eventually and

8          effectively delivered a net total of $200,000 to LUXURY DEVELOPMENT

9          FUND, that net total now effectively being within the ambit of an IRA maintained

10         for her benefit, and for which she was to receive an interest bearing and secured

11         promissory note; and

12   d.    During or about March 2007 and based on representations made regarding a

13         venture generally referred to as "Erie Land Fund" and documents initiated by

14         SOLOMON CAPITAL, INC., pertaining to a purported project in Colorado

15         (generally and initially referred to as the "Erie project" and later the "Sierra Vista

16         Project"), delivered $100,000 for which she eventually received a secured

17         promissory note bearing interest at the rate of 10 percent for which the security

18         was further evidenced by a security agreement and deed of trust in the sum of

19         $100,000 on which the maker was Erie Land Fund, LLC, a Colorado limited

20         liability company, and was due and payable in full on or about March 9, 2009.

21   12.  Plaintiff, Clarice Arne, is an individual residing in Santa Clara County, California,

22   who, using personal cash, IRA funds, and by rollover of prior investment delivered to LUXURY

23   DEVELOPMENT FUND, LLC:

24   a.    Caused to be delivered $65,300 by a check issued by Pensco Trust Company dated

25         November 3, 2005 payable to Luxury Development Fund, LLC;

26   b.    Caused to be delivered $9,000 by a check issued by Pensco Trust Company dated

27         November 3, 2005 payable to Luxury Development Fund, LLC; and

28   c.    Pursuant to a written agreement authorized application and delivery of $40,000

---

**CASE NO.: C 08-03535 RMW      FOURTH AMENDED COMPLAINT**      Page 8 of 164

1  comprised of what would have been a purported distribution by "Equity

2  Enterprises" related to a purported membership interest in EENI-Paseo Village,

3  LLC; for which she received three secured promissory notes from LUXURY

4  DEVELOPMENT FUND, LLC, all dated November 2, 2005, one in the sum of

5  $40,000, one in the sum of $65,300, and one in the sum of $9,000, all signed on

6  behalf of  LUXURY DEVELOPMENT FUND, LLC, by Charice Buchholz as

7  manager and all bearing interest at the rate of 18 percent per annum. All of the

8  notes were due no later than November 2, 2008 and no payment has been made or

9  tendered thereon. This suit is intended as demand for payment and notice of

10  breach.

11  13.   Plaintiff, Mike Baker, is an individual residing in Santa Clara County, California,

12  who:

13      a.   Delivered the total sum of $165,392.10 to LUXURY DEVELOPMENT FUND by

14           a personal check dated June 14, 2005 in the sum of $25,000 payable to  "Solomon

15           Capital Trust Account" and a personal check dated November 4 [sic] in the sum of

16           $132,392.10 payable to "Luxury Development" and   a personal check dated

17           November 1, 2005 in the sum of $8,000 payable to "Luxury Development Fund"

18           and received secured promissory notes from LUXURY DEVELOPMENT FUND,

19           LLC, one dated June 21, 2005 in the sum of $25,000 bearing interest at the rate of

20           16 percent per annum, and one dated November 2, 2005 in the sum of $140,392.10

21           bearing interest at the rate of 18 percent per annum, all signed on behalf of

22           LUXURY DEVELOPMENT FUND, LLC, by Charice Buchholz as manager. The

23           notes are past due, no payment has been made or tendered thereon. This suit is

24           intended as demand for payment and notice of breach.

25      b.   Delivered the sum of $49,542.39 (by two personal checks, one in the sum of

26           $40,000 and the other in the sum of $9,542.39, both dated September 25, 2006 and

27           both payable to "Chicago Condo Fund, LLC c/o Solomon Capital Inc., intended

28           for CHICAGO CONDO FUND, LLC,  and received a secured promissory note

---

**CASE NO.: C 08-03535 RMW        FOURTH AMENDED COMPLAINT**        Page 9 of  164

1  from CHICAGO CONDO FUND, LLC, dated October 20, 2006 in the sum of

2  $49,542.39 bearing interest at the rate of 14 percent per annum, signed on behalf

3  of  CHICAGO CONDO FUND, LLC, a Delaware limited liability company, by

4  Charice Buchholz as manager. The note is past due and this suit is intended as

5  demand for payment and notice of breach. Pursuant to instructions for payment by

6  wire transfer and issued by CHICAGO CONDO FUND, LLC, c/o SOLOMON

7  CAPITAL, INC., funds were to be wired to Union National Bank in Elgin, Illinois,

8  to the account of "OC Investors, LLC, 20 Great Oaks Blvd., Suite 230, San Jose,

9  CA 95119, Account Number 841320.

10  14.   Plaintiffs, Juan and Brenda Bettaglio, are individuals residing in Santa Clara

11  County, California, and are the trustees of the Bettaglio Family Trust, who delivered and/or

12  caused to be delivered:

13       a.    A total of $600,000 ($400,000 from Juan and Brenda Bettaglio, and $200,000

14             from their silent partners, Brian and Debra Starr) to OC INVESTORS, LLC, by a

15             check dated April 13, 2005 in the sum of $200,000 payable to OC Investors, LLC"

16             and check dated April 13, 2005 in the sum of $50,000 payable to OC Investors,

17             LLC" and a check dated March 29, 2005 in the sum of $100,000 payable to

18             "Solomon Capital Trust" on which the memo line noted "OC Investors, LLC, and

19             the sum of $250,000 by wire transfer from an E-Trade account on or about April

20             14, 2005 to the Bank of America Illinois for credit to Chicago Title and Trust

21             Company, S.W., Account Number 8765-9-60515, Escrow Number 25029647, for

22             which they received documents indicating a membership interest in OC

23             INVESTORS, LLC, and a capital contribution of $600,000 and a purported

24             membership interest of 9.04%;

25       b.    $65,000 to LUXURY DEVELOPMENT FUND, LLC, utilizing the funds of an

26             IRA of which Juan Bettaglio is the beneficiary and for which was received a

27             secured promissory note dated July 14, 2005 in the sum of $65,000 bearing interest

28             at 16 percent per annum, signed on behalf of  LUXURY DEVELOPMENT

FUND, LLC, by Charice Buchholz as manager, the note being past due, no
payment made or tendered thereon and this suit is intended as demand for payment
and notice of breach; and

c.    $200,000 to SOLOMON TOWERS, LLC, by a check dated March 10, 2005 in the
sum of $200,000 issued by Pensco Trust Company payable to Solomon Towers,
LLC, drawn on an account that existed for benefit of Juan Bettaglio and for which
documents were received indicating a membership interest in the name of Juan
Bettaglio as Trustee for the Bettaglio Family Trust in SOLOMON TOWERS,
LLC, a Nevada limited liability company, those documents failing to specify the
purported membership interest.

15.    Plaintiffs, Mike and Renee Brogdon, are  individuals residing in Santa Clara County,
California, who, in part being materially influenced by the urging and statements of WILLIAM
E. BUCHHOLZ and the position of trust and confidence existing as a result of involvement with
the FAMILY COMMUNITY CHURCH, and who were not qualified investors, a fact known on
the basis of multiple Investor Representations forms completed and returned by them, delivered:

a.    A total of $100,000 intended for investment in COLORADO CONDOS FUND,
LLC pursuant to a check dated April 26, 2006 in the sum of $20,000 payable to
"Colorado Condos Fund, LLC", and a check dated April 26, 2006 in the sum of
$46,500 payable to "Colorado Condos Fund, LLC, and  a check issued by Pensco
Trust Company on an account maintained for the benefit of Mike Brogdon dated
April 27, 2006 in the sum of $14,000 payable to "Colorado Condos Fund, LLC,
and a check issued by Pensco Trust Company on an account maintained for the
benefit  of Renee Brogdon dated April 27, 2006 in the sum of $19,500 payable to
"Colorado Condos Fund, LLC, for which a secured promissory note was received,
dated April 25, 2006 in the sum of $66,500 bearing interest at the rate of 18
percent payable to the "Brogdon Family Trust" and executed by CHARICE
BUCHHOLZ as the manager for Colorado Condos Fund, LLC, and a secured
promissory note dated April 25, 2006 in the sum of $14,000 bearing interest at the

1    rate of 18 percent payable to the "Pensco Trust Company FBO Michael S.

2    Brogdon IRA #BR382" and executed by CHARICE BUCHHOLZ as the manager

3    for Colorado Condos Fund, LLC, and a secured promissory note dated April 25,

4    2006 in the sum of $19,500 bearing interest at the rate of 18 percent payable to the

5    "Pensco Trust Company FBO Karen Renee Brogdon IRA #BR383" and executed

6    by CHARICE BUCHHOLZ as the manager for Colorado Condos Fund, LLC;

7    b.    A total of $75,000 intended for investment related to EENI-Patriot Courtyards,

8          LLC by check dated June 4, 2004 in the sum of $75,000 payable to "Equity

9          Enterprises" for which documents were received indicating an unspecified

10         membership interest in the name of "The Brogdon Family Trust, and for which

11         The Brogdon Family Trust after receiving distributions of $19,737 and $37,500,

12         has resulted in a net loss of investment in the sum of $17,763;

13   c.    A total of $75,000 intended for investment in  EEI-Wailea Town Center, LLC, by

14         check dated August 17, 2003 in the sum of $75,000 payable to "Equity

15         Enterprises" and for which they received documents indicating an unspecified

16         membership interest in EEI-Wailea Town Center, LLC, and after receipt of

17         distributions totaling $47,776.52 (two distributions of $22,342.75 and $25,433.77)

18         have a net loss of investment in the amount of $27,223.48 as to this entity and

19         project; and

20   d.    Based on representations made regarding a project generally referred to as "Red

21         Mountain Professional Plaza" purportedly located on Gilbert Road in Mesa,

22         Arizona, and pursuant to a subscription agreement and other documents initiated

23         by Equity Enterprises, Inc., delivered a total of $50,075.67 by personal check dated

24         November 24, 2003 in the sum of $7,340.67 payable to "Equity Enterprises" plus

25         $42,735  rolled over from an investment related to an entity or project  known as

26         EENI-Longview, LLC, which should have resulted in a membership interest in

27         EENI-GILBERT OFFICE INVESTORS, LLC, a Nevada limited liability

28         company, funds utilizing an IRA of which she is beneficiary for investment in the

project generally known as Gilbert Office and Red Mountain (Arizona) and, after distributions has a net loss of investment in the sum of or approximate sum of $23,182, the balance of which is now being carried in an IRA.

16.    Plaintiff, Dianne Bryson, is an individual residing in Santa Clara County, California, and who was not a qualified investor, and who:

a.    Caused to be delivered $34,853, via wire transfer during or about April 2006, from an account held for her benefit by Pensco Trust Company to Daystream  Cherry Creek, LLC, Wells Fargo Account #27961229536, routing number 121000248, 10260 South De Anza Blvd., Cupertino, CA 95014;

b.    Based on representations included in a Confidential Private Placement Memorandum, but were not limited to, that Daystream Deer Creek, LLC, was a Nevada limited liability company formed for the purpose of investing in Courtyards at Deer Creek, LLC, a Colorado limited liability company, that Courtyards at Deer Creek, LLC, was the entity involved in the purchase and development of office condominiums on 5.25 acres of vacant land in Jefferson County, Colorado, and that Daystream Deer Creek, LLC, would acquire a 52.63% interest in Courtyards at Deer Creek, LLC, for $1,000,000, caused to be delivered the sum of $34,800 for which she received a promissory note dated April 25, 2006 in the principal sum of and bearing interest at the rate of 18 percent payable to the order of Dianne Bryson, Pensco ID# BR1AU on which the maker was stated to be "Daystream Cherry Creek, LLC, and executed by Jan Edbrooke as the manager of Daystream Cherry Creek, LLC; and

c.    For which this suit is intended as demand for payment and notice of breach.

17.    Plaintiff, James Bryson, is an individual residing in Santa Clara County, California, who, based on the questionnaire completed and provided by him, was not a qualified investor and who, in part being materially influenced by the urging and statements of WILLIAM E. BUCHHOLZ and the position of trust and confidence existing as a result of involvement with the FAMILY COMMUNITY CHURCH,  delivered the sum of $200,000 by two checks both

1   dated May 5, 2003, both payable to "Equity Enterprises" and both noting "Ray Ranch" in the

2   memo lines utilizing funds of a trust (the James David Bryson Family Trust dated August 14,

3   2000), for which he received documents an unspecified membership interest in EEI-Ray Ranch,

4   LLC, an Arizona limited liability company, in the name of James Davis Bryson, as Trustee of the

5   James Davis Bryson Family Trust dated August 14, 2000, for the benefit of James Davis Bryson

6   as his sole and separate property, and who, after several distributions and reinvestment, has a net

7   loss of investment in the sum of or approximate sum of $44,133 for investment in the project

8   generally referred to as Ray Ranch (Arizona), and who eventually received subsequent

9   documentation indicating a membership interest of 5.05%.

10   18.    Plaintiffs, Wayne and Candise Canto, are individuals residing in Santa Clara

11   County, California, who were not qualified investors and who, in part being materially

12   influenced by the urging and statements of WILLIAM E. BUCHHOLZ and the position of trust

13   and confidence existing as a result of involvement with the FAMILY COMMUNITY

14   CHURCH:

15         a.    Delivered a total of $100,000 intended for investment in  EEI-Wailea Town

16               Center, LLC, by check dated August 26, 2003 in the sum of $100,000 payable to

17               "Equity Enterprise" on which the memo line stated "Hawaii Pool" and for which

18               they received documents indicating an unspecified membership interest in EEI-

19               Wailea Town Center, LLC, and in the name of "The Canto 2002 Trust" after

20               which they subsequently received K-1s indicating an interest of 5.5555556% and

21               after receipt of distributions totaling $63,702.02 (distributions of $29,790.33,

22               $33,911.69) have a net loss of investment in the amount of $36,297.98 as to this

23               entity and project;

24         b.    On the basis of documents disseminated by EQUITY ENTERPRISES, INC.,

25               caused to be delivered the sum of $75,000 by check dated September 23, 2003

26               payable to "Equity Enterprises" and delivered to Charice Buchholz what was

27               represented as being for an membership interest in EENI-MESA POINT, LLC, an

28               Arizona limited liability company, for which EQUITY ENTERPRISES-

---

**CASE NO.: C 08-03535 RMW      FOURTH AMENDED COMPLAINT         Page 14 of  164**

1   NEVADA, INC., a Nevada corporation was represented as the manager, and for

2   which they received documents indicating an unspecified membership interest in

3   EENI-MESA POINT, LLC, an Arizona limited liability company, in the name of

4   "The Canto 2002 Trust" (Candise Canto, Trustee), subsequent to which they

5   received a IRS Form 1065 (Schedule K-1) for tax year 2004 indicating a

6   6.2493010% interest, subsequent to which and during or about November 2005

7   they were presented and executed a "Transfer Agreement" whereby their

8   membership interest was purchased by EENI-MESA POINT, LLC,  a Nevada

9   limited liability company, in exchange for a promissory note dated November 1,

10  2005 in the principal sum of $75,000 bearing interest at the rate of 15 percent per

11  annum with the payor stated as being EENI-MESA POINT, LLC, a Nevada

12  limited liability company, the holder being stated as being "Canto 2002 Trust" and

13  with a due date of September 30, 2008, and for which this suit is intended as

14  demand for payment and notice of breach;

15  c.   On the basis of documents disseminated by EQUITY ENTERPRISES, INC.,

16       regarding a project generally referred to as "Ray Ranch" and "Ray Ranch

17       Professional Plaza" caused to be delivered the sum of $100,000 by personal check

18       dated May 19, 2003 in the sum of $100,000 payable to "Equity Enterprises, Inc.,"

19       on which the memo line read "Ray Ranch" and for which they received documents

20       indicating an unspecified membership interest in EEI-Ray Ranch, LLC, an Arizona

21       limited liability company in the name of "The Canto 2002 Trust" and later

22       received K-1s indicating a membership interest of 5.055 percent based on capital

23       interest and after receiving distributions totaling $77,933.65 (three of $49,000,

24       $13,000, and $15,933.65) have a net loss on the investment of $22,066.35.

25  19.   Plaintiffs, Frank Carbajal and Megan Carbajal, are individuals residing in San

26  Joaquin County, California, were not qualified investors, and in part being materially influenced

27  by the urging and statements of WILLIAM E. BUCHHOLZ and the position of trust and

28  confidence existing as a result of involvement with the FAMILY COMMUNITY CHURCH,

---

**CASE NO.: C 08-03535 RMW       FOURTH AMENDED COMPLAINT       Page 15 of  164**

1  during or about September 2005 delivered $92,000 for investment in OC INVESTORS, LLC,

2  did so using funds obtained by refinancing their  home, and after receiving a distribution of

3  $10,000 have a net loss of investment of $82,000.

4  20.    Plaintiff, Kwei Choong, is an individual residing in Santa Clara County,

5  California, who in part being materially influenced by the urging and statements of WILLIAM

6  E. BUCHHOLZ and the position of trust and confidence existing as a result of involvement with

7  the FAMILY COMMUNITY CHURCH:

8          a.    Delivered the sum of $50,000 by cashier's check dated October 27, 2005 payable

9                to LUXURY DEVELOPMENT FUND, LLC, for which she received a secured

10               promissory note dated November 2, 2005 in the sum of $50,000 bearing interest at

11               16 percent per annum and related security agreement, both issued by and signed on

12               behalf of  LUXURY DEVELOPMENT FUND, LLC, by Charice Buchholz as

13               manager, the note being are past due, no payment made or tendered thereon and

14               this suit is intended as demand for payment and notice of breach; and

15         b.    On or about April 25, 2006 caused to be delivered via an IRA the sum of $74,134

16               for investment in the Colorado Condo Fund for which she received a secured

17               promissory note dated April 25, 2006 in the sum of $74,134 bearing interest at 18

18               percent per annum and related security agreement, both issued by signed on behalf

19               of COLORADO CONDOS FUND, LLC, a Delaware limited liability company, by

20               Charice Buchholz as manager; and

21         c.    On or about April 25, 2006 caused to be delivered by wire transfer to "SOLOMON

22               CAPITAL TRUST ACCOUNT" personal funds in the sum of $26,000 for

23               investment in the Colorado Condo Fund for which she received a secured

24               promissory note dated April 25, 2006 in the sum of $26,000 bearing interest at 18

25               percent per annum and related security agreement, both issued by signed on behalf

26               of COLORADO CONDOS FUND, LLC, a Delaware limited liability company, by

27               Charice Buchholz as manager.

28  21.    Plaintiff, Jason Colyar, is an individual residing in Santa Clara County, California,

CASE NO.: C 08-03535 RMW        FOURTH AMENDED COMPLAINT            Page 16 of  164

who on or about December 7, 2005 delivered $50,000 for investment in Luxury Development

Fund and did so in part being materially influenced by the urging and statements of WILLIAM

E. BUCHHOLZ and the position of trust and confidence existing as a result of involvement with

the FAMILY COMMUNITY CHURCH.

22.     Plaintiff, Jim Coates, is an individual residing in Santa Clara County, California.

Plaintiff, JKAT Properties, LLC, is a California limited liability company, of which Plaintiff,

Jim Coates is a manager, and which:

      a.     During March and April 2005 delivered series of checks drawn on the account of

           JKAT Properties (one of which was made payable to "Solomon Capital Trust" for

           the sum of $225,000) of which the total sum of was $975,000 for which was

           received documents indicating a membership interest in OC INVESTORS, LLC,

           and a capital contribution of $1,000,000 and a purported interest of 15.06 percent

           and with the Counterpart Signature Page signed by Jim Coates as the Manager of

           JKAT Properties;

      b.     Caused to be delivered a check dated February 25, 2005 drawn on the account of

           JKAT Properties in the sum of $250,000 payable to "Solomon Capital Trust" and

           intended for investment in the project generally known as Solomon Towers and for

           which he received documents indicating an unspecified membership interest in

           SOLOMON TOWERS, LLC, a Nevada limited liability company initially taken in

           the name of JKAT Properties, LLC; and

      c.     For which actual application of funds and interests has not been fully and

           accurately reported leaving these plaintiffs uncertain as how the respective entities

           and defendants actually applied and accounted for funds as between JKAT

           Properties and Jim Coates personally.

23.     Plaintiffs, Mark and Kathleen Delman, are  individuals residing in Santa Clara

County, California, who were not qualified investors, who delivered the sum of $50,000 for

investment in the LUXURY DEVELOPMENT FUND based on representations that the fund

would pursue a project or projects in Arizona, and delivered the funds by Official Check of US

1   Bank dated June 29, 2005 in the sum of $50,000 payable to "LUXURY DEVELOPMENT

2   FUND TRUST ACCOUNT" and did so in part being materially influenced by the urging and

3   statements of WILLIAM E. BUCHHOLZ and the position of trust and confidence existing as a

4   result of involvement with the FAMILY COMMUNITY CHURCH, for which they received a

5   secured promissory note dated June 29, 2005 in the sum of $50,000 bearing interest at 16 percent

6   per annum and related security agreement, both issued by and signed on behalf of  LUXURY

7   DEVELOPMENT FUND, LLC, by Charice Buchholz as manager, the note being are past due,

8   and except for interest of $657.53 received during 2005 no payment made or tendered thereon

9   and this suit is intended as demand for payment and notice of breach.

10  24.    Plaintiffs, Timothy and Lori Gale, are individuals residing in Santa Clara County,

11  California, for whom defendants failed to obtain information as to whether or not they were

12  qualified investors, who:

13          a.    Caused to be delivered the total sum of $200,000 for investment in the Luxury

14                Development Fund based on representations the fund would pursue specific

15                activities in Arizona utilizing $92,000 from an IRA of which Timothy Gale is

16                beneficiary and $108,000 from an IRA of which Lori Gale is beneficiary, for

17                which they received two secured promissory notes, both dated November 2, 2005,

18                one in the principal sum of $92,000 bearing interest at 20 percent per annum and

19                one  in the principal sum of $108,000 bearing interest at 20 percent per annum

20                related security agreements, all issued by and signed on behalf of  LUXURY

21                DEVELOPMENT FUND, LLC, by Charice Buchholz as manager, the notes being

22                are past due, and except for interest of $657.53 received during 2005 no payment

23                made or tendered thereon and this suit is intended as demand for payment and

24                notice of breach; and

25          b.    Caused to be delivered the sum of $100,000 for investment in the Colorado Condo

26                Fund and did so by Cashier's Check issued by Wells Fargo $100,000 dated April

27                24, 2006 payable to "COLORADO CONDOS FUND LLC" utilizing funds of a

28                family trust of which they are trustees for which they received a secured

1    promissory note dated April 25, 2006 in the sum of $100,000 bearing interest at 18

2    percent per annum and related security agreement, both issued by and signed on

3    behalf of COLORADO CONDOS FUND, LLC, a Delaware limited liability

4    company, by Charice Buchholz as manager.

5    25.    Plaintiff, Eric Gold, is an individual residing in Santa Clara County, California,

6    who was not a qualified investor and who, in part being materially influenced by the urging and

7    statements of WILLIAM E. BUCHHOLZ and the position of trust and confidence existing as a

8    result of involvement with the FAMILY COMMUNITY CHURCH,  delivered the sum of

9    $180,000 for investment in the project sometimes known as OC Chicago. Plaintiff, Eric Gold

10    delivered the sum of $180,000 for investment in the Colorado Condo Fund and did so by

11    Cashier's Check issued by Wells Fargo $180,000 dated July 7, 2005 payable to "OC

12    INVESTORS LLC" utilizing funds of a family trust and for which he should have received, but

13    has yet to locate any record of receiving, a secured promissory note issued by OC INVESTORS,

14    LLC, or a membership interest therein. Plaintiff, Eric Gold, was able to raise the $180,000 by

15    refinancing his home which he did so as a result of suggestion and encouragement by one or

16    more individual defendants.

17    26.    Plaintiffs, Jack and Diane Greer, are  individuals residing in Santa Clara County,

18    California, who:

19        a.    Caused to be delivered the sum of $50,000 for investment in the project generally

20            known as St. Charles (Chicago), utilizing funds of an IRA of which Jack Greer is

21            the beneficiary, the pertinent check having been issued by Pensco Trust Company

22            dated January 21, 2004 in the sum of $50,000 payable to 'Equity Enterprises" with

23            a notation of "Greater Bay Bank ST CHARLES" for which was received

24            documents indicating a membership interest of 2.06 percent in "EENI-St. Charles

25            Office Investors, LLC," an entity to be formed pursuant to Nevada law and with

26            the intended manager stated as being "Equity Enterprises-Nevada, Inc., a Nevada

27            corporation;

28        b.    Caused to be delivered a total of $50,000 for investment in the project generally

referred to as Scottsdale Lofts (Arizona) of which $20,000 was provided by personal check dated September 17, 2004 payable to "Equity Enterprises Trust Acct" and $30,000 via a self directed IRA maintained at Pensco Trust Company for the Benefit of Diane Greer, all intended for investment in EENI-SCOTTSDALE LOFTS, LLC, for which documents were received indicating an unspecified interest in EENI-SCOTTSDALE LOFTS, LLC, and subsequently received K-1s indicating a 1.3201670% capital interest in the name of "Pensco FBO Diane Greer IRA" and a .880112% interest in the name of "Jack and Diane Greer."

27.    Plaintiffs, Jerry and Rhonda Hughes, are individuals residing in Santa Clara County, California, who, in part being materially influenced by the urging and statements of WILLIAM E. BUCHHOLZ and the position of trust and confidence existing as a result of involvement with the FAMILY COMMUNITY CHURCH,  delivered $50,000 for investment in LUXURY DEVELOPMENT FUND and did so by delivery on or about October 31, 2005 a Wells Fargo Cashier's check in the sum of $16,500 payable to "SOLOMON CAPITAL" and on or about October 31, 2005 delivered a Commonwealth Central Credit Union Cashier's Check in the sum of $33,500 for which they a secured promissory note dated November 2, 2005 in the principal amount of $50,000 issued by LUXURY DEVELOPMENT FUND, LLC, and bearing interest at the rate of 16 percent. The note is past due, and this suit is intended as demand for payment and notice of breach.

28.    Plaintiff, Jeff Lawrence, is an individual residing in Santa Clara County, California, who:

  a. During or about November 2004, delivered $34,000 for investment in the project sometimes known as Scottsdale Lofts aka Osborn Commons aka X - TEN WINE LOFTS for a membership interest in EENI-Scottsdale Lofts, LLC; and

  b. On or about September 26, 2006 delivered $200,000 by a Union Bank Cashier's check dated September 26, 2006 in the sum of $200,000 payable to "COLORADO CONDOS" for investment related to the "Colorado Condos Fund Note Program"

1        disseminated by SOLOMON CAPITAL regarding projects referenced therein as

2        "Courtyards at Deer Creek" and "Courtyards at Cherry Creek" for which  he was

3        to receive a secured promissory note bearing interest of or  abut 18 percent and

4        related security agreement from Colorado Condos Fund, LLC, a Delaware limited

5        liability company.

6  29.    Plaintiff, Tina McCraw, is an individual residing in Santa Clara County, California, who

7  was not a qualified investor who during or about October 2003 caused to be delivered $50,000

8  for investment in the project sometimes referred to as Wailea Town Center and did so via her

9  Pensco IRA, and for which she received documents indicating an unspecified membership

10  interest in EEI-Wailea Town Center, LLC, a California limited liability company and after

11  subsequently received a K-1 indicating a 2.754% capital interest and who after receiving partial

12  returns/distributions ($16,955.85 and $14,895.17) has suffered a lost of principal investment of

13  $18,149.

14  30.    Plaintiffs, Bruce and Deborah Meeker, are  individuals residing in Santa Clara

15  County, California, who were not qualified investors, delivered an/or caused to be delivered the

16  total sum of $200,054, funds raised by refinancing their condominium, for investment in

17  LUXURY DEVELOPMENT FUND, and did so by a personal check dated October 26, 2005 in

18  the sum of $188,100.70 payable to "LUXURY DEVELOPMENT FUND, LLC" and a check

19  from Sterling Trust Company (FBO IRA Account Holders) dated October 20, 2005 in the sum of

20  $6,003.30 payable to "LUXURY DEVELOPMENT FUND" and a check from Sterling Trust

21  Company (FBO IRA Account Holders) dated October 20, 2005 in the sum of $2,975 (check

22  number 461578) payable to "LUXURY DEVELOPMENT FUND" and a check from Sterling

23  Trust Company (FBO IRA Account Holders) dated October 20, 2005 in the sum of $2,975

24  (check number 461579) payable to "LUXURY DEVELOPMENT FUND" for which they

25  received four Secured Promissory Notes all issued by LUXURY DEVELOPMENT FUND,

26  LLC, a Delaware limited liability company and all dated November 2, 2005 and all bearing

27  interest at the rate of 20% per annum, and all signed by Charice Buchholz as manager, one in the

28  principal amount of $2,975 payable to 'Sterling Trust Co. FBO Bruce D. Meeker, IRA Acct ..."

1   and  one in the principal amount of $2,975 payable to 'Sterling Trust Co. FBO Deborah K.

2   Meeker, IRA Acct ..." one in the principal amount of $6,003.30 payable to 'Sterling Trust Co.

3   FBO Bruce D. Meeker, IRA Acct ..." and one in the amount of $188,100.70 payable to "Bruce

4   and Deborah Meeker, all of which are past due and no payments having been made thereon and

5   this lawsuit constituting demand for payment and notice of breach.

6   31.    Plaintiffs, Matt and Julie Rogers, are individuals residing in Contra Costa County,

7   California, who were not qualified investors who during or about October 2004 delivered and/or

8   caused to be delivered the net total sum of $50,000 to "EQUITY ENTERPRISES TRUST

9   ACCOUNT" for investment in the project generally referred to as Scottsdale Lofts aka Osborn

10  Commons for which they received documents indicating an unspecified membership interest in

11  EENI-SCOTTSDALE LOFTS, LLC.

12  32.    Plaintiff, David Sams, is an individual residing in Contra Costa County, California,

13  who in March 2007 caused to be delivered to "ERIE LAND FUND, LLC", the sum of $145,000

14  utilizing funds of an IRA of which he is beneficiary for investment in a project in Erie,

15  Colorado, for which was received a promissory note given by ERIE LAND FUND, LLC, a

16  Colorado limited liability company, by CHARICE FISCHER as manager, in the principal sum of

17  $145,000, bearing simple interest at the rate of ten percent for the life of the note, the stated

18  holder being "IRA Services/First Regional BANK FBO David B. Sams IRA" and the

19  promissory note now being past due this lawsuit intended as demand for payment and notice of

20  breach.

21  33.    Plaintiff, Cynthia Semenoff, is an individual residing in Santa Clara County,

22  California, who:

23         a.    On or about November 20, 2003, delivered $50,000 by personal check dated

24               November 19, 2003 payable to "Equity Enterprises" for investment in a project

25               generally referred to as Gilbert Office aka Red Mountain Professional Plaza on

26               Gilbert Road in Mesa, Arizona for which she received documents indicating an

27               unspecified membership interest in EENI-GILBERT OFFICE INVESTORS, LLC,

28               a Nevada limited liability company, and who after returns (the last being in

1  October 2008 in the amount of $4,138)  has suffered a net loss thereon of $11,573

2  or more;

3  b.  Caused to be  delivered the sum of $25,000 for investment based on a project in

4  Mesa Point, Arizona utilizing funds of an IRA of which she is beneficiary, by a

5  check dated September 15, 2003 issued by Pensco Trust Company for the benefit

6  of an IRA of which Cynthia Semenoff was the beneficiary in the sum of $25,000

7  payable to "Equity Enterprises" for which she received documents indicating an

8  unspecified membership interest in EENI-MESA POINT, LLC, an Arizona limited

9  liability company;

10  c.  During or about October 4, 2006, caused to be delivered funds utilizing funds of

11  an IRA of which she is beneficiary the sum of $35,000 by check dated October 4,

12  2006 issued by Pensco Trust Company and payable to Chicago Condo Fund, LLC,

13  for the project sometimes referred to as Chicago Condo Fund and for which was

14  received a secured promissory note from CHICAGO CONDO FUND, LLC, a

15  Delaware limited liability company, dated October 20, 2006 in the sum of $35,000

16  bearing interest at the rate of 14 percent per annum, payable to Pensco Trust Co.

17  FBO Cynthia J. Semenoff IRA, signed on behalf of  CHICAGO CONDO FUND,

18  LLC,  by Charice Buchholz as manager. The note is past due and this suit is

19  intended as demand for payment and notice of breach; and

20  d.  From July 2005 through October 2005 delivered and caused to be delivered, by

21  checks and transfer of interest/distribution regarding Palomino Gardens, the total

22  sum of $200,100 personally and via IRA(s) of which she is beneficiary,  for

23  investment in the LUXURY DEVELOPMENT FUND for which was received

24  and/or should have been received secured promissory notes from LUXURY

25  DEVELOPMENT FUND, LLC, totaling  $200,100 for which repayment is past

26  due and this suit is intended as demand for payment and notice of breach.

27  34.   Plaintiffs, Brian and Debra Starr, are residents of Santa Clara County who and in

28  combination with their "silent partner" Juan Bettaglio on or about delivered $200,000 for

1  investment in OC Chicago and did so by check dated April 13, 2005 in the sum of $200,000

2  payable to Juan Bettaglio.

3  35.    Plaintiff, Jeffrey Steele, is an individual residing in Santa Clara County, California,

4  who on or about September 29, 2003 caused to be delivered  $24,000 for investment in the

5  project sometimes referred to as Mesa Point and did so via his Pensco IRA and for which was

6  received documents indicating an unspecified membership interest in EENI-MESA POINT,

7  LLC, an Arizona limited liability company.

8  36.    Plaintiff, Nicole Steele,  is an individual residing in Santa Clara County,

9  California, who on or about September 29, 2003 caused to be delivered  $8,000 for investment in

10  the project sometimes referred to as Mesa Point and did so via her Pensco IRA and for which

11  was received documents indicating an unspecified membership interest in EENI-MESA POINT,

12  LLC, an Arizona limited liability company.

13  37.    Plaintiff, Laura Steele, is an individual residing in Santa Clara County, California,

14  who on or about September 29, 2003 caused to be delivered  $8,000 for investment in the project

15  sometimes referred to as Mesa Point and did so via her Pensco IRA and for which was received

16  documents indicating an unspecified membership interest in EENI-MESA POINT, LLC, an

17  Arizona limited liability company.

18  38.    Plaintiffs, Len Turner  and Jan Turner, are individuals residing in Murfreesboro,

19  Tennessee, who:

20          a.    During or about September 2003 caused to delivered $25,000 via an account at

21               Pensco Trust Company for investment in the project sometimes referred to as

22               Mesa Point and did so via his Pensco IRA and for which was received documents

23               indicating an unspecified membership interest in EENI-MESA POINT, LLC, an

24               Arizona limited liability company; and

25          b.    On or about August 14, 2003 caused to be delivered $100,000 via an account at

26               Pensco Trust Company  for investment in the project sometimes referred to as

27               Wailea Town Center for which was received documents indicating an unspecified

28               membership interest in EEI-WAILEA TOWN CENTER, LLC, a California limited

1    liability company and who after receiving returns/distributions have suffered a net

2    loss thereon of $36,298.

3    39.   Plaintiffs, Irvin and Yolanda "Patricia" Urbanski, are individuals residing in Santa Clara

4    County, California, who, in part being materially influenced by the urging and statements of

5    WILLIAM E. BUCHHOLZ and the position of trust and confidence existing as a result of

6    involvement with the FAMILY COMMUNITY CHURCH:

7         a.    During or about October 2005, delivered and caused to be delivered a total of

8               $400,314.79 for investment in the LUXURY DEVELOPMENT FUND of which

9               $194,064.79 was delivered via an IRA account at Pensco Trust Company of which

10              Irvin Urbanski was the beneficiary of a Pensco Trust Company check dated

11              October 25, 2005 payable to "Luxury Development Fund, LLC" and $206, 250 of

12              personal funds for which was received two secured promissory notes, both dated

13              November 2, 2005, one in the principal sum of $194,064.79 bearing interest at 20

14              percent per annum of which the payee is "Pensco Trust Co. FBO Irvin Craig

15              Urbanski, IRA ..." and one in the principal sum of $206,250 bearing interest at 20

16              percent per annum of which the payee is "Irvin Urbanski" and related security

17              agreements, all issued by and signed on behalf of LUXURY DEVELOPMENT

18              FUND, LLC, by Charice Buchholz as manager, the notes being past due, and this

19              suit intended as demand for payment and notice of breach; and

20        b.    Caused to be delivered $90,000 via an IRA account at Pensco Trust Company of

21              which Irvin Urbanski was the beneficiary by a Pensco Trust Company check dated

22              August 19, 2004 payable to "Equity Enterprises, LLC" for there was to be received

23              a membership interest in EENI-PATRIOT COURTYARDS, LLC, a Delaware

24              limited liability company and after receipt of distributions (the last being in

25              November 2008 in the amount of $45,000) have suffered a net loss thereon of

26              $21,316.

27    40.   Plaintiff, Kathy Ury, is an individual residing in San Mateo County, California, who:

28        a.    During or about November 2003, caused to be delivered the sum of $28,439.55 by

---

**CASE NO.: C 08-03535 RMW       FOURTH AMENDED COMPLAINT**        Page 25 of  164

rollover from "Longview" for which was received documents indicating an unspecified membership interest in EENI-GILBERT OFFICE INVESTORS, LLC, A Nevada limited liability company and who has suffered a net loss after distributions  (the last being in October 2008 in the amount of $4,715.25) thereon of $13,138.75;

b.   Delivered and caused to be delivered a total of $33,100 comprised of a personal check dated September 8, 2003 in the sum of $25,000 and payable to "Equity Enterprises" and $8,100 utilizing funds of an IRA of which she is beneficiary for investment in the project sometimes referred to as Mesa Point, for which were received two notes from EENI-MESA POINT, LLC, an Arizona limited liability company, one in the sum of $8,100 and the other in the sum of $25,000, both of which are past due and this constituting demand for payment  and notice of breach; and

c.   Delivered and/or caused to be delivered the sum of $53,655 in several payments beginning April or May 2006 for investment in the project sometimes referred to as Colorado Condo Fund.

41.   Plaintiff, Mark Van Buhler, is an individual residing in Santa Clara County, California, who delivered $200,000 by wire transfer on or about October 8, 2005 to SOLOMON CAPITAL for investment in the LUXURY DEVELOPMENT FUND for which he received a secured promissory note dated November 2, 2005 in the principal amount of $200,000 issued by LUXURY DEVELOPMENT FUND, LLC, and bearing interest at the rate of 20 percent and a related security agreement. The note is past due, and this suit is intended as demand for payment and notice of breach.

42.   Plaintiffs, Bob Winger and Nancy Winger, are individuals residing in Santa Clara County, California, and are the Trustees of the Robert Winger and Nancy Winger Inter Vivo Trust, who, in part being materially influenced by the urging and statements of WILLIAM E. BUCHHOLZ and the position of trust and confidence existing as a result of involvement with the FAMILY COMMUNITY CHURCH:

1         a.      During or about September 2003, caused to be delivered $52,000, by combination

2               of cash and prior loan to RON BUCHHOLZ, for investment in the project

3               sometimes referred to as Mesa Point;

4         b.      During April 2006, delivered and caused to be delivered the total sum of $200,000

5               (personal funds of $173,600 and the balance via IRAs of which they are

6               beneficiaries for investment in the project sometimes referred to as Colorado

7               Condos Fund, for which was received multiple secured promissory notes issued by

8               COLORADO CONDOS FUND, LLC, a Delaware limited liability company, and

9               received secured promissory notes all of which are past due  and demand for

10              payment and notice of breach hereby made;

11        c.      During or about March 2005 caused to be delivered $30,000 via Daystream ST for

12              investment in the project sometimes referred to as Solomon Towers plus $1,500 on

13              or about March 2008 as a capital call;

14        d.      During July 2003, caused to be delivered  $100,000 for investment in the project

15              sometimes referred to as Ray Ranch, and after receiving distributions of $77,933

16              have a net loss of $22,066 on the investment; and

17        e.      During or about May 2004, delivered $211,000 for investment in the project

18              sometimes referred to as Patriot Courtyards, and after receiving distributions of

19              $55,526 and $105,500 in November 2008, have a net loss of $49,974 on the

20              investment.

21  43.    Plaintiff, James Wong, is an individual residing in Santa Clara County, California,

22  who:

23        a.      By personal check dated September 16, 2004 payable to "Equity Enterprises Trust

24              Account" delivered $50,000 for investment in the project sometimes referred to as

25              Scottsdale Lofts, for which was received documents indicating an unspecified

26              membership interest in EENI-SCOTTSDALE LOFTS, LLC; and

27        b.      Delivered $46,000 for investment in the in the LUXURY DEVELOPMENT

28              FUND, for which was received a secured promissory note dated November 2,

2005 in the principal amount of $46,000 issued by LUXURY DEVELOPMENT
FUND, LLC, and bearing interest at the rate of 16 percent and a related security
agreement and the note is past due, and this suit is intended as demand for payment
and notice of breach.

c.     Delivered $100,000 for investment in pursuits sometimes referred to as Erie Fund,
and for which was received a secured promissory note issued by "Erie land Fund,
LLC" dated March 8, 2007 bearing simple interest at 10 percent, and related
security agreement documents and the note is past due, and this suit is intended as
demand for payment and notice of breach; and

d.     Delivered $25,000 by personal check dated March 6, 2006 payable to "Solomon
Capital trust Account" for investment in the project sometimes referred to as
Colorado Condo Fund for which was received a secured promissory note dated
March 14, 2006 in the sum of $25,000 bearing interest at 16 percent issued by
Colorado Condos Fund, LLC, a Delaware limited liability company, the note being
past due, and this suit is intended as demand for payment and notice of breach.

44.     Plaintiff, Charlin Yen, is an individual residing in Santa Clara County, California,
who delivered, by check dated July 18, 2005 in the sum of $25,000 payable to Luxury
Development Fund, for which she was to receive an interest bearing and secured promissory
note. Funds were delivered on the basis or reasonable reliance on the representations made
pursuant to the Luxury Development Fund Note Program and Confidential Private Offering
Memorandum. Charlin Yen did not meet the applicable definition of a "qualified investor."

45.     The amounts alleged above as to each Plaintiff reflect the minimum and currently
calculated losses based on the respective amounts of principal provided and/or net loss of
investment and/or principal amount claimed by them of each which, collectively total
approximately $6.5 million.

**B.     Plaintiff Groups (By Project and Fund)**

46.     Although in some instances, Plaintiffs are unable to further specify the full nature and
extent of their claims as a result of some Defendants' failure to provide meaningful accountings

1   and/or financial statements despite affirmative duties to do so, and for whom their individually

2   collective losses as to their claims as to specific projects and funds are as follows:

3       a.      "Chicago Condo Fund Plaintiffs" hereafter refers to and includes (with the dates of

4               and respective amounts of principal provided and/or net loss of investment and/or

5               principal amount claimed by them) Mike Baker ($49,542.39; September and

6               October 2006), Cynthia Semenoff ($35,000; October 2006), the total amount so

7               referenced  for these plaintiffs as to this project/fund being $84,542.39;

8       b.      "Colorado Condo Fund Plaintiffs" hereafter refers to and includes (with the dates

9               of investment and respective amounts of principal provided and/or net loss of

10              investment and/or principal amount claimed by them), Mike and Renee Brogdon

11              ($100,000; April 2006), Kwei Choong ($100,134; April 2006), Timothy and Lori

12              Gale ($100,000; April 2006 ), Jeff Lawrence ($200,000; September 2006), Kathy

13              Ury ($53,655; beginning April or May 2006 ), Bob Winger and Nancy Winger

14              ($200,000; April 2006), James Wong ($25,000; March 2006) the total amount so

15              referenced  for these plaintiffs as to this project/fund being $778,789;

16      c.      "Daystream Plaintiffs" hereafter refers to and includes (with the dates of

17              investment and  respective amounts of principal provided and/or net loss of

18              investment and/or principal amount claimed by them) Dianne Bryson ($34,853;

19              April 2006), Bob and Nancy Winger ($30,000; March 2005; plus $1,500 March

20              2008 as a capital call), the total amount so referenced  for these plaintiffs as to this

21              project/fund being $66,353;

22      d.      "Erie Land Fund Plaintiffs" hereafter refers to and includes (with the dates of

23              investment and respective amounts of principal provided and/or net loss of

24              investment and/or principal amount claimed by them)  Yu-Sze Yen ($100,000;

25              March 2007), David Sams ($145,000; March 2007), James Wong ($100,000;

26              March 2007), the total amount so referenced  for these plaintiffs as to this

27              project/fund being $345,000;

28      e.      "Gilbert Office Plaintiffs" hereafter refers to and includes (all of whom invested

---

1    during November 2003 with the dates of investment and respective amounts of

2    principal provided and/or net loss of investment and/or principal amount claimed

3    by them)  Yu-Sze Yen ($46,293), Mike and Renee Brogdon ($23,182), Cynthia

4    Semenoff ($11,573 or more), Kathy Ury ($13,138.75), the total amount so

5    referenced  for these plaintiffs as to this project/fund being $94,187;

6    f.    "LDF Plaintiffs" hereafter refers to and includes those who invested in the

7          LUXURY DEVELOPMENT FUND (with the respective amounts of principal

8          provided and/or net loss of investment and/or principal amount claimed by them as

9          damages) Yu-Sze Yen ($200,000; August 2005 commenced investing), Charlin

10         Yen ($25,000; July 2005), Clarice Arne ($114,300; November 2005), Mike Baker

11         (a total of $165,392.10; June 2005 and November 2005), Juan Bettaglio ($65,000;

12         July 2005), Kwei Choong ($50,000; October 2005), Jason Colyar ($50,000;

13         December 2005), Mark and Kathleen Delman ($50,000; June 2005) Timothy and

14         Lori Gale ($200,000; October and/or November 2005), Jerry and Rhonda Hughes

15         ($50,000; October/November 2005), Bruce and Deborah Meeker ($200,054;

16         October 2005), Cynthia J. Semenoff ($200,100; July 2005 - October 2005), Mark

17         Van Buhler ($200,000; October 2005), Irvin and Yolanda Urbanski ($400,314.79;

18         October 2005), James Wong ($46,000; October/November 2005), the total amount

19         so referenced  for these plaintiffs as to this project/fund being $2,016,160.89;

20    g.    "Mesa Point Plaintiffs" hereafter refers to and includes (with the respective

21          amounts of principal provided and/or net loss of investment and/or principal

22          amount claimed by them) Wayne and Candise Canto ($75,000; first investment

23          September 2003 and membership interest exchanged for a promissory note

24          November 2005), Cynthia Semenoff ($25,000; September 2003), Laura Steele

25          ($8,000 September 2003), Nicole Steele ($8,000 September 2003), Jeffrey  Steele

26          ($24,000 September 2003), Len Turner and Jan Turner ($25,000 first investment

27          September 2003 and exchanged for a promissory note November 2005), Kathy Ury

28          ($33,100 September 2003), Bob and Nancy Winger ($52,000 September 2003), the

CASE NO.: C 08-03535 RMW        FOURTH AMENDED COMPLAINT        Page 30 of  164

1      total amount so referenced  for these plaintiffs as to this project/fund being

2      $250,100;

3    h.    "OC Investor Plaintiffs" hereafter refers to and includes (with the respective

4          amounts of principal provided and/or net loss of investment and/or principal

5          amount claimed by them) Juan and Brenda Bettaglio ($400,000; April 2005),

6          Frank Carbajal and Megan Carbajal ($82,000; September 2005), Jim Coates and/or

7          JKAT Properties ($975,000; March and April 2005), Eric Gold ($180,000; July

8          2005), Brian and Debra Starr ($200,000; April 2005) the total amount so

9          referenced  for these plaintiffs as to this project/fund being $1,837,000;

10   i.     "Osborn Commons Plaintiffs" hereafter refers to and includes (with the respective

11         amounts of principal provided and/or net loss of investment and/or principal

12         amount claimed by them) Jack and Diane Greer ($50,000; September 2004), Jeff

13         Lawrence ($34,000; November 2004), Matt and Julie Rogers ($50,000; October

14         2004), James Wong ($50,000; September 2004), the total amount so referenced

15         for these plaintiffs as to this project/fund being $184,000;

16   j.     "Patriot Courtyards Plaintiffs" hereafter refers to and includes (with the respective

17         amounts of principal provided and/or net loss of investment and/or principal

18         amount claimed by them) Mike and Renee Brogdon ($17,763; June 2004), Irvin

19         and Yolanda Urbanski ($21,316; August 2004), Bob and Nancy Winger( $49,974;

20         May 2004), the total amount so referenced  for these plaintiffs as to this

21         project/fund being $89,053;

22   k.     "Ray Ranch Plaintiffs" hereafter refers to and includes (with the respective

23         amounts of principal provided and/or principal amount claimed by them) James

24         Bryson ($44,133; May 2003), Wayne and Candise Canto ($22,066.35; May 2003),

25         Bob and Nancy Winger ($22,066; July 2003), the total amount so referenced  for

26         these plaintiffs as to this project/fund being $88,265.35;

27   l.     "Solomon Towers Plaintiffs" hereafter refers to and includes (with the respective

28         amounts of principal provided and/or net loss of investment and/or principal

amount claimed by them) Juan and Brenda Bettaglio ($200,000; March 2005), Jim Coates and/or JKAT Properties ($250,000; February 2005), the total amount so referenced  for these plaintiffs as to this project/fund being $450,000;

m.    "St. Charles Plaintiffs" hereafter refers to and includes (with the respective amounts of principal provided and/or net loss of investment and/or principal amount claimed by them) Yu-Sze Yen ($50,000; January 2004), Jack and Diane Greer ($50,000; January 2004), the total amount so referenced  for these plaintiffs as to this project/fund being $100,000;

n.    "Wailea Town Center Plaintiffs" hereafter refers to and includes (with the respective amounts of principal provided and/or principal amount claimed by them) Mike and Renee Brogdon ($27,223.48; August 2003), Wayne and Candise Canto ($36,297.98; August 2003), Tina McCraw ($18,149; October 2003), Len Turner ($36,298; August 2003),  the total amount so referenced  for these plaintiffs as to this project/fund being $117,968.46; and

o.    "FCC PLAINTIFFS" and the principal amount of their respective net losses refers to and includes, those who were parishioners/penitents of the FAMILY COMMUNITY CHURCH and who invested based on the material representations of defendant, WILLIAM BUCHHOLZ, made within the ambit of his position with defendant, FAMILY COMMUNITY CHURCH: Mike and Renee Brogdon ($168,169); James Bryson ($44,133); Wayne and Candice Canto ($133,365); Frank and Megan Carbajal ($82,000); Jason Colyar ($50,000); Kwei Choong ($150,134); Mark and Kathleen Delman ($50,000); Eric Gold ($180,000); Jerry & Rhonda Hughes ($50,000); Jay (Irvin) and Yolanda "Patricia" Urbanski ($421,630); Bob and Nancy Winger ($355,540); for whom the total and collective principal amount of their respective net losses is $1,684,972.

C.    **Defendants**.

47.    Based on public records, Plaintiffs are informed and believe, Defendant, RONALD BUCHHOLZ  ("BUCHHOLZ"), is, and at all times relevant, purported to be a citizen of

1  Nevada, but also resided in and conducted business in Santa Clara County, California. Reference

2  to "BUCHHOLZ" refers only to RONALD BUCHHOLZ and is not intended to make any

3  reference to Defendant WILLIAM BUCHHOLZ.

4  48.   Based on public records, Plaintiffs are informed and believe that Defendant BUCHHOLZ

5  has been meaningfully involved with at least 89 entities created within the last five years, of

6  which the full extent and inter-relationship is presently not fully known to Plaintiffs and that his

7  involvement in those entities was by one or more of the following methods: creator/founder,

8  member, manager, shareholder, officer, and/or director, and that some or more of the entities

9  were used by BUCHHOLZ and other Defendants to perpetrate the acts complained of herein

10  using places of business in San Jose, California.

11  49.   Based on public records, Plaintiffs are informed and believe, Defendant CHARICE

12  FISCHER, formerly known and  a.k.a., Charice Buchholz ("FISCHER") is, and at all times

13  relevant, purported to be a citizen of Nevada, but also resided in and conducted business in Santa

14  Clara County, California.

15  50.   Defendants BUCHHOLZ and FISCHER interchangeably, and often without distinction,

16  used the name of "SOLOMON CAPITAL" in referring to Defendants SOLOMON CAPITAL,

17  INC., and SOLOMON CAPITAL, LLC. and based on public records and written materials

18  disseminated or caused to be disseminated by BUCHHOLZ and/or FISCHER, Plaintiffs are

19  informed and believe that there were at least two such entities, one being SOLOMON

20  CAPITAL, LLC, a Nevada limited liability company, that maintained an office at 20 Great Oaks

21  Blvd., Suite 230, San Jose, California, and the other being  SOLOMON CAPITAL, INC., most

22  likely a Nevada corporation formed January 7, 2005 of which status in California is believed to

23  have been forfeited, both entities having been used by and in connection with Defendants

24  RONALD BUCHHOLZ and CHARICE FISCHER to commit the acts complained of herein.

25  51.   Based on, but not limited to, public records and documents filed in the case of Trachsel v.

26  Ronald Buchholz  (5:08-CV-02248-RMW), Plaintiffs are informed and believe, Defendant

27  JONATHON VENTO ("VENTO") is, and at all times relevant was, a citizen of Arizona.

28  52.   Defendant VENTO directly and indirectly exercised a position of control over other

1   defendants including, but not necessarily limited to, GRACE CAPITAL, LLC, dba GRACE

2   COMMUNITIES, a Arizona limited liability company; VENTO INVESTMENTS, LLC, an

3   Arizona limited liability (sometimes also referred to herein as "VI"); and the VENTO FAMILY

4   TRUST  (sometimes also referred to herein as "VFT").

5   53.     Prior to 2002 VENTO had little or no prior experience whatsoever being directly involved

6   in the design, development, or construction of office condominiums.

7   54.     Based on, but not limited to, searches of public records and representations made by and

8   attributable to him,  Plaintiffs are informed and believe Defendant DONALD ZELEZNAK

9   ("ZELEZNAK") is, and at all times relevant was, a citizen of the State of Arizona.

10   55.      Defendant ZELEZNAK directly and indirectly exercised a position of control over other

11   defendants including, but not necessarily limited to, GRACE CAPITAL, LLC, dba GRACE

12   COMMUNITIES, a Arizona limited liability company; Z-LOFTS; ZELTOR, LLC; and

13   ZELEZNAK PROPERTY MANAGEMENT, LLC dba KELLER WILLIAMS REALTY,

14   (sometimes also referred to herein as "ZPM") an Arizona limited liability company.

15   56.     ZELEZNAK PROPERTY MANAGEMENT, LLC, also dba KELLER WILLIAMS

16   REALTY, (sometimes also referred to herein as "ZPM") is an Arizona limited liability company

17   or which Defendant ZELEZNAK was and is a manager and member.

18   57.  Defendant Z-LOFT, LLC, is an Arizona limited liability company (formerly known  as Soho

19   Lofts, LLC, and sometimes also referred to herein as "Z-LOFT"), with its principal place of

20   business in Maricopa County, Arizona, of which DONALD ZELEZNAK was a manager.

21   58.     Z-LOFT, in connection with Defendants SOLOMON CAPITAL, RDB

22   DEVELOPMENT, BUCHHOLZ, FISCHER, ZELEZNAK, ZPM, VENTO, and GRACE

23   CAPITAL substantially participated in the conduct complained of herein and participated in the

24   preparation of material information known to be intended for presentation to investors including.

25   59.     Defendant GRACE CAPITAL, LLC, and also dba GRACE COMMUNITIES is an

26   Arizona limited liability company (sometimes also referred to herein as "GRACE CAPITAL"),

27   with its principal place of business in Maricopa County, Arizona.

28   60.     GRACE CAPITAL, in connection with Defendants including, but not limited to,

---

1   SOLOMON CAPITAL, RDB DEVELOPMENT, BUCHHOLZ, FISCHER, ZELEZNAK,

2   Z-LOFT, ZPM, and VENTO,  materially and substantially participated in the conduct

3   complained of herein.

4   61.     Defendants VENTO; GRACE CAPITAL, LLC, also dba GRACE COMMUNITIES;

5   VENTO INVESTMENTS, LLC; the VENTO FAMILY TRUST; ZELEZNAK; ZELEZNAK

6   PROPERTY MANAGEMENT, LLC, also dba KELLER WILLIAMS REALTY; Z-LOFT; and

7   ZELTOR, LLC, are sometimes referred to collectively and throughout as the "GRACE

8   DEFENDANTS."

9   62.     GRACE DEFENDANTS materially ans substantially participated in the creation of

10  material information and documentation knowing that it was intended to solicit investment from

11  persons such as Plaintiffs.

12  63.     GRACE DEFENDANTS knew that EQUITY ENTERPRISES, SOLOMON CAPITAL,

13  BUCHHOLZ, and FISCHER, and entities controlled by these four Defendants were soliciting

14  investors by methods that included investors becoming members of limited liability companies

15  and to whom BUCHHOLZ and/or FISCHER, and/or entities controlled by them  would owe

16  special, confidential, and/or fiduciary duties as managers of entities in which investors were

17  members and that those limited liability companies would in turn be investing in liability

18  companies to which one or more GRACE DEFENDANTS owed fiduciary duties.

19  64.     GRACE DEFENDANTS knew Defendants BUCHHOLZ, FISCHER, EQUITY

20  ENTERPRISE, and SOLOMON CAPITAL and/or other entities controlled by these four

21  Defendants did not have the independent  financial wherewithal to engage in the projects  and

22  transactions described herein.

23  65.     Defendant, RDB DEVELOPMENT, LLC, is a limited liability company, managed by

24  Defendant BUCHHOLZ, that conducted a substantial portion of its business activities from

25  within San Jose, California.

26  66.     Defendant ZELTOR, LLC, is a Nevada limited liability company (sometimes also

27  referred to herein as "ZELTOR"), that was and is managed by Defendant ZELEZNAK.

28  67.     Defendant RNC HOLDINGS, LLC, is a Nevada limited  liability company (sometimes

also referred to herein as "RNC") and was managed by Defendants BUCHHOLZ and FISCHER.

68. Defendant LUXURY DEVELOPMENT FUND, LLC, a Delaware limited liability company (sometimes also referred to herein as "LDF"), was an entity used to raise funds and materially involved in acts specifically complained of elsewhere herein including, but not limited to, the purchase and sale transactions of property for an over-inflated and above fair market value price and diversion of funds and was managed by Defendants BUCHHOLZ and FISCHER.

69. Defendant EQUITY ENTERPRISES, INC., a California corporation (sometimes also referred to herein as "EEI"), was an entity used and controlled primarily by Defendants, BUCHHOLZ and FISCHER. ,

70. Defendant EQUITY ENTERPRISES-NEVADA, INC., a Nevada corporation (sometimes also referred to herein as "EENI"), was an entity used and controlled primarily by Defendants, BUCHHOLZ and FISCHER.

71. Although Plaintiffs have been unable to find any public record of such an entity ever being formed, but on the basis of the name having appeared on document(s) disseminated to some Plaintiffs, Defendant EQUITY ENTERPRISE MANAGEMENT, INC., (sometimes also referred to herein as "EEM") was an entity used and controlled primarily by Defendants BUCHHOLZ and FISCHER, to raise funds and was materially involved in acts specifically complained of elsewhere herein.

72. Defendant ALABANZA, INC., formerly a California corporation was an entity primarily used and controlled by Defendant FISCHER.

73. Defendant VENTO INVESTMENTS, LLC, is and was an Arizona limited liability formed during or around 2004, of which Defendant VENTO, was and is a manager and member.

74. Defendant VENTO FAMILY TRUST was controlled by Defendant VENTO primarily via his status as a trustee.

75. Defendant FAMILY COMMUNITY CHURCH, is a California corporate entity (sometimes also referred to herein as "FCC"), with a principal place of business at 478 Piercy Road, San Jose, California.

76.     Defendant WILLIAM E. BUCHHOLZ is the father of Defendants RON  BUCHHOLZ and CHARISE FISCHER and is the Senior Pastor of the Family Community Church located at 478 Piercy Road, San Jose, California.

77.     Defendant WILLIAM E. BUCHHOLZ is referred to as such and should not confused with "BUCHHOLZ" which refers only to RONALD BUCHHOLZ and reference to "BUCHHOLZ" is not intended to make any reference to Defendant WILLIAM E. BUCHHOLZ.

78.     At all times herein relevant, WILLIAM E. BUCHHOLZ, served as on officer of FCC, including President, or was otherwise in a position to exercise substantial control of and over FCC.

79.     Defendant FAMILY COMMUNITY CHURCH is vicariously liable for the acts of WILLIAM E. BUCHHOLZ, as a result of his status as Senior Pastor, and/or employee, and/or corporate officer, and/or director, the acts of the pastor being those of an employee and/or other managing agent, if not in fact those of an officer or director.

80.     As further described herein, WILLIAM E. BUCHHOLZ utilized his position of faith, confidence and trust to induce and entice the FCC Plaintiffs to invest funds with his son and daughter, Defendants RONALD BUCHHOLZ and FISCHER.

81.     In some instances, WILLIAM E. BUCHHOLZ promised FCC members they would be relieved of their obligation to tithe if they invested with his son, RONALD BUCHHOLZ.

**IV.     ALLEGATIONS REGARDING DELAYED DISCOVERY**.

82.     Plaintiffs were neither aware of nor could they have been reasonably aware of the acts complained of herein until on or about July 24, 2007 at the earliest when the offices in San Jose utilized by Defendants, BUCHHOLZ and FISCHER, and the entities controlled by them were raided by both state and federal authorities in connection with a warrant to investigate allegations of fraudulent activities.

83.     Additional awareness of the acts complained of herein arose when Plaintiffs received a letter from Deputy District Attorney Michael Fitzsimmons of the Santa Clara County Office of the District Attorney dated July 31, 2007 requesting their voluntary responses to a questionnaire about SOLOMON CAPITAL and EQUITY ENTERPRISES, INC.

84.     Plaintiffs were neither aware of nor could they have been reasonably aware of the acts complained of herein until on or about July 24, 2007 at the earliest for additional reasons.

85.     Prior to July 24, 2007, Defendants BUCHHOLZ and FISCHER controlled and limited information provided to Plaintiffs.

86.     As further alleged below, many Plaintiffs were to sign agreements precluding them from undertaking their own meaningful investigation as to the facts, circumstances, and status of projects covered by those agreements.

87.     Plaintiffs are informed and believe and thereon allege the state and federal authorities seized the contents of the offices in San Jose utilized by Defendants, BUCHHOLZ and FISCHER, and the entities created and controlled by them in connection with the state and federal investigation regarding potential allegations including, but not limited to, fraud and the documents seized indicate SOLOMON CAPITAL, BUCHHOLZ and FISCHER used more than 400 different bank accounts during the course of their activities.

88.     Plaintiffs are now informed and believe that the Santa Clara County Office of the District Attorney has halted its investigation in deference to an investigation being conducted by the Federal Bureau of Investigation.

89.     The seizure of the documents has impaired the ability of plaintiffs to demand and/or otherwise acquire material information necessary to presentation of their claims so as to effectively limit their ability to obtain additional and further relevant information as part of this Complaint.

**V.      GENERAL FACTUAL ALLEGATIONS REGARDING DEFENDANTS RONALD BUCHHOLZ AND CHARISE FISCHER AND THEIR ALLEGED REAL ESTATE INVESTMENT COMPANIES AND RELATIONSHIPS.**

90.     According to the SOLOMON CAPITAL website Defendant BUCHHOLZ is the President of Defendant SOLOMON CAPITAL and Defendant FISCHER is both a principal and the Chief Financial Officer of Defendant SOLOMON CAPITAL.

91.     BUCHHOLZ, FISCHER, and SOLOMON CAPITAL marketed and advertised themselves as experts in the context of real estate investing, and did so without regard to whether

1   reference was being made to SOLOMON CAPITAL, INC., or SOLOMON CAPITAL, LLC,

2   and therefore any reference to "SOLOMON CAPITAL" means either or both because Plaintiffs

3   are not reasonably able to specify because of the confusion and lack of clarity attributable to

4   Defendants BUCHHOLZ and FISCHER.

5   92.   Defendant BUCHHOLZ was a founder of EQUITY ENTERPRISES, INC., a

6   predecessor to SOLOMON CAPITAL. BUCHHOLZ was the President of both corporate

7   entities.

8   93.   Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL also demanded and

9   took undisclosed "kick backs" from third parties in connection with some of the projects and did

10  so  primarily by FISCHER via ALABANZA.

11  94.   As alleged further herein, BUCHHOLZ, FISCHER, and entities controlled by them have

12  taken hundreds of thousands, if not millions, of dollars for supposed developer fees and

13  management fees without generating fair value in return therefore, all to the detriment of the

14  Plaintiff investors.

15  95.   As alleged further herein, Defendants BUCHHOLZ, FISCHER, and entities controlled

16  by them commingled, moved and transferred the investments of the Plaintiff investors to

17  additional projects without their consent and encumbered the projects with additional debt

18  without the notice to and/or required consent of the Plaintiff investors.

19  96.   As alleged further herein, Defendants  BUCHHOLZ, FISCHER, and entities controlled

20  by them improperly commingled the investor funds with their own and with those of the other

21  investors and other entities controlled by them despite promising not to do so.

22  97.   As alleged further herein, Defendants BUCHHOLZ and FISCHER and entities controlled

23  by them diverted undisclosed funds from the multiple projects to entities controlled by them for

24  their own personal use and without fair value given therefore to the detriment of Plaintiffs

25  herein.

26  **VI.   ALTER EGO ALLEGATIONS (Regarding Defendants BUCHHOLZ, FISCHER,**

27  **SOLOMON CAPITAL, RDB, RNC, LDF, EEI,  EENI, EEM, ALABANZA, INC.)**

28  98.   Plaintiffs re-allege and incorporate by reference paragraphs 47-50, 65, 67-72, and 82-97

1   inclusive, as though fully set forth herein.

2   99.   There existed and still exists and at all times herein mentioned, a unity of interest and

3   ownership between Defendants BUCHHOLZ, FISCHER, ALABANZA, INC.;  EQUITY

4   ENTERPRISES, INC.; EQUITY ENTERPRISES-NEVADA, INC.; LUXURY

5   DEVELOPMENT FUND, LLC; RDB DEVELOPMENT, LLC; RNC HOLDINGS, LLC;

6   SOLOMON CAPITAL, INC.; and SOLOMON CAPITAL, LLC, such that any individuality and

7   separateness between these Defendants and entities controlled by them  has ceased and were the

8   alter egos of BUCHHOLZ and FISCHER.

9   100.   Other entities used by Defendants BUCHHOLZ and FISCHER and as alleged herein

10  below included, but were not necessarily limited to Arroyo Mountain, LLC; Chicago Condo

11  Fund, LLC; Clear Creek South, LLC; Colorado Condos Fund, LLC; Colorado Investment

12  Group, LLC; Crystal Lake Office Condos, LLC; Daystream Deer Creek, LLC; Daystream

13  Cherry Creek, LLC; Daystream ST, LLC; EEI-Ray Ranch, LLC; EEI-Ray Ranch 10K, LLC;

14  EEI-Wailea Town Center, LLC; EENI-Dunham Suites, LLC; EENI-Mesa Point, LLC; EENI-

15  Patriot Courtyards, LLC; EENI- Scottsdale Lofts, LLC; EENI-St. Charles Office Investors,

16  LLC;  Erie Land Fund, LLC; Glenview Office Investors, LLC; Hellyer Commons, LLC;

17  Hoffman Estates Office Condos, LLC; Monta Vista, LLC; OC Investors, LLC; Naperville

18  Office Condos, LLC; Solomon Towers, LLC; and Spirit Investors, LLC.

19  101.   As further alleged herein, Defendants BUCHHOLZ and FISCHER directly and/or

20  indirectly were and/or acted as managers of the limited liability companies stated immediately

21  above and as officers of  the corporations stated immediately above and as managers of the

22  entities created by them regarding individual projects.

23  102.   As further alleged herein, Defendants BUCHHOLZ and FISCHER used assets of entities

24  created and controlled by them for personal use, caused assets to be transferred without adequate

25  consideration, undercapitalized the entities investments, and withdrew funds from entity bank

26  accounts for their own personal use.

27  103.   Defendants BUCHHOLZ and FISCHER and entities controlled by them routinely failed

28  to observe legally required formalities as to the giving of notice and holding meetings to

1  members of limited liability companies.

2  104.    Defendants BUCHHOLZ and FISCHER and entities controlled by them failed to observe

3  the requirements of Operating Agreements regarding the limited liability companies controlled

4  by them and by failing to give notice and call for votes of members regarding material and

5  substantive matters subject to vote by members.

6  105.    As further alleged herein Defendants BUCHHOLZ and FISCHER and entities controlled

7  by them improperly excluded members from the business and affairs of the limited liability

8  companies identified above by requiring investor/members to sign agreements precluding

9  members from seeking or obtaining information regarding the affairs thereof.

10  106.    Despite numerous representations in materials provided to investors and despite

11  requirements of multiple Operating Agreements regarding individual projects that investor funds

12  would be segregated and not commingled, Defendants BUCHHOLZ and FISCHER and entities

13  controlled by them failed to segregate the business and funds of the entities created and

14  controlled by them for the projects and activities further described herein.

15  107.    Defendants BUCHHOLZ and FISCHER and entities controlled by them commingled

16  the funds of individual entities by use of accounts in the name of EQUITY ENTERPRISES,

17  INC., and Equity Enterprises Partnership and used funds and assets of individual projects for

18  their own purposes and without regard to the promises and requirements of separateness.

19  108.    As further alleged herein, Defendants BUCHHOLZ and FISCHER and entities

20  controlled by them used funds raised for particular projects to make payments related to other

21  projects without regard to the promises and requirements of separateness.

22  109.    Defendants BUCHHOLZ and FISCHER used funds from Defendant SOLOMON

23  CAPITAL in connection with Defendant RDB DEVELOPMENT for their own personal

24  residences and vehicles and/or applied funds from SOLOMON CAPITAL accounts in

25  furtherance of the acts complained of herein.

26  110.    Based on information and belief including approximately $300,000 in cash having been

27  found in a storage facility rented in the name of their aunt, Defendants BUCHHOLZ and

28  FISCHER diverted funds from for their own personal use to the detriment of Plaintiffs herein.

111.    Plaintiffs are informed and believe that Defendant BUCHHOLZ has created approximately 400 bank accounts for the purpose of improperly diverting and concealing funds taken for his own personal gain and that a substantial portion of the funds in these bank accounts derived from improperly commingled funds.

112.    As such, the entity Defendants created and controlled by Defendants BUCHHOLZ and FISCHER were mere shells, instrumentalities, and conduits used to carry out acts complained of herein.

113.    Therefore, Plaintiffs request this Court disregard the legal formalities as between Defendants BUCHHOLZ, FISCHER, SOLOMON CAPITAL, RNC, LDF, EEI,  EENI, EEM, ALABANZA, INC., RDB,  and other entities created and controlled by BUCHHOLZ and FISCHER referred to herein used by them in furtherance of the acts complained of herein.

## VII.    ALLEGATIONS AND COUNTS AS TO  WILLIAM E. BUCHHOLZ AND FAMILY COMMUNITY CHURCH ONLY.

### A.    Factual Allegations as to  William E. Buchholz and Family Community Church.

114.    Paragraphs 1-9, 11-45, 46.o, 47-50, 65, 67, 69-72, and 75-113 are re-alleged and incorporated here. Inclusion of paragraphs 11 through 45 and 75 through 113 in their entirety is for the purpose of formally including the pertinent details regarding plaintiffs and defendants specifically referenced in this section and is not intended to expand the scope of plaintiffs' claims by the  plaintiffs specifically stated in this section as against the defendants as specifically alleged in this section.

115.    "FCC PLAINTIFFS" and the principal amount of their respective net losses refers to and includes, those who were parishioners/penitents of the FAMILY COMMUNITY CHURCH and who invested based on the material representations of defendant, WILLIAM BUCHHOLZ, made within the ambit of his position with defendant, FAMILY COMMUNITY CHURCH: Mike and Renee Brogdon ($168,169); James Bryson ($44,133); Wayne and Candice Canto ($133,365); Frank and Megan Carbajal ($82,000); Jason Colyar ($50,000); Kwei Choong ($150,134); Mark and Kathleen Delman ($50,000); Eric Gold ($180,000); Jerry & Rhonda

1   Hughes ($50,000); Jay (Irvin) and Yolanda "Patricia" Urbanski ($421,630); Bob and Nancy

2   Winger ($355,540); for whom the total and collective principal amount of their respective net

3   losses is $1,684,972 claimed as their minimum damages.

4   116.   Plaintiffs are informed and believed that Defendant WILLIAM E. BUCHHOLZ and

5   Defendant  FAMILY COMMUNITY CHURCH knowingly engaged in transactions with

6   Defendants BUCHHOLZ, FISCHER and entities controlled by them, for reasons that included

7   direct and indirect personal benefit and benefit of FAMILY COMMUNITY CHURCH and did

8   so on terms and conditions that manifest furtherance of the acts complained of herein and breach

9   of duties of faith, trust and confidence owed to FCC members, and that such acts were done by

10  Defendant WILLIAM E. BUCHHOLZ within the scope of his employment and/or agency with

11  the Defendant FAMILY COMMUNITY CHURCH including, but not limited to the following:

12          a.      The position of  WILLIAM E. BUCHHOLZ in the FAMILY COMMUNITY

13                  CHURCH was and is such that he was able to and did unilaterally act in

14                  transactions involving  FAMILY COMMUNITY CHURCH;

15          b.      WILLIAM E. BUCHHOLZ engaged in soliciting parishioners/penitents to invest

16                  in the activities of his son, RONALD BUCHHOLZ, and his daughter, CHARICE

17                  FISCHER;

18          c.      WILLIAM E. BUCHHOLZ represented he invested personal funds with his son

19                  and  daughter;

20          d.      At one point in time the  FAMILY COMMUNITY CHURCH owned the property

21                  at 20 Great Oaks Drive, San Jose, California, having acquired it with church funds;

22          e.      The FCC Plaintiffs are informed and believe and thereon allege that Defendant

23                  FAMILY COMMUNITY CHURCH, by and through the unilateral actions of

24                  WILLIAM E.  BUCHHOLZ allowed EQUITY ENTERPRISES and SOLOMON

25                  CAPITAL to have use of office space there for little or no consideration, actions

26                  that knowingly furthered the activities of EQUITY ENTERPRISES and

27                  SOLOMON CAPITAL;

28          f.      The FCC Plaintiffs are informed and believe and thereon allege that FAMILY

COMMUNITY CHURCH, by and through the unilateral actions of WILLIAM E. BUCHHOLZ eventually and purportedly sold the property at 20 Great Oaks Drive, San Jose, California, to his son, RON BUCHHOLZ and/or his daughter, CHARICE FISCHER or to entities controlled by them for an amount well below the fair market value of the property, assisted their purchase of the property by secretly delivering as much as $1.8 million of church funds, received all or part of an undisclosed fee or commission in the amount of $80,000 as part of the transaction, and then had the FAMILY COMMUNITY CHURCH pay rent for use of the property;

g.  WILLIAM E. BUCHHOLZ was actively involved in the transactions and activities regarding the project generally known as Patriot Courtyards and was calling persons at the offices of SOLOMON CAPITAL an average of three times per week in regard thereto;

h.  On the basis of his active participation in the nature of inquiries and otherwise regarding the transactions and activities regarding the project generally known as Patriot Courtyards, WILLIAM E. BUCHHOLZ, knew or should have known or reasonably could have made inquiry of his so and/or daughter so as to be aware of the artificial profit of $1,561,300 regarding Patriot Courtyards;

i.  The FCC Plaintiffs are informed and believe and thereon allege that WILLIAM E. BUCHHOLZ, pursuant to his ability to unilaterally act in transactions involving FAMILY COMMUNITY CHURCH, issued a check in the sum of $1.8 million regarding the project being directed by his son, RON BUCHHOLZ, and generally known as Hellyer Commons;

117.  In January 2003, WILLIAM E. BUCHHOLZ first began soliciting investors for the activities of his son and daughter when he did a sermon series on Tithing and Christian Stewardship.

118.  In that sermon series he stated he was receiving 18% to 25% profit and greater from his own personal investments, and if parishioners did so, they would have more income, and be able

1  to give more to FCC and there would be a meeting the next week at the church for those who

2  wanted more information and to meet with the people involved.

3  119.    When approached afterwards by parishioners he again stated that those who wished to

4  learn about this should come to a meeting to be held at a later date. The meeting went forward

5  with 25 to 50 attendees. WILLIAM E. BUCHHOLZ introduced his son, RON BUCHHOLZ.

6  WILLIAM E.  BUCHHOLZ led them to believe that his son and his company possessed the

7  required expertise, experience, business structure, and business skills that could protect their

8  investments and bring the returns projected by RON BUCHHOLZ'S company, that RON

9  BUCHHOLZ could be completely trusted with their money, and held their financial interests as

10  a top priority.   The clear implication, if not expression, was that for those who wanted to make

11  wise choices with their money, it was a wise choice to invest with RON BUCHHOLZ because it

12  would bring  higher returns.

13  120.    A "Pooled Investment Showcase" sponsored and presented by EQUITY ENTERPRISES,

14  was held at the Family Community Church, then located at 20 Great Oaks Boulevard, San Jose,

15  CA, on Monday, July 21, 2003 and another on August 2, 2003 for which invitations were sent

16  via the Internet from email addresses associated with equityenterprises.com.

17  121.    In substantial part and as a result of these statements and events, parishioners/penitents

18  began investing with Defendants RONALD BUCHHOLZ and FISCHER.

19  122.    Approximately two years later during 2005, the FAMILY COMMUNITY CHURCH was

20  starting its third building fund campaign that included an event called "Invite and Invest" at

21  which WILLIAM E. BUCHHOLZ made statements to the effect that the church was currently in

22  a solvent cash flow situation and it would be far better and productive for parishioners to stop

23  paying tithes to the FCC and use that money to invest with his son RON BUCHHOLZ because

24  investments with him would eventually yield a much greater return for the FCC.

25  123.    During the entire course of soliciting parishioners and on the basis of it having been

26  represented that WILLIAM E. BUCHHOLZ had personally invested, WILLIAM E.

27  BUCHHOLZ knew or should have known that investments in which  his son and daughter were

28  involved were not generating the returns as represented.

---

**CASE NO.: C 08-03535 RMW        FOURTH AMENDED COMPLAINT        Page 45 of  164**

1   124.   The FCC Plaintiffs are informed and believe and thereon allege that FAMILY

2   COMMUNITY CHURCH, by and through the unilateral actions of WILLIAM E. BUCHHOLZ

3   engaged in transactions regarding a project being directed by his son, RON BUCHHOLZ, and

4   generally known as Hellyer Commons.

5   125.   The FCC Plaintiffs are informed and believe and thereon allege that WILLIAM E.

6   BUCHHOLZ received a "fee"of $30,000 regarding transactions related to the project being

7   directed by his son, RON BUCHHOLZ, and generally known as Hellyer Commons. The "fee"of

8   $30,000 involved a series of convoluted events and transactions the essence of which was:

9         a.     FCC bought the property located at 478 Piercy Road, San Jose, from an

10               entity controlled by Defendant RONALD BUCHHOLZ;

11        b.     Several months later, Hellyer Commons, LLC, (another entity controlled by

12               RONALD BUCHHOLZ) acquired property adjacent to the Church's

13               property at 478 Piercy Road;

14        c.     An agreement and easement were recorded between Hellyer Commons,

15               LLC, and the FAMILY COMMUNITY CHURCH (apparently a reciprocal

16               parking agreement);

17        d.     On September 19, 2006, Hellyer Commons, LLC, gave the FAMILY

18               COMMUNITY CHURCH an easement by deed; and

19        e.     Despite the fact the FAMILY COMMUNITY CHURCH purchased the

20               property from an entity controlled by RONALD BUCHHOLZ,  FAMILY

21               COMMUNITY CHURCH presently holds a Deed of Trust and Assignment

22               of Rents regarding the Hellyer Commons property.

23   126.   The above facts show a series of transactions among the Defendants RONALD

24   BUCHHOLZ AND FISCHER and the entities controlled by them and Defendants WILLIAM E.

25   BUCHHOLZ and FAMILY COMMUNITY CHURCH, giving rise to ready and reasonable

26   supposition there were undisclosed transactions and benefits inuring to them to the detriment of

27   FCC Plaintiffs and others all of a type and nature that WILLIAM E. BUCHHOLZ had a duty to

28   disclose on the basis of actively soliciting investments for his son and daughter and by virtue of

1   his confidential, if not fiduciary, relationship with parishioners.

2          **B.    Counts as to William E. Buchholz and Family Community Church.**

3            **1.    Count 1: BREACH OF FIDUCIARY DUTY**

4   127.   Paragraphs 114 through 126 are re-alleged and incorporated here by reference.

5   128.   Defendants WILLIAM E. BUCHHOLZ and FCC had a special relationship with  the

6   FCC PLAINTIFFS arising out of or related to their participation within FCC as penitents that

7   constitutes a confidential relationship, if not, fiduciary relationship and/or equivalent based on

8   the relationship of faith, trust, and confidence.

9   129.   Defendants  WILLIAM E. BUCHHOLZ and FCC owed a duty of utmost care, integrity,

10  honesty and loyalty toward FCC Plaintiffs and breached the duty by, among other things,

11  misrepresenting the nature and extent of the background and experience of Defendants

12  RONALD BUCHHOLZ and  FISCHER, expected returns, enticement to invest based on

13  relieving obligations to tithe, failing to disclose the dealings between Defendants RONALD

14  BUCHHOLZ and  FISCHER and entities controlled by them and WILLIAM E. BUCHHOLZ

15  and the FAMILY COMMUNITY CHURCH, and failing to  disclose information that was

16  known or should have been known as to certain projects, particularly Patriot Courtyards,

17  soliciting parishioners/penitents on the basis of promises affecting their relationship with and

18  obligations to FCC, delivery of false and incomplete information, failing to disclose interests in

19  transactions, and misrepresenting his own financial results.

20  130.   As a direct and proximate result of the breaches of fiduciary duty by Defendants

21  WILLIAM E. BUCHHOLZ and the FAMILY COMMUNITY CHURCH the FCC PLAINTIFFS

22  have been injured in their business and property as herein alleged.

23  131.   Wherefore, the FCC Plaintiffs pray for judgement as set forth below.

24           **2.    Count 2: MISREPRESENTATION AND CONCEALMENT.**

25  132.   Paragraphs 114 through 126 are re-alleged and incorporated here by reference.

26  133.   Starting  January 2003, and again in March 2003, July 2003 and August  2003, and

27  throughout 2005, Defendant WILLIAM E. BUCHHOLZ and within the ambit of his actual or

28  apparent authority to speak and act for Defendant FCC made the numerous representations and

---

1   promises as herein alleged to induce parishioners/penitents into purchasing the subject

2   investments and securities as herein alleged.

3   134.    The representations were untrue in that WILLIAM E.  BUCHHOLZ had not made the

4   personal investments to the extent stated, investments were not generating the returns indicated,

5   there was no reasonable basis to expect such returns were realistic, and Defendants RONALD

6   BUCHHOLZ and CHARICE FISCHER did not have the knowledge, skill, experience, or history

7   of being able to generate such returns as had been represented

8   135.    The FCC PLAINTIFFS substantially and reasonably relied upon the statements of

9   WILLIAM E. BUCHHOLZ in making their investments and did so without any knowledge or

10  reasonable ability to determine the statements were not full, complete, and accurate.

11  136.    Had the FCC Plaintiffs known the true facts, they would not have invested.

12  137.    Having justifiably placed substantial faith and trust in WILLIAM E. BUCHHOLZ, the

13  FCC PLAINTIFFS have been injured in their business and property as herein alleged.

14  138.    Having justifiably placed substantial faith and trust in WILLIAM E. BUCHHOLZ, FCC

15  PLAINTIFFS have incurred and continue to incur legal fees and costs to recover such losses and

16  any potential judgments.

17  139.    By virtue of his relationship with parishioners/penitents and having undertaken to

18  encourage parishioners/penitents to invest with RONALD BUCHHOLZ and CHARICE

19  FISCHER and the entities controlled by them, WILLIAM E. BUCHHOLZ had an obligation to

20  fully disclose all pertinent and material information.

21  140.    WILLIAM E. BUCHHOLZ failed to disclose that FAMILY COMMUNITY CHURCH,

22  by and through the unilateral actions of WILLIAM E. BUCHHOLZ, was furthering the activities

23  of RONALD BUCHHOLZ and CHARICE FISCHER and the entities controlled by them by

24  providing office space at 20 Great Oaks Drive, San Jose, California, for little or no

25  consideration.

26  141.    WILLIAM E. BUCHHOLZ failed to disclose the sale of 20 Great Oaks Drive, San Jose,

27  California, by the FAMILY COMMUNITY CHURCH to his son, RON BUCHHOLZ and/or his

28  daughter, CHARICE FISCHER or to entities controlled by them was for an amount well below

---

**CASE NO.: C 08-03535 RMW        FOURTH AMENDED COMPLAINT        Page 48 of  164**

the fair market value of the property.

142.    WILLIAM E. BUCHHOLZ failed to disclose that the sale of 20 Great Oaks Drive, San Jose, California, to his son, RON BUCHHOLZ and/or his daughter, CHARICE FISCHER or to entities controlled by them was facilitated by him having arranged to effectively and secretly providing as much as $1.8 million of FCC funds for the benefit of RONALD BUCHHOLZ and/or his daughter, CHARICE FISCHER or to entities controlled by them.

143.    On the basis of best information and belief, WILLIAM E. BUCHHOLZ received and failed to disclose a fee or commission in the amount of $80,000 regarding the sale of 20 Great Oaks Drive, San Jose, California.

144.    WILLIAM E. BUCHHOLZ was actively involved in the transactions and activities regarding the project generally known as Patriot Courtyards and was calling persons at the offices of SOLOMON CAPITAL an average of three times per week in regard thereto.

145.    WILLIAM E.  BUCHHOLZ failed to disclose the artificial profit of $1,561,300 regarding Patriot Courtyards which he knew or should have known on the basis of his active participation in the nature of inquiries and otherwise regarding  the transactions and activities regarding the project generally known as Patriot Courtyards.

146.    WILLIAM E. BUCHHOLZ failed to disclose the true nature and extent of the transactions involving  FAMILY COMMUNITY CHURCH regarding Hellyer Commons.

147.    The matters not disclosed were of a substantial and material nature and type that would reasonably be considered by reasonable and prudent investors.

148.    The FCC PLAINTIFFS reasonably relied on and expected WILLIAM E.  BUCHHOLZ to provide full, complete, and accurate information without omission.

149.    If the FCC PLAINTIFFS been apprised of the matters not disclosed, they would not have made investments to the extent they did.

150.    As a direct and proximate result of the acts and omissions of Defendants WILLIAM E. BUCHHOLZ and FCC, which at this time the FCC PLAINTIFFS are unsure as whether having been negligent, intentional, or both, have been injured in their business and property as herein alleged.

1    151.   FCC PLAINTIFFS have incurred and continue to incur legal fees and costs to recover
2    such losses and any potential judgments.

3    152.   Wherefore, judgment is prayed for as hereinafter set forth.

4            **3.    Count 3: CONSTRUCTIVE FRAUD**

5    153.   Paragraphs 114 through 152 are re-alleged and incorporated here by reference.

6    154.   As parishioners/penitents, there existed a confidential, if not fiduciary relationship
7    between the FCC PLAINTIFFS and Defendants WILLIAM E. BUCHHOLZ and FCC.

8    155.   There being a confidential, if not fiduciary, relationship between the FCC PLAINTIFFS
9    and Defendants WILLIAM E. BUCHHOLZ and FCC and WILLIAM E. BUCHHOLZ having
10   undertaken to solicit parishioners/penitents to make investments, these Defendants had a duty to
11   make full disclosure and accurate disclosure of all material facts.

12   156.   The statements and failures to disclose of Defendant WILLIAM E. BUCHHOLZ
13   occurring in the context of his actual authority to speak and act for FCC, were at a minimum
14   careless and negligent.

15   157.   Defendants WILLIAM E. BUCHHOLZ and FCC obtained advantage over and  benefit
16   from the FCC PLAINTIFFS, such advantage and benefit including, but not limited to, the
17   undisclosed fees and/or commissions received by WILLIAM E. BUCHHOLZ and the benefits
18   received by FCC arising out of or related to the Hellyer Commons transactions.

19   158.   Defendants WILLIAM E. BUCHHOLZ and FCC breached the duty owed by the acts,
20   statements, omissions, and concealment complained of herein.

21   159.   The FCC PLAINTIFFS reasonably relied on and expected WILLIAM E. BUCHHOLZ
22   individually and in the context of their penitent relationships with him and  FCC to provide full
23   complete, and accurate information.

24   160.   As a result of the breaches of duty complained of herein the FCC PLAINTIFFS were
25   misled to their prejudice by having made their investments.

26   161.   As a direct and proximate result of the acts and omissions of Defendants WILLIAM E.
27   BUCHHOLZ and FCC, the FCC PLAINTIFFS have been injured in their business and property
28   as herein alleged.

---

**CASE NO.: C 08-03535 RMW        FOURTH AMENDED COMPLAINT        Page 50 of  164**

1   162.    The FCC PLAINTIFFS have incurred and continue to incur legal fees and costs to

2   recover such losses and any potential judgments.

3   163.    Wherefore, judgment is prayed for as hereinafter set forth.

4   **VIII.    ALLEGATIONS AND COUNTS REGARDING SOLOMON TOWERS. (Including**

5   **Allegations and Counts Regarding Defendants BUCHHOLZ, FISCHER,**

6   **SOLOMON CAPITAL,  VENTO, ZELEZNAK, Z-LOFTS, ZPM, GRACE**

7   **CAPITAL.)**

8          **A.    Factual Allegations Common to All Counts.**

9   164.    Paragraphs 1 through 74 and 82 through 113 are re-alleged and incorporated here.

10  Inclusion of paragraphs 1 through 74 and 82 through 113 in their entirety is for the purpose of

11  formally including the pertinent details regarding plaintiffs and defendants specifically

12  referenced in this section and is not intended to expand the scope of plaintiffs' claims by the

13  plaintiffs specifically stated in this section as against the defendants as specifically alleged in this

14  section.

15  165.    "Solomon Towers Plaintiffs" hereafter refers to and includes (with the respective amounts

16  of principal provided and/or net loss of investment and/or principal amount claimed by them as

17  damages as to this transaction) Juan and Brenda Bettaglio ($200,000; March 2005), Jim Coates

18  and/or JKAT Properties ($250,000; February 2005), the total amount so referenced  for these

19  plaintiffs as to this project/fund being $450,000.

20  166.    "Daystream Plaintiffs" hereafter refers to and includes (with the dates of  investment and

21  respective amounts of principal provided and/or net loss of investment and/or principal amount

22  claimed by them as damages as to this transaction) Dianne Bryson ($34,853; April 2006), Bob

23  and Nancy Winger ($30,000; March 2005; plus $1,500 March 2008 as a capital call), the total

24  amount so referenced  for these plaintiffs as to this project/fund being $66,353.

25  167.    The Daystream Plaintiffs became invested in the Solomon Towers project via Daystream

26  ST, LLC.

27  168.    Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL directed smaller

28  investors such as the Daystream Plaintiffs to a limited liability company generally referred to as

---

**CASE NO.: C 08-03535 RMW        FOURTH AMENDED COMPLAINT        Page 51 of  164**

1  Daystream.

2  169.    Daystream ST, LLC, was a Nevada limited liability company formed March 3, 2005  for

3  the purpose of raising pooled investor money which would then be used by Daystream ST, LLC,

4  to invest in the Solomon Towers project by purchasing a membership interest in Solomon

5  Towers, LLC.

6  170.    At the time of formation and for years thereafter, one of the managers of Daystream ST,

7  LLC, was Jan Edbrooke, who was also employed by and/or otherwise involved in conducting the

8  affairs of SOLOMON CAPITAL and/or EQUITY ENTERPRISES, INC.

9  171.    The Solomon Towers Plaintiffs (Juan and Brenda Bettaglio ($200,000), Jim Coates

10  and/or JKAT Properties ($250,000)) and other investors ultimately contributed a total of

11  $5,010,000 to the Solomon Capital project (at least 18 "equity" members contributing

12  $4,169,400, and at least 13 "debt" members based on notes issued by Solomon Towers, LLC,

13  who contributed $840,600).

14  172.    During and around February of 2005, and as known to Defendants VENTO and

15  ZELEZNAK at the time, Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL

16  began soliciting investment in a project generally referred to as Solomon Towers which was

17  presented to potential investors as a high rise condominium investment in Phoenix, Arizona.

18  173.    Investors were solicited on the based of a Power Point presentation and written Pro Forma

19  financial statements. No other disclosure information or documentation was disseminated to

20  potential investors. There was no Private Placement Memorandum or similar document setting

21  forth any other detailed information, potential risks, or otherwise.

22  174.    A true and correct copy of a Power Point presentation and written materials including Pro

23  Forma financial statements presented to and/or provided to potential investors is attached hereto

24  as EXHIBIT A and incorporated by reference here.

25  175.    Defendants JONATHAN VENTO and DONALD ZELEZNAK substantially participated

26  in the creation of information and documentation used to solicit investors and provided the

27  information and documents to defendants BUCHHOLZ, FISCHER knowing and intending that

28  it would be used to solicit investors.

176.    The information and documentation in which JONATHAN VENTO and DONALD
ZELEZNAK substantially participated in creating included, but was not necessarily limited to,
demographic information regarding Greater Phoenix and Downtown Phoenix, architectural
renderings of the intended structure, portions of the Project Overview, depictions of and
information described as Monroe Place Luxury Lofts, pro forma numbers, development and
sales and finance pro formas, and two Development Budgets both referencing Z Lofts and the
date of 1/14/2005 in the upper left hand corner.

177.    Metadata information regarding EXHIBIT A indicates JONATHAN VENTO was the
author of the spreadsheet that constituted the financial information in the Development Budgets
contained in EXHIBIT A.

178.    The design drawings contained in EXHIBIT A were prepared by DFD Connoyer
Hendrick, of which JONATHON VENTO was President before joining GRACE CAPITAL, are
believed to have been originally created on November 17, 2004, several months before the
investor meeting, and metadata information indicates that the document itself was created on
February 3, 2005, two days before it was presented to investors and most likely came as a result
of the activities of Defendant VENTO.

179.    Prior to presentation and delivery to potential investors including the Solomon Towers
Plaintiffs, the Power Point presentation and written materials went through several iterations that
included telephone communications in which BUCHHOLZ, FISCHER, VENTO, and
ZELEZNAK participated.

180.    At the time materials were being created and were provided, VENTO and ZELEZNAK
knew the materials were to be used to solicit potential investors.

181.    At the time materials were being created and were provided, VENTO and ZELEZNAK
knew Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL and/or other entities
controlled by them did not have the financial wherewithal to complete the transaction.

182.    At the time materials were being created and were provided, VENTO and ZELEZNAK
knew Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL intended to seek
investors by sale of membership interests in a limited liability company and by promissory notes.

183.   During and around March of 2005, Solomon Towers Plaintiffs began executing the Operating Agreement with Solomon Towers, LLC. The Operating Agreement categorically establishes initial members in excess of 35 who contributed a total of $5,010,000 to the Solomon Capital project. The Operating Agreement includes 18 "equity" members contributing $4,169,400, and 13 "debt" members based on notes issued by Solomon Towers, LLC, who contributed $840,600.

184.   As part of this Operating Agreement, Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL, as managers of Solomon Towers, LLC, agreed, among other things, to use company funds only to further the purposes of the company, not to commingle the funds with their own or others' funds, not to knowingly perform any act that contravened the Operating Agreement or was inconsistent with the purposes of the company, and to keep accurate books and records for the company.

185.   In addition to owning the property purchased by Solomon Towers and although it was later characterized as an "up charge", a commission of $1 million was paid out of escrow which plaintiffs are informed and believe first went to Defendant ZELEZNAK in a structure indicating a dual relationship as the seller's agent and the buyer's broker for the purchase of the Solomon Towers property.

186.   Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL have received "developer fees" in excess of $330,000 from the amount raised and invested for which they did not have the competency to justify and for which they did little or nothing.

187.   On or about February 1, 2006, Solomon Towers, LLC, deeded the Property to Z-LOFTS, the original seller, for de minimus consideration. Further, on September 18, 2006, Solomon Towers, LLC purchased the Property from Z-LOFTS for $10. The aforementioned acts were undertaken as further attempts to disguise the fraudulent nature of the acts complained of herein.

    **B.**    **Specific Counts.**

        **1.**    **Count 1: FRAUD (Misrepresentation and Concealment Against Defendants BUCHHOLZ, FISCHER, SOLOMON CAPITAL, VENTO, ZELEZNAK, Z-LOFTS, ZPM, GRACE CAPITAL .)**

188.    Paragraphs 164 through 187 are re-alleged and incorporated here.

**a.    Affirmative Misrepresentations**

189.    The Power Point presentation and written materials provided to Solomon Towers Plaintiffs beginning February 2005 (EXHIBIT A) contained multiple false and misleading representations of a material nature.

190.    The Power Point presentation and written materials represented a project known as Monroe Place (a project under the control of one or more GRACE DEFENDANTS) as a comparable property selling for $600 per square foot.

191.    The representation was false in that at the time there were nominal pre-sales ranging from approximately $300 to a maximum of $517 per square foot and that a document entitled "44 Monroe Development Budget" revised 4/22/2005 and later used by defendants to solicit investment in the Luxury Development Fund valued Gross Sales Proceeds at $484.08 per square foot, and actual sales occurred at prices much lower than that.

192.    The Power Point presentation and written materials represented the Estimated Project Timeframe as 36 months.

193.    The representation was false in that in that no project had yet been submitted to any governmental authority, the property was zoned "R-5 HR1" such that a 10 story structure could not have been built without a substantial variance, and that a 15 story structure would have been extraordinary under any circumstances and as such the entitlement process itself should have been anticipated as taking up to 36 months, and that a document subsequently provided to plaintiffs dated as of February 15, 2007 discovered and having been prepared by defendants actually stated the Overall Project Time line to be 4.92 years going forward from March 1, 2007.

194.    The Power Point presentation and written materials represented the land size as .75 acres.

195.    The representation was false in that the land size was actually .643 acres and was material in that it understated the land area by approximately 15% something reasonably expected to affect the ability to develop the property.

196.    The Power Point presentation and written materials first presented to investors represented the "Land Cost" as $4,000,000.

---

1   197.   The representation was false and misleading in that it eventually comprised a portion of

2   an inherent, undisclosed, and artificial profit of or about $4,608,000 based on the following:

3          a.      Defendant Z-LOFTS, LLC, under its former name of Soho Lofts, LLC, had

4                  purchased the property on July 25, 2002, for $392,000;

5          b.      On April 11, 2005, Defendant Z-LOFTS, in connection with Defendant GRACE

6                  CAPITAL and based on the Settlement Statement, sold the Property to

7                  SOLOMON TOWERS, LLC,  for $4,000,000 plus a commission of $1,000,000,

8                  charged to the buyer;

9          c.      From July 25, 2002 to April 11, 2005 nothing was done to enhance the property in

10                 the way of improvements or moving forward therewith except perhaps for two

11                 nominal permits regarding nominal demolition of a very small structure and

12                 general clean up;

13         d.      Neither market conditions nor any other reason(s) justified a price increase from

14                 $392,000 to $4-5 million from July 25, 2002 to April 11, 2005;

15         e.      The originally stated sales price of $4,000,000 and ultimate sales price of $5

16                 million including a $1 million purported commission was NOT a price reached by

17                 good faith and arms length negotiations, but rather was a price based on

18                 discussions that included, at the least, BUCHHOLZ, FISCHER, VENTO, and

19                 ZELEZNAK on the basis of what they thought might be a price that could be

20                 posed to and obtained from investors including Solomon Towers Plaintiffs;

21         f.      Once the artificial price of $4,000,000 sales price had been agreed to by

22                 BUCHHOLZ, FISCHER, VENTO, and ZELEZNAK, and prior to the Power Point

23                 presentation and delivery of Development Budgets, BUCHHOLZ began discussing

24                 the opportunity with potential investors including some of the Solomon Towers

25                 Plaintiffs and referenced the land cost of $4,000,000;

26         g.      Subsequent to BUCHHOLZ having had such discussions, VENTO and

27                 ZELEZNAK telephoned the SOLOMON CAPITAL office and told FISCHER

28                 they wanted another million dollars;

     h.     FISCHER went and told BUCHHOLZ that VENTO wanted another million dollars to which BUCHHOLZ replied in the affirmative and that they could cover it by telling investors that there would be an up charge;

     i.     The presentation and documents were modified to state land acquisition costs as $5,000,000 as contained in the Development Budgets given to some of the investors;

     j.     On or about April 21, 2005, an email sent by FISCHER to proposed investors including Solomon Towers Plaintiffs stated there had been mention of an up charge during the presentation, that at the time the amount had been uncertain, but it had now been determined that total land cost including the supposed up charge would be $5,000,000 and that it would be paid as a commission, the $4 million "sales price" and $1 million "commission" being what ultimately appeared on the Settlement Statement.

198.    The Power Point presentation and written materials presented to investors including Solomon Towers Plaintiffs included representations as to costs and expenses for construction and related aspects.

199.    The representations as to construction and related costs and expenses were false in that, as a whole, the costs and expenses were understated construction costs by millions of dollars.

200.    The representations, individually and collectively, were material in that they were of a type and nature reasonably relied on by reasonable investors including Solomon Towers Plaintiffs including, but not limited to, evaluation of investment risk, potential profit, and time for return of investment.

201.    The representations, individually and collectively, were justifiably relied on by the Solomon Towers Plaintiffs and Daystream Plaintiffs in deciding to invest in that they were of a type and nature reasonably relied on by reasonable investors including, but not limited to, evaluation of investment risk, potential profit, and time for return of investment.

202.    Had the true facts been known, the decision to invest would not have been made by the Solomon Towers Plaintiffs and Daystream Plaintiffs .

203.   As a consequence, the Solomon Towers Plaintiffs and Daystream Plaintiffs have suffered the damages alleged herein.

**b.   Concealment of Material Facts**.

204.   These Defendants failed to disclose the pre-existing relationship between Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL with Defendants ZELEZNAK and VENTO and their other GRACE entities.

205.   Defendants, BUCHHOLZ, FISCHER, SOLOMON CAPITAL, ZELEZNAK and VENTO concealed and failed to disclose pre-existing and ongoing relationships between them and the true nature of $1 million paid to ZELEZNAK.

206.   The failure to disclose this fact constitutes a material omission since, among other reasons, the Property was purchased by Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL from Defendants ZELEZNAK and VENTO and/or their companies, Z-LOFTS, ZPM, and/or GRACE CAPITAL for a vastly over-inflated price and involved an exorbitant commission rate and that at the least, there was duty to disclose the effective dual agency and other involvement of ZELEZNAK to whom it is believed the $1 million commission was paid out of escrow.

207.   Defendants BUCHHOLZ, FISCHER, SOLOMON CAPITAL, ZELEZNAK and VENTO concealed and failed to disclose the true nature of the purported $1 million paid directly or indirectly to ZELEZNAK.

208.   Defendants BUCHHOLZ, FISCHER, SOLOMON CAPITAL, ZELEZNAK and VENTO concealed and failed to disclose the true value of the property.

209.   Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL, especially considering the other undisclosed contemporaneous activities with the GRACE DEFENDANTS in the same area knew and concealed that the price paid for the land was more than five times its fair market value and nearly thirteen times the cost to Z-LOFTS and ZELEZNAK.

210.   The information concealed was material and of a type reasonably relied on by reasonable investors.

211.   The Solomon Towers Plaintiffs and Daystream Plaintiffs reasonably relied on these

1   Defendants to provide full and complete information without omission.

2   212.   If the Solomon Towers Plaintiffs and Daystream Plaintiffs had known the concealed

3   information, they would not have invested.

4   213.   As a consequence the Solomon Towers Plaintiffs and Daystream Plaintiffs have suffered

5   the damages alleged herein.

6   214.   The conduct of these Defendants as described above, involved malice, oppression and

7   fraud, and such conduct was clearly despicable.  Such despicable and fraudulent conduct was

8   plainly conducted by the individual defendants as officers, directors, and/or managing agents of

9   these entity Defendants and/or was ratified by the entity defendants.  Accordingly, the Court

10  should assess punitive damages against these Defendants.

11  215.   Wherefore, the Solomon Towers Plaintiffs and Daystream Plaintiffs pray for judgment as

12  set forth below.

13              **2.      Count 2: BREACH OF FIDUCIARY DUTY (Against Defendants**

14                      **BUCHHOLZ, FISCHER, SOLOMON CAPITAL, VENTO and**

15                      **ZELEZNAK.)**

16  216.   Paragraphs 164 through 215 are re-alleged and incorporated here.

17  217.   As the President and Chief Financial Officers of SOLOMON CAPITAL and as the

18  managing partners of Solomon Towers, LLC, Defendants BUCHHOLZ, FISCHER, and

19  SOLOMON CAPITAL owed fiduciary duties to Plaintiffs who were members of Solomon

20  Towers, LLC, and Plaintiffs who had invested by promissory notes, but also required to sign the

21  Operating agreement.

22  218.   Defendants VENTO and ZELEZNAK knew that the manner in which investors would be

23  solicited was such that Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL

24  included sales of membership interests in Solomon Towers, LLC.

25  219.   VENTO and ZELEZNAK knew Defendants BUCHHOLZ, FISCHER, and SOLOMON

26  CAPITAL would incur fiduciary obligations to members of Solomon Towers, LLC, and those

27  otherwise bound by the terms of the Operating Agreement of Solomon Towers, LLC.

28  220.   As substantial participants in the preparation of information and/or documents that were

---

1   known to be intended for dissemination to third persons for the purpose of soliciting investment

2   and that included material information which would reasonably be relied by investors to whom

3   BUCHHOLZ, FISCHER, and SOLOMON CAPITAL would have fiduciary obligations,

4   VENTO and ZELEZNAK incurred and owed a similar duty of care and fiduciary obligations.

5   221.    Having fiduciary obligations, Defendants BUCHHOLZ, FISCHER, SOLOMON

6   CAPITAL, VENTO, and ZELEZNAK had a duty to provide only truthful information and not

7   make any untrue statement or omit any material fact.

8   222.    Defendant ZELEZNAK had a further and heightened obligation to provide only truthful

9   information and not make any untrue statement or omit any material fact.

10  223.    By having the equivalent of an ownership interest in the property sold and direct or

11  indirect receipt of $1 million first characterized to investors as an "up charge" and paid out of

12  escrow as a purported commission, Defendant ZELEZNAK had, at a minimum, a dual

13  relationship equivalent to that of being the seller's agent and the buyer's broker regarding the sale

14  of the Solomon Towers property.

15  224.    The existence of the equivalent of an ownership interest and a dual relationship and

16  having participated in the creation and dissemination of information and documents to investors

17  created a conflict of interest for Defendant ZELEZNAK and imposed on him a duty of full and

18  complete disclosure to all those known or reasonably expected to be affected by the transaction.

19  225.    Defendants BUCHHOLZ, FISCHER, SOLOMON CAPITAL, ZELEZNAK and VENTO

20  breached their duty to provide full and complete information without omission by making the

21  misrepresentations and concealing the material information stated above.

22  226.    As a result of the breach of their fiduciary obligations, the Daystream Plaintiffs and

23  Solomon Towers Plaintiffs suffered the damages alleged herein.

24  227.    The conduct of these Defendants as described above involved malice, oppression and

25  fraud, and such conduct was clearly despicable.  Such despicable and fraudulent conduct was

26  plainly conducted by the individual defendants as officers, directors, and/or managing agents of

27  these entity Defendants and/or was ratified by the entity defendants.  Accordingly, the Court

28  should assess punitive damages against these Defendants.

---

1   228.   Wherefore, the Solomon Towers Plaintiffs and Daystream Plaintiffs pray for judgment as
2   set forth below.

3   IX.   **ALLEGATIONS AND COUNTS AS TO THE LUXURY DEVELOPMENT FUND**
4         **AND SPIRIT AT SPECTRUM. (Including allegations and counts as to Defendants**
5         **BUCHHOLZ; RDB DEVELOPMENT, LLC; FISCHER; SOLOMON CAPITAL;**
6         **LDF; VENTO; VENTO INVESTMENTS, LLC; ZELEZNAK; ZELTOR, LLC;**
7         **GRACE CAPITAL.)**
8         A.   **Factual Allegations Common to All Counts, Including Specific**
9              **Misrepresentations and Falsity Thereof and Specific Concealment of Material**
10             **Facts, All Incorporated Later as to Specific Counts.**

11  229.   Paragraphs 1 through 74 and 82 through 113 are re-alleged and incorporated here.
12  Inclusion of paragraphs 1 through 74 and 82 through 113 in their entirety is for the purpose of
13  formally including the pertinent details regarding plaintiffs and defendants specifically
14  referenced in this section and is not intended to expand the scope of plaintiffs' claims by the
15  plaintiffs specifically stated in this section as against the defendants as specifically alleged in this
16  section.

17  230.   "LDF Plaintiffs" hereafter refers to and includes those plaintiffs who invested in the
18  LUXURY DEVELOPMENT FUND and their minimum damages claimed and alleged as being
19  (with the respective amounts of principal provided and/or net loss of investment and/or principal
20  amount claimed by them and for which all received promissory notes stated as being secured)
21  Yu-Sze Yen ($200,000; August 2005 commenced investing), Charlin Yen ($25,000; July 2005),
22  Clarice Arne ($114,300; November 2005), Mike Baker (a total of $165,392.10; June 2005 and
23  November 2005), Juan Bettaglio ($65,000; July 2005), Kwei Choong ($50,000; October 2005),
24  Jason Colyar ($50,000; December 2005), Mark and Kathleen Delman ($50,000; June 2005)
25  Timothy and Lori Gale ($200,000; October and/or November 2005), Jerry and Rhonda Hughes
26  ($50,000; October/November 2005), Bruce and Deborah Meeker ($200,054; October 2005),
27  Cynthia J. Semenoff ($200,100; July 2005 - October 2005), Mark Van Buhler ($200,000;
28  October 2005), Irvin and Yolanda Urbanski ($400,314.79; October 2005), James Wong

1  ($46,000; October/November 2005), the total amount so referenced  for these plaintiffs as to this
2  project/fund being $2,016,160.89.
3  231.    About May 2005, Defendants BUCHHOLZ and FISCHER caused Defendant
4  SOLOMON CAPITAL to begin disseminating invitations, including via email, for an
5  investment presentation to be held on June 8, 2005 at the SOLOMON CAPITAL office at 20
6  Great Oaks Boulevard, San Jose, California.
7  232.    The invitation soliciting investors included a biography for DONALD ZELEZNAK and
8  stated in part SOLOMON CAPITAL will be hosting an information event to discuss the details
9  of the investment, introduce key players, and distribute the Private Placement Memorandum, and
10  would be joined by special guest, DONALD ZELEZNAK, a principle of GRACE
11  COMMUNITIES, who be sharing valuable information on the Arizona marketplace and the
12  investment opportunities being presented.
13  233.    The biography of DONALD ZELEZNAK included with the email was virtually identical
14  to, if not identical to the same as what then existed on one or more web sites maintained and
15  controlled by one or more Grace entities and represented DONALD ZELEZNAK as a principal
16  of Grace Communities, detailing his purported experience, who would be sharing valuable
17  information on the marketplace and the investment opportunities being presented.
18  234.    Exhibit A to the Confidential Private Offering Memorandum contained nine pages
19  specific to the proposed loan for the office condominium projects in Illinois and specifically
20  identified three projects referred to as Naper Courtyards, Courtyards at Greenspoint, and
21  Prospect Courtyards which could only have come from one or more GRACE DEFENDANTS.
22  235.    Exhibit B to the Confidential Private Offering Memorandum contained 18 pages specific
23  to the proposed loan for Monroe Place including a proposed development entitled "44 Monroe
24  Development Budget" which could only have come from one or more GRACE DEFENDANTS.
25  236.    Exhibit C to the Confidential Private Offering Memorandum contained at least 11pages
26  specific to the proposed loan for the Portales Condominium Project including the statements that
27  "Grace Communities, LLC (Grace) has announced its plans to build *Portales*, a $188 million
28  luxury condominium development" and "the project  has been completely approved by the

1   Scottsdale City Council, 85% engineered and designed, and will be permit ready by June 2005"

2   and contained project history, property renderings, projected unit pricing, demographic analysis,

3   and the "Project Pro Forma"all of which most reasonably came from one or more GRACE

4   DEFENDANTS.

5   237.   A document entitled Luxury Development Fund Note Program Confidential Private

6   Offering Memorandum of approximately 100 pages including exhibits was provided to attendees

7   on June 8, 2005 and subsequently to others and the LDF Plaintiffs.

8   238.   The Memorandum stated investors were being given the opportunity to purchase Notes in

9   units of $25,000 each and  would receive promissory notes for funds supplied with interest of

10  20% to those committing to more than $200,000 18% to those who committed to between

11  $100,000 and $200,000, and 16% to others (Executive Summary, pages 14-15).

12  239.   Attached as EXHIBIT B and incorporated by reference are true, correct, and highlighted

13  portions representative of the Luxury Development Fund Note Program Confidential Private

14  Offering Memorandum given to investors including LDF Plaintiffs.

15  240.   On June 8, 2005, Defendant ZELEZNAK traveled to Solomon Capital's offices in Santa

16  Clara County and spoke with potential investors as part of the event at which the details of the

17  investment and Private Placement Memorandum were presented. There were approximately 100

18  attendees including, but not limited to, LDF Plaintiffs Yu-Sze Yen, Jim Wong, Juan Bettaglio,

19  Mark Delman, Mark Van Buhler, Jerry & Rhonda Hughes, Jim Coates,  Irvin "Jay" Urbanski,

20  Wayne & Candise Canto, Cynthia Semenoff all of whom were in material part influenced to

21  invest on the basis of what was presented and said.

22  241.   ZELEZNAK was presented by BUCHHOLZ as being one of "our partners" and  "part of

23  our team" and "one of the people who make things happen."

24  242.   ZELEZNAK spoke and answered questions for approximately an hour and made

25  statements and representations regarding and/or including, but not limited to, his expertise and

26  background in the industry and particular market areas of Phoenix/Scottsdale, has done a lot of

27  projects in the area, the Phoenix/Scottsdale market offered great opportunities, the residential

28  market for downtown Phoenix was going to boom, Monroe Place presented a great opportunity

1   for Luxury Development Fund investors in that it was a great project with great pre-sales,

2   Portales presented a great opportunity for Luxury Development Fund investors, and the office

3   condominium concept was new to the Chicago area and presented an excellent opportunity.

4   243.   ZELEZNAK's presentation was such that he was fully familiar with the contents of the

5   Confidential Private Offering Memorandum and he neither did nor said anything to contradict its

6   contents.

7   244.   On the basis of ZELEZNAK's statements and the representations in the Memorandum,

8   the LDF Plaintiffs reasonably believed ZELEZNAK was authorized to speak for and did speak

9   for and on behalf of VENTO, GRACE COMMUNITIES, LLC, and their affiliates.

10  245.   Subsequent to the presentation of June 8, 2005, there was another and similar presentation

11  and dissemination of documents as a purported second round opportunity regarding the

12  opportunity presented by the Luxury Development Fund.

13  246.   The Luxury Development Fund Note Program Confidential Private Offering

14  Memorandum and the presentation of ZELEZNAK made multiple representations to LDF

15  Plaintiffs that were false and misleading.

16  247.   The Memorandum and presentation included multiple statements and representations of

17  an unequivocal nature as to what percentage of funds and/or amounts thereof would be invested

18  in the Office Condos in the Chicago area, (2) in the Monroe Project and (3) in the Portales

19  project. Some of the specific representations included the following statements:

20          a.      Three of the projects have already been identified, and detailed descriptions

21                  are included in Exhibits A, B and C as the Illinois Office Condominium

22                  Project, the Monroe Place Mixed Use Project, and the Portales Residential

23                  Luxury Condominium Project, respectively; and

24          b.      The Illinois Office Condominium Project properties are located in the greater

25                  Chicago, Illinois area, in the suburbs of Naperville, Hoffman Estates and Itasca ...

26                  (Executive Summary, pages 2-3).

27  248.   These representations were false in that there was no intention to invest funds as

28  represented, while funds were still being solicited and accepted, the Defendants BUCHHOLZ,

1  FISCHER, ZELEZNAK, and FISCHER were undertaking to engage in the Spirit at Spectrum

2  transaction as described further below.

3  249.    On the basis of the written materials presented and the presentation by ZELEZNAK and

4  the totality of the representations made, all indications were that Luxury Development Fund

5  investor money was going to be allocated to and used for the three projects identified for loans

6  including the office condominiums in (1) the Chicago area, (2) Monroe Place  and (3) Portales

7  and any reasonable investor could only have so concluded and on which basis the LDF Plaintiffs

8  were induced to make their investments as herein alleged.

9  250.    The representations were false in that there was no intent to engage in the purported loans

10  regarding Monroe Place and Portales; loans were never made regarding Monroe Place and

11  Portales; none of the GRACE DEFENDANTS would not have had any reason or need to seek

12  mezzanine financing for the Monroe and Portales projects, especially considering their prior

13  representations as  to the status of the Monroe project such as that contained in what had been

14  presented  in the context of the Solomon Towers project; Defendants never intended to engage in

15  the purported loans regarding office condominiums in Chicago as had been represented

16  (represented as a 20% allocation) and no more than ten percent of funds went to such projects

17  and even then it went to a different project; SOLOMON CAPITAL was simultaneously

18  soliciting investors for a different fund for the supposed purpose of the Chicago area office

19  condos; and that as of the time investors were being solicited, the true intent of the defendants

20  was to raise money to be used for a project generally referred to as Spirit at Spectrum, and to

21  which approximately 90% of all Luxury Development Fund investor money went and in which

22  defendants engaged in another transaction involving the creation of an undisclosed artificial

23  profit as described further below.

24  251.    The Memorandum and presentation represented loans would be made through one or

25  more intermediate investment entities or vehicles to be Ron and Charice Buchholz, as principals

26  of Solomon Capital, and/or Jonathan Vento and Donald Zeleznak, as the principals of Grace

27  Communities, LLC ("Grace"), or their affiliates (Executive Summary, page 2).

28  252.    The representation was false in that there was no intention to create any such investment

---

**CASE NO.: C 08-03535 RMW       FOURTH AMENDED COMPLAINT       Page 65 of  164**

1   vehicles and while funds were still being solicited and accepted and Defendants BUCHHOLZ,

2   FISCHER, and ZELEZNAK, were undertaking to engage in the Spirit at Spectrum transaction as

3   described further below.

4   253.    In June 2004, Defendants VENTO and ZELEZNAK formed The Spirit at Spectrum,

5   LLC, an Arizona limited liability company of which the managers and members included

6   ZELTOR, LLC, (which was in turn managed by DONALD ZELEZNAK); VENTO

7   INVESTMENTS, LLC, (which was in turn managed by JONATHON VENTO) and others.

8   254.    Pursuant to a contract dated July 26, 2004 and a deed that recorded October 29, 2004,

9   The Spirit at Spectrum, LLC, acquired vacant land in Maricopa County, Arizona for $4,652,000

10  that included 15.48 acres of vacant land then reflected on County records as being within Parcels

11  23 and 24 of the Final Plat Map of The Spectrum at Val Vista Phase 1 recorded in Maricopa

12  County on September 25, 2001 (Book 573, Page 36).

13  255.    According to the Deed Records for Maricopa County, The Spirit at Spectrum, LLC,

14  financed the purchase of this land, and apparently more, by a loan of $5,200,000 from Stearns

15  Bank secured by a deed of trust on the property.

16  256.    During July 2005 and despite the ongoing misrepresentations as to intended use of funds

17  being raised and ongoing solicitation of investors, Defendants BUCHHOLZ and FISCHER

18  caused the formation of Spirit Investors, LLC, an Arizona limited liability company, of which

19  Defendants FISCHER and RDB Development, LLC, (which in turn was managed by Defendant

20  BUCHHOLZ) were managers and members with an interest of 20% or greater.

21  257.    The LDF Plaintiffs are informed and believe and thereon allege that there was no purpose

22  for the formation of Spirit Investors, LLC, other than the orchestration of the sale of the vacant

23  land as further described below.

24  258.    Despite the ongoing misrepresentations as to intended use of funds being raised and

25  ongoing solicitation of investors, the sale of the vacant land at a greatly inflated and artificial

26  price was being orchestrated as evidenced by a Purchase Agreement dated September 12, 2005

27  wherein The Spirit at Spectrum, LLC, (signed by ZELEZNAK as manager) agreed to sell the

28  vacant land to RDB DEVELOPMENT, LLC, (signed by BUCHHOLZ as manager) for

---

**CASE NO.: C 08-03535 RMW        FOURTH AMENDED COMPLAINT        Page 66 of  164**

$15,500,000 with earnest money deposits required to be $1,000,000 by September 15, 2005, $2,608,339 by November 1, 2005, and $1,391,661 by November 7, 2005 (total earnest money of $5,000,000) and without further specification of financing terms.

259.    Immediately after investment in the Luxury Development Fund was purportedly closed, documents were finalized and recorded  regarding the sale of the vacant land regarding what came to known and generally referred to as Spirit at Spectrum.

260.    Based on a warranty deed recorded November 25, 2005 in for Maricopa County, Arizona, (Document Number 1778114), The Spirit at Spectrum, LLC, sold the vacant land to Spirit Investors, LLC, for $15,500,000 of which $7,000,000 was paid in cash and the balance, on information belief and public records was financed by a loan obtained from M&I Marshall & Ilsley Bank that included use of a misleading and false appraisal that included artificially contrived comparable sales. DONALD ZELEZNAK signed on behalf of the seller and RONALD BUCHHOLZ signed on behalf of buyer. The sale price of $15,500,000 was 333% greater than the price paid by The Spirit at Spectrum, LLC.

261.    The loan of $5,200,000 from Stearns Bank to The Spirit at Spectrum, LLC, that  financed its purchase of the land is believed to have been paid out escrow.

262.    During the approximate 13 months The Spirit at Spectrum, LLC, owned the land, nothing had occurred to justify any substantial increase in value.

263.    The LDF Plaintiffs are unaware of and have been unable to determine any meaningful activity such as permits, works of improvement or similar  activity during the time The Spirit at Spectrum, LLC, owned the land.

264.    Based on a Deed of Trust recorded in Maricopa County on November 23, 2005, Spirit Investors, LLC, obtained two loans from M&I Marshall & Ilsley Bank, one for $14,000,000 and the other for $9,000,000, both secured by the property of which Spirit at Spectrum, LLC, was actually able to obtain and use $10,450,000, including use of a fraudulent appraisal.

265.    Based on the above, these Defendants engaged in transactions that created an artificial profit of $10,848,000 based on the purported sale price of $15,500,000 and the reported acquisition price of $4,652,000.

266.   Based on the above, there was an artificial cash profit of at least $2,348,000.

267.   After Spirit Investors, LLC, acquired title, there was no meaningful activity to develop or further development of the land or service debt.

268.   Instead, once as much cash as possible had been obtained, the property was allowed to go to foreclosure and the property was eventually lost by foreclosure on or about September 7, 2007.

269.   As a result of the above, these defendants have been able to profit in an amount exceeding $5,000,000 and the LDF Plaintiffs have suffered the losses and damages alleged herein.

270.   The LDF Plaintiffs are unable to further specify the extent of their damages and direct benefit to these defendants because any and all such information and/or documents are in the possession of one or more defendants and/or third parties, the complexity of the transactions, the fact that the land involved underwent changes to parcel numbers.

**B.    Specific Counts  Regarding the Luxury Development Fund and Spirit at Spectrum.**

       **1.    Count 1:  VIOLATION OF SECTION 10B AND RULE 10B-5 OF THE SECURITIES EXCHANGE ACT OF 1934. (Against Defendants BUCHHOLZ; RDB DEVELOPMENT, LLC; FISCHER; LUXURY DEVELOPMENT FUND; SOLOMON CAPITAL; VENTO; VENTO INVESTMENTS, LLC; ZELEZNAK; ZELTOR, LLC;  GRACE CAPITAL.)**

271.   Paragraphs 229 through 270 are re-alleged and incorporated here.

272.   Defendants BUCHHOLZ; RDB DEVELOPMENT, LLC; FISCHER; SOLOMON CAPITAL; LUXURY DEVELOPMENT FUND; VENTO; VENTO INVESTMENTS, LLC; ZELEZNAK; ZELTOR, LLC; and GRACE CAPITAL engaged in a course of fraudulent activities  to secure money from the LDF Plaintiffs for the purpose of re-selling vacant land at a grossly and artificially inflated price and substantially participated in the creation, dissemination, approval, and presentation of the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose

material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading.

273.    These  Defendants violated §10(b) and Rule 10b-5 of the 1934 Act in that they:

      a.    Employed devices, schemes and artifices to defraud Plaintiffs;

      b.    Made untrue statements of material facts and omitted to state material facts

           necessary in order to make the statements made, in light of the circumstances

           under which they were made, not misleading; or

      c.    Engaged in acts, practices and a course of business that operated as a fraud or

           deceit upon the LDF Plaintiffs.

274.    The LDF Plaintiffs have suffered damages in that, in reliance on these Defendants'

representations including, but not limited to, their investments were not used as represented and

instead were used to pay for the land at a grossly and artificially inflated price.

275.    As a direct and proximate result of these Defendants' violation of §10(b) and Rule 10b-5

of the 1934 Act, the LDF Plaintiffs have been injured in their business and property as herein

alleged. Portions of LDF Plaintiffs' investments have been transferred to these Defendants.

276.    The LDF Plaintiffs have incurred and continue to incur legal fees and costs to recover

such losses and any potential judgments against these Defendants in the pending lawsuit.

277.    WHEREFORE, The LDF Plaintiffs pray for judgment as hereinafter set forth.

    **2.    Count  2:  VIOLATION OF SECTION 12(A) OF THE SECURITIES**

        **ACT OF 1933 (Against Defendants BUCHHOLZ; RDB**

        **DEVELOPMENT, LLC; FISCHER; SOLOMON CAPITAL;**

        **LUXURY DEVELOPMENT FUND; VENTO; VENTO**

        **INVESTMENTS, LLC; ZELEZNAK; ZELTOR, LLC;  GRACE**

        **CAPITAL)**

278.    Paragraphs 229 through 270 are re-alleged and incorporated here.

279.    Defendants BUCHHOLZ; RDB DEVELOPMENT, LLC; FISCHER; SOLOMON

CAPITAL; LDF; VENTO; VENTO INVESTMENTS, LLC; ZELEZNAK; ZELTOR, LLC; and

GRACE CAPITAL violated 15 U.S.C. § 77l  in that they:

(a)     Offered to sell a security by means that included  oral communication; and,

(b)     Made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or substantially participated in the preparation thereof knowing of intended use for dissemination and solicitation of investors.

280.    The LDF Plaintiffs suffered damages as herein alleged and in reliance on the statements of these Defendants, including, but not limited to, their investments were not used as represented and instead used to pay for the land at a grossly and artificially inflated price.

281.    As a direct and proximate result of these Defendants' violation of §12(a) of the 1933 Act, The LDF Plaintiffs have been injured in their business and property as herein alleged.

282.    Portions of LDF Plaintiffs' investments have been transferred to these Defendants or third parties.

283.    The LDF Plaintiffs have incurred and continue to incur legal fees and costs to recover such losses and any potential judgments against Defendants in the pending lawsuits.

284.    As a direct and proximate result of these Defendants' wrongful conduct, The LDF Plaintiffs are entitled to restitution of monies invested with interest thereon.

285.    WHEREFORE, the LDF Plaintiffs pray for judgment as hereinafter set forth.

**3.      Count 3: FRAUD (Misrepresentation and Concealment Against Defendants BUCHHOLZ; RDB DEVELOPMENT, LLC; FISCHER; SOLOMON CAPITAL; LDF; VENTO; VENTO INVESTMENTS, LLC; ZELEZNAK; ZELTOR, LLC; and GRACE CAPITAL).**

286.    Paragraphs 229 through 270 are re-alleged and incorporated here.

287.    Defendants BUCHHOLZ; RDB DEVELOPMENT, LLC; FISCHER; SOLOMON CAPITAL; LDF; VENTO; VENTO INVESTMENTS, LLC; ZELEZNAK; ZELTOR, LLC; and GRACE CAPITAL made and/or substantially participated in the making of, and/or authorized and ratified the making of the misrepresentations and concealment of material facts and information.

288.   These Defendants, individually and collectively, made the multiple representations which, individually and collectively, led the LDF Plaintiffs to believe that funds would be allocated and used as presented to them.

289.   The representations were false in that Defendants BUCHHOLZ; RDB DEVELOPMENT, LLC; FISCHER; LDF; and SOLOMON CAPITAL had no intention of allocating and using funds as represented and were actually engaged in orchestrating the transaction that became known as Spirit at Spectrum.

290.   The representations were also false in that Defendants VENTO; VENTO INVESTMENTS, LLC; ZELEZNAK; ZELTOR, LLC; and GRACE CAPITAL had no intention of receiving or accepting the funds for the projects as represented and were actually engaged in orchestrating the transaction that became known as Spirit at Spectrum.

291.   The representations were material.

292.   The LDF Plaintiffs justifiably relied on the individual and collective representations in deciding to invest.

293.   If the LDF Plaintiffs had known the true facts, the decisions to invest would not have been made.

294.   Defendants BUCHHOLZ; RDB DEVELOPMENT, LLC; FISCHER; SOLOMON CAPITAL; LDF; VENTO; VENTO INVESTMENTS, LLC; ZELEZNAK; ZELTOR, LLC; and GRACE CAPITAL actively concealed their true intentions and activities regarding orchestration of and intent to enter into the transaction that became known as Spirit at Spectrum.

295.   The LDF Plaintiffs justifiably relied on these Defendants to provide full and complete information without omission including, but not limited to, the fact that once these Defendants undertook to speak and make the representations, they incurred a duty to make full and complete disclosure without omission.

296.   The information concealed was material

297.   If the LDF Plaintiffs had known known the concealed information, they would not have invested.

298.   As a consequence the LDF Plaintiffs have suffered the damages alleged herein.

299. The conduct of these Defendants as described above, involved malice, oppression and fraud, and such conduct was clearly despicable. Such despicable and fraudulent conduct was plainly conducted by the individual defendants as officers, directors, and/or managing agents of these entity Defendants and/or was ratified by the entity defendants. Accordingly, the Court should assess punitive damages against these Defendants.

300. Wherefore, the LDF Plaintiffs pray for damages as set forth below.

### 4. Count 4: BREACH OF CONTRACT (Anticipatory Breach) (Against Defendants BUCHHOLZ; RDB DEVELOPMENT, LLC; FISCHER; SOLOMON CAPITAL; and LDF.)

301. Paragraphs 229 through 270 are re-alleged and incorporated here.

302. Defendants BUCHHOLZ; RDB DEVELOPMENT, LLC; FISCHER; SOLOMON CAPITAL; and LDF induced the LDF Plaintiffs to make their investments by promising Secured Promissory Notes.

303. From June 2005 through December 2005, LDF issued each of the LDF Plaintiffs Secured Promissory Notes for the amounts of their investments herein alleged.

304. The Secured Promissory Notes provided for maturity and payment on the third anniversary of the date the note was given.

305. Through the Spring of 2007, Defendants BUCHHOLZ, FISCHER, SOLOMON CAPITAL, and LDF were still telling the LDF Plaintiffs and/or causing the LDF Plaintiffs to be told the LDF projects were progressing well.

306. By communication dated February 19, 2008 on letterhead of Solomon Capital, the LDF Plaintiffs were advised that the LDF had been unable to meet its obligations on money borrowed and secured by the Spirit at Spectrum property, the lending bank had foreclosed, the LDF investment in the Spirit at Spectrum property was worthless, the only other asset on the books was an $800,000 loan by LDF to The Courtyards at Briargate, LLC.

307. By email dated May 26, 2008, LDF Plaintiffs were informed the value of The Courtyards at Briargate, LLC, was such that the lending bank was likely to foreclose on the property, the inherent consequence of which would be the entire loss of the LDF loan to The Courtyards at

1    Briargate, LLC.

2    308.    Based on a Balance Sheet dated June 21, 2007 and given to LDF Plaintiffs, LDF had no

3    other assets or business activities and a negative net worth of $466,429.53.

4    309.    Based on the above, it is apparent that LDF cannot make and will not be able to make

5    payments on the Secured Promissory Notes given to LDF Plaintiffs.

6    310.    The circumstances give rise to a de facto anticipatory breach such that the notes may now

7    be deemed accelerated and due.

8    311.    As a consequence the LDF Plaintiffs have suffered the damages alleged herein.

9    312.    Wherefore, the LDF Plaintiffs pray for damages as set forth below.

10         **5.    Count 5: CONSPIRACY (Against Defendants BUCHHOLZ; RDB**

11              **DEVELOPMENT, LLC; FISCHER; SOLOMON CAPITAL; LDF;**

12              **VENTO; VENTO INVESTMENTS, LLC; ZELEZNAK; ZELTOR,**

13              **LLC; and GRACE CAPITAL.)**

14   313.    Paragraphs 229 through 270 are re-alleged and incorporated here.

15   314.    Defendants BUCHHOLZ; RDB DEVELOPMENT, LLC; FISCHER; SOLOMON

16   CAPITAL; LDF; VENTO; VENTO INVESTMENTS, LLC; ZELEZNAK; ZELTOR, LLC; and

17   GRACE CAPITAL made and/or substantially participated in the making of, and/or authorized

18   and ratified the making of the misrepresentations and concealment of material facts and

19   information as to the LDF Plaintiffs.

20   315.    At least as far back as early 2003, and perhaps earlier, these Defendants knowingly and

21   willfully conspired by agreements among themselves to concoct projects and transactions, of

22   which the LDF Fund and  Spirit at Spectrum was part, in such a fashion to effectively sell real

23   property directly or indirectly funded by LDF Plaintiff investors for prices significantly over

24   market value and the price for which property had been or was acquired while promising fair

25   returns on the investment, then to divert cash created thereby for their own benefit, leaving the

26   properties severely undercapitalized, and leaving the investors with no return on their investment

27   and otherwise siphon LDF investor money.

28   316.    Defendants BUCHHOLZ; RDB DEVELOPMENT, LLC; FISCHER; SOLOMON

1   CAPITAL; LDF; VENTO; VENTO INVESTMENTS, LLC; ZELEZNAK; ZELTOR, LLC; and

2   GRACE CAPITAL, made and/or participated in the making of, and/or authorized and ratified

3   the making of the misrepresentations and concealment of material facts and information, and

4   engaged in the acts alleged herein pursuant to, and in furtherance of the conspiracy.

5   317.   Neither the LDF Plaintiffs nor any other Plaintiffs had knowledge of the

6   above-described conspiracy and other conspiracies at the time they were taking

7   place.

8   318.   Neither the LDF Plaintiffs nor any other Plaintiffs could have discovered the conspiracy

9   involving the LUXURY DEVELOPMENT FUND and Spirit at Spectrum or  any other

10  conspiracies in the exercise of reasonable diligence because they were not sophisticated

11  investors, justifiably relied on Defendants to uphold their obligations and duties to provide full

12  and complete information without omission, and because Defendants actively concealed their

13  activities.

14  319.   As a proximate result of the wrongful acts herein alleged, the LDF Plaintiffs have

15  been damaged as alleged herein.

16  320.   The conduct of Defendants BUCHHOLZ; RDB DEVELOPMENT, LLC; FISCHER;

17  SOLOMON CAPITAL; LDF; VENTO; VENTO INVESTMENTS, LLC; ZELEZNAK;

18  ZELTOR, LLC; and GRACE CAPITAL as described above, involved malice, oppression and

19  fraud, and such conduct was clearly despicable.  Such despicable and fraudulent conduct was

20  plainly conducted by the individual defendants as officers, directors, and/or managing agents of

21  these entity Defendants and/or was ratified by the entity defendants.  Accordingly, the Court

22  should assess punitive damages against these Defendants.

23  321.   WHEREFORE, the LDF Plaintiffs pray for judgment as hereinafter set forth.

24  **X.      ALLEGATIONS AND COUNTS REGARDING PATRIOT COURTYARDS**

25  **(Including allegations and counts as to Defendants  BUCHHOLZ, RDB**

26  **DEVELOPMENT, LLC, EENI, FISCHER, EQUITY ENTERPRISES, INC.,**

27  **VENTO INVESTMENTS, LLC, JONATHAN VENTO, ZELTOR, LLC, DONALD**

28  **ZELEZNAK, GRACE CAPITAL.)**

**A.    Factual Allegations Common to All Counts.**

1

2    322.    Paragraphs 1 through 74 and 82 through 113 are re-alleged and incorporated here.

3    Inclusion of paragraphs 1 through 74 and 82 through 113 in their entirety is for the purpose of

4    formally including the pertinent details regarding plaintiffs and defendants specifically

5    referenced in this section and is not intended to expand the scope of plaintiffs' claims by the

6    plaintiffs specifically stated in this section as against the defendants as specifically alleged in this

7    section.

8    323.    Patriot Courtyards Investors, LLC, was an Arizona limited liability company formed May

9    6, 2004 (Arizona Secretary of State 01337009) of which the initial managers and were members

10    with a 20% or greater interest were VENTO INVESTMENTS, LLC (of which JONATHAN

11    VENTO was a member and manager), ZELTOR, LLC, (of which DONALD ZELEZNAK was a

12    member and manager), and RDB DEVELOPMENT, LLC, (of which RONALD BUCHHOLZ

13    was a member and manager.

14    324.    "Patriot Courtyards Plaintiffs" all of whom invested by purchase of membership interests

15    in PATRIOT COURTYARDS INVESTORS, LLC, hereafter refers to and includes (with the

16    respective amounts of principal provided and/or net loss of investment and/or principal amount

17    claimed by them as damages) Mike and Renee Brogdon ($17,763; June 2004), Irvin and Yolanda

18    Urbanski ($21,316; August 2004), Bob and Nancy Winger ($49,974; May 2004), the total

19    amount so referenced  for these plaintiffs as to this project/fund being $89,053.

20    325.    Beginning Spring 2004, Defendants BUCHHOLZ and FISCHER caused Defendant

21    EQUITY ENTERPRISES to begin soliciting investment and accepting deposits for a 7.02 acre

22    project generally referred to "Patriot Courtyards" in Glenview, Illinois.

23    326.    As part of the efforts to solicit investors, EQUITY ENTERPRISES disseminated

24    documents that included, but were not limited to, a Confidential Private Offering Memorandum

25    dated July 2004.

26    327.    EQUITY ENTERPRISES began formalizing and finalizing investments of the Patriot

27    Courtyards Plaintiffs in July 2004 after having disseminated documents that included, but were

28    not limited to, the Confidential Private Offering Memorandum dated July 2004.

---

1   328.   It is alleged on information and belief Defendants GRACE CAPITAL; VENTO

2   INVESTMENTS, LLC; JONATHAN VENTO; ZELTOR, LLC; and ZELEZNAK were

3   materially and substantially involved in the creation and provision of material information

4   contained in the Confidential Private Offering Memorandum used to solicit investors and as was

5   given to the Patriot Courtyards Plaintiffs based on the similarity of with materials and documents

6   known to have emanated from one or more Grace Defendants, their involvement as members

7   and managers, and numerous references to Grace Capital including but not limited architectural

8   drawings and renderings labeled Grace Capital.

9   329.   Defendants GRACE CAPITAL; VENTO INVESTMENTS, LLC; JONATHAN VENTO;

10  ZELTOR, LLC; and ZELEZNAK knew the material and substantial information created and

11  provided by them would then be used to solicit investors.

12  330.   Defendants GRACE CAPITAL; VENTO INVESTMENTS, LLC; JONATHAN VENTO;

13  ZELTOR, LLC; and ZELEZNAK, knew that Defendants, RDB, BUCHHOLZ, FISCHER, and

14  EQUITY ENTERPRISES, INC., and/or other entities controlled by them did not have the

15  financial wherewithal to make the investment and that funds would have to be solicited and

16  obtained from investors such as the Patriot Courtyards Plaintiffs.

17  331.   Defendants GRACE CAPITAL; VENTO INVESTMENTS, LLC; JONATHAN VENTO;

18  ZELTOR, LLC; and ZELEZNAK, knew that BUCHHOLZ, FISCHER, and EQUITY

19  ENTERPRISES, INC., were going to solicit investors to purchase membership interests in a

20  limited liability company (EENI-Patriot Courtyards, LLC,) which in turn would have a

21  membership interest in Patriot Courtyards Investors, LLC.

22          **B.    Specific Counts.**

23                  **1.     Count 1: FRAUD (Misrepresentation and Concealment Against**

24                          **Defendants BUCHHOLZ, RDB DEVELOPMENT, LLC, FISCHER,**

25                          **EQUITY ENTERPRISES, INC., EENI, VENTO INVESTMENTS,**

26                          **LLC, JONATHAN VENTO, ZELTOR, LLC, DONALD ZELEZNAK,**

27                          **GRACE CAPITAL.)**

28  332.   Paragraphs 322 through 331 are re-alleged and incorporated here.

333.    The information and documents provided to the Patriot Courtyards Plaintiffs prior to finalization and formalization of their investments by sale of membership interests, were materially false and misleading.

334.    The materials represented the cost of land would be $4,573,800; The Executive Summary represented the property was "to be purchased by Patriot  Courtyards, Investors, LLC, ..." and the Development Pro Forma section represented "Land Cost" as $4,573,800 and the summary of "The Funds Investment in the Project Owner" represented the project owner had acquired the property "at the end of May 2004 for a gross purchase price of $4,673,000."

335.    The representations as to land cost were false in that the land was actually purchased by Patriot Courtyards, Investors, LLC, for $3,012, 238.35 by payment of that amount to the seller, Catellus Prairie Glen, Inc., by disbursement from escrow on or about June 4, 2004 resulting in an artificial profit of approximately $1,561,300.

336.    Defendants GRACE CAPITAL; VENTO INVESTMENTS, LLC; JONATHAN VENTO; ZELTOR, LLC; ZELEZNAK; RDB; and BUCHHOLZ diverted the artificial profit of approximately $1,561,300 by disbursement from escrow in the sum of $1,561,561.65 to "Glenview Office Investors, LLC."

337.    Glenview Office Investors, LLC, was an Arizona limited liability company formed March 8, 2004 (about two months before Patriot Courtyards Investors, LLC, was formed) of which the managers and members holding interests of 20% or more were VENTO INVESTMENTS, LLC, (of which  VENTO was manager), ZELTOR, LLC, (of which ZELEZNAK was manager), and RDB DEVELOPMENT, LLC, (of which BUCHHOLZ was manager).

338.    Glenview Office Investors, LLC, did not have any direct or indirect involvement in the project nor was there any other basis for any funds to be delivered to Glenview Office Investors, LLC, nor have Patriot Courtyards Plaintiffs been able to determine any legitimate business activities conducted by Glenview Office Investors, LLC.

339.    Defendants GRACE CAPITAL; VENTO INVESTMENTS, LLC; JONATHAN VENTO; ZELTOR, LLC; ZELEZNAK; RDB; and BUCHHOLZ created the excess funds for diversion by over funding an escrow that included, but not limited to, $2,100,000 in cash and a loan of

1    $2,679,275.

2    340.    The sum of $125,000 was disbursed from escrow to GRACE CAPITAL as purported

3    earnest money.

4    341.    The representations as to land cost were material in that it misled the Patriot Courtyards

5    Plaintiffs as to the true nature and extent of the financial aspects of the project, intended use of

6    funds, and potential profitability.

7    342.    The representations as to land cost were justifiably relied on in deciding to invest and if

8    the truth had been known, the investments would not have been made.

9    343.    The Development Pro Forma section represented there would be a brokerage fee of

10   $100,000.

11   344.    The representation was false in that no commissions or brokerages fees were owed or

12   paid out of escrow.

13   355.    The Development Pro Forma section represented there would be Developer Fees of

14   $400,000.

15   356.    The representation was false in that there was no need for any such fees, and Defendants

16   GRACE CAPAITAL; VENTO INVESTMENTS, LLC; JONATHAN VENTO; ZELTOR, LLC;

17   ZELEZNAK; RDB; and BUCHHOLZ did not intend to render nor did they render fair value for

18   this amount.

19   357.    The Development Pro Forma section represented there would be Project Management Fee

20   of $70,000.

21   358.    The representation was false in that there was no need for any such fees, and Defendants

22   GRACE CAPITAL; VENTO INVESTMENTS, LLC; JONATHAN VENTO; ZELTOR, LLC;

23   ZELEZNAK; RDB; and BUCHHOLZ did not intend to render nor did they render fair value for

24   this amount.

25   359.    The Development Pro Forma section represented there would be a Construction

26   Management Fee of $200,000.

27   360.    The representation was false in that there was no need for any such fees, and Defendants

28   GRACE CAPITAL; VENTO INVESTMENTS, LLC; JONATHAN VENTO; ZELTOR, LLC;

ZELEZNAK; RDB; and BUCHHOLZ did not intend to render nor did they render fair value for this amount.

361.    The representations as to commissions, brokerage fees, and other fees were material in that they misled the Patriot Courtyards Plaintiffs and investors as to the true nature and  extent of the financial aspects of the project, intended use of funds, potential profitability, and created a vehicle for improper and unjustified diversion of funds.

362.    The representations as to commissions, brokerage fees, and other fees were justifiably relied on by the Patriot Courtyards Plaintiffs in deciding to invest and if the truth had been known, the investments would not have been made.

363.    Prior to finalizing and formalizing the membership interests of the Patriot Courtyards Investors, Defendants VENTO INVESTMENTS, LLC; JONATHAN VENTO; ZELTOR, LLC; ZELEZNAK; RDB; BUCHHOLZ; and FISCHER concealed their direct or indirect receipt of the following amounts (totaling $565,000):

      a.    On June 10, 2004, $200,000 to ZELTOR, LLC, and without a stated purpose;

      b.    On June 10, 2004, $200,000 to VENTO INVESTMENTS, LLC, and without a stated purpose;

      c.    On June 25, 2004, $62,500 to RDB DEVELOPMENT and without a stated purpose;

      d.    On June 25, 2004, $62,500 to FISCHER and without a stated purpose;

      e.    On, July 27, 2004, $40,000 to EQUITY ENTERPRISE for purported management fee.

364.    The information concealed was material in that the collective amount would greatly affect profitability, there was no apparent reason for direct or indirect payment of any money to FISCHER and the majority of funds were disbursed without a stated purpose or reason.

365.    The Patriot Courtyards Plaintiffs justifiably relied on being provided full and complete information without omission.

366.    If the Patriot Courtyards Plaintiffs had known the concealed information, they would not have invested.

367.    As a consequence of the misrepresentations, the  Patriot Courtyards Plaintiffs have suffered the damages alleged herein.

368.    Despite the representations made as to money intended to be disbursed and in addition to diversion of the artificial profit based on land cost, a collective total of $851,668 was disbursed from June 10, 2004 through December 1, 2004 to those including the aforementioned Defendants.

369.    As a consequence of the omissions, the  Patriot Courtyards Plaintiffs have suffered the damages alleged herein.

370.    The conduct of these Defendants as described above, involved malice, oppression and fraud, and such conduct was clearly despicable.  Such despicable and fraudulent conduct was plainly conducted by the individual defendants as officers, directors, and/or managing agents of these entity Defendants and/or was ratified by the entity defendants.  Accordingly, the Court should assess punitive damages against these Defendants.

371.    Wherefore,  the  Patriot Courtyards Plaintiffs pray for damages as hereinafter set forth.

> **2.    Count 2: BREACH OF FIDUCIARY DUTY (Against Defendants BUCHHOLZ, RDB DEVELOPMENT, LLC, FISCHER, EQUITY ENTERPRISES, INC., VENTO INVESTMENTS, LLC, VENTO, ZELTOR, LLC, ZELEZNAK, GRACE CAPITAL.)**

372.    Paragraphs 322 through 371 are re-alleged and incorporated here.

373.    By effectively acting in the capacity of managers of EENI, Defendants RDB DEVELOPMENT, LLC, and BUCHHOLZ owed a fiduciary duty to the Patriot Courtyards Plaintiffs.

374.    As managers and members of Patriot Courtyards, LLC, Defendants VENTO INVESTMENTS, LLC; and ZELTOR, LLC, owed a fiduciary duty to members of Patriot Courtyards, LLC

375.    Defendants GRACE CAPITAL; VENTO INVESTMENTS, LLC; JONATHAN VENTO; ZELTOR, LLC; and ZELEZNAK owed a fiduciary duty to the Patriot Courtyards Plaintiffs because they had materially participated in the creation of information and documents they knew

1  would be used to solicit investors, knew that Defendants RDB DEVELOPMENT, BUCHHOLZ,

2  FISCHER, and EQUITY ENTERPRISES, INC., and/or other entities controlled by them did not

3  have  the  financial wherewithal to make the investment and that funds would have to be solicited

4  and obtained from investors such as the Patriot Courtyards Plaintiffs, knew Defendants

5  BUCHHOLZ, FISCHER, and EQUITY ENTERPRISES, INC., were going to solicit investors to

6  purchase membership interests in a limited liability company (EENI-Patriot Courtyards, LLC,)

7  which in turn would have a membership interest in Patriot Courtyards Investors, LLC, thereby

8  creating fiduciary duties owed to the Patriot Courtyards Plaintiffs.

9  376.   Owing fiduciary duties to the Patriot Courtyards Plaintiffs, Defendants GRACE

10  CAPITAL; VENTO INVESTMENTS, LLC; JONATHAN VENTO; ZELTOR, LLC; and

11  ZELEZNAK, BUCHHOLZ, FISCHER, RDB; and EQUITY ENTERPRISES, INC., had a duty

12  to provide only truthful information and not make any untrue statement or omit any material fact.

13  377.   The aforementioned Defendants breached their fiduciary duties including, but not limited

14  to, the following:

15      a.    The misrepresentations and omissions regarding land cost and diversion of the

16            artificial profit of approximately $1.561 million;

17      b.    By not disclosing the taking of funds during June and July 2004 that totaled

18            $565,000;

19      c.    Despite the Pro Forma representation of an intended brokerage fee of $100,000

20            and by never disclosing payments of $100,000 each during October and November

21            2004 to Keller Williams Southwest  Realty, an entity in which ZELEZNAK has an

22            interest and control, supposedly for a finders fee and brokerage commission during

23            October and November 2004;

24      d.    After obtaining a construction and development loan of  $10,439,225 on or about

25            September 27, 2004, directing a total of $326,668 to GRACE CAPITAL from

26            September 28, 2004 through December 1, 2004.

27  378.   As a result of the above breaches of fiduciary duties, the Patriot Courtyards Plaintiffs

28  have been damaged as alleged herein.

379.    The conduct of these Defendants as described above, involved malice, oppression and fraud, and such conduct was clearly despicable.  Such despicable and fraudulent conduct was plainly conducted by the individual defendants as officers, directors, and/or managing agents of these entity Defendants and/or was ratified by the entity defendants.  Accordingly, the Court should assess punitive damages against these Defendants.

380.    Wherefore, the Patriot Courtyards Plaintiffs pray for judgment as hereinafter set forth.

> **3.    Count 3: ACCOUNTING (Against Defendants  BUCHHOLZ, RDB DEVELOPMENT, LLC, FISCHER, EQUITY ENTERPRISES, INC., VENTO INVESTMENTS, LLC, VENTO, ZELTOR, LLC, ZELEZNAK, GRACE CAPITAL.)**

381.    Paragraphs 322 through 378 are re-alleged and incorporated here.

382.    The Patriot Courtyards Plaintiffs have never received meaningful accountings and/or meaningful financial statements despite the obligation of one or more of the above mentioned defendants to so provide.

383.    The Patriot Courtyards Plaintiffs are entitled to an accounting because, but not limited to, the existence and breaches of fiduciary duties, the disparity between representations as to intended expenditures and money actually disbursed, and the creation and misappropriation of the artificial profit of approximately $1.561 million.

384.    Based on the above, the Patriot Courtyards Plaintiffs have claims for damages in the minimum and collective amount of $89,053 and additional amounts for actual profits and the artificial profit of $1,561,300, the precise amount which the Patriot Courtyards Plaintiffs  are unable to further specify because any and all such information and/or documents are in the possession of one or more these defendants and has never been supplied to the Patriot Courtyards Plaintiffs in a meaningful fashion despite the duty of one or more these defendants to so supply and the methods used by defendants, and the methods by which these defendants used to create the artificial profit as to land cost.

385.    These Defendants are obligated to account to the Patriot Courtyards Plaintiffs based on their de jure and de facto fiduciary obligations and the other reasons set forth herein.

1  386.    Wherefore, the Patriot Courtyards Plaintiffs are entitled to and pray for an accounting as

2  hereinafter set forth.

3  **XI.    ALLEGATIONS AND COUNTS REGARDING THE ERIE LAND FUND.**

4  **(All Allegations and Counts Are Against Defendants BUCHHOLZ, FISCHER, and**

5  **SOLOMON CAPITAL only).**

6  **A.    Factual Allegations Common to All Counts.**

7  387.    Paragraphs 1 through 74 and 82 through 113 are re-alleged and incorporated here.

8  Inclusion of paragraphs 1 through 74 and 82 through 113 in their entirety is for the purpose of

9  formally including the pertinent details regarding plaintiffs and defendants specifically

10 referenced in this section and is not intended to expand the scope of plaintiffs' claims by the

11 plaintiffs specifically stated in this section as against the defendants as specifically alleged in this

12 section.

13 388.    "Erie Land Fund Plaintiffs" hereafter refers to and includes (with the dates of investment

14 and respective amounts of principal provided and/or net loss of investment and/or principal

15 amount claimed by them)  Yu-Sze Yen ($100,000; March 2007), David Sams ($145,000; March

16 2007), James Wong ($100,000; March 2007), the total amount so referenced  for these plaintiffs

17 as to this project/fund being $345,000.

18 389.    In early 2007, Defendants BUCHHOLZ and FISCHER caused Defendant SOLOMON

19 CAPITAL to begin soliciting investors for a project in Erie, Colorado, later referred to as Sierra

20 Vista. Erie Colorado is a "statutory town" in Weld and Boulder Counties.

21 390.    The project was generally described by these Defendants as involving the purchase of

22 land, seeking annexation of the land within the town of Erie, and then either selling the land at a

23 profit or undertaking development.

24 391.    Investors were solicited by the use of written documents, hosted visits to the site, and

25 numerous written and oral representations made by BUCHHOLZ, FISCHER, and other

26 authorized representatives of SOLOMON CAPITAL, primarily Jan Edbrooke and Anna

27 Keirstead.

28 392.    The Erie Land Fund Plaintiffs invested in exchange for promissory notes.

393.   James Wong received a promissory note in the sum of $100,000 dated March 8, 2007.

394.   Yu-Sze Yen received a promissory note in the sum of $100,000  dated March 8, 2007.

395.   David Sams received a promissory note in the sum of $145,000 dated March 14, 2007.

396.   All three notes were issued by Erie Land Fund, LLC, a Colorado limited liability company and were signed by FISCHER as manager.

397.   All three notes were to be secured by a deed of trust given by Erie Land Fund, LLC, but were not as further described below.

398.   All three notes carried interest at the rate of 10%.

399.   All three notes were initially due in 12 months, but contained a provision to extend 12 more months.

400.   None of the notes have been paid and are now due in full.

**B.    Specific Counts.**

    **1.    Count 1: Fraud (Misrepresentation and Concealment Against Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL).**

401.   Paragraphs 387 through 400 are re-alleged and incorporated here.

    **a.    Affirmative Misrepresentations.**

402.   The written materials given to the Erie Land Fund Plaintiffs and numerous other written oral and written statements by Defendants BUCHHOLZ, FISCHER, and other authorized representatives of Defendant SOLOMON CAPITAL, represented the promissory notes would be secured by a deed of trust regarding the land acquired.

403.   The statements were false in misleading in numerous respects:

    a.    Erie Land Fund, LLC, could not give a deed of trust because it did not have any interest in title;

    b.    The land had actually been purchased by Colorado Investment Group, LLC, an entity for which FISCHER executed documents as manager, had a principal place of business at 20 Great Oaks Boulevard in San Jose, and was otherwise controlled by BUCHHOLZ and FISCHER;

    c.    Instead of giving the Erie Land Fund Plaintiffs a deed of trust as promised,

Erie Land Fund, LLC, gave a "Security and Collateral Agent Agreement" purporting to secure the notes with "all Company assets" which was effectively worthless because:

    i.    At or about that time and based on a Balance Sheet of Erie Land Fund, LLC, dated July 24, 2007, Erie Land Fund, LLC, had only $726,936.93 in assets of which $700,000 was a note receivable from Colorado Investment Group, LLC; and

    ii.    As of about that time Colorado Investment Group, LLC, had total equity of only $7,655.13.

404.   The representations were material in that they were of a type and nature reasonably relied on by reasonable investors including, but not limited to, evaluation of investment risk, potential profit, and time for return of investment.

405.   The representations were justifiably relied on by the Erie Land Fund Plaintiffs in deciding to invest in that they were of a type and nature reasonably relied on by reasonable investors including, but not limited to, evaluation of investment risk, potential profit, and time for return of investment.

406.   If any of the true facts been known, much less the collective falsity of the misrepresentations and facts not disclosed, the Erie Land Fund Plaintiffs would not have invested.

407.   As a consequence, the Erie Land Fund Plaintiffs have suffered the damages alleged herein.

**b.    Material Facts Concealed.**

408.   Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL concealed the fact that Erie Land Fund, LLC, did not have an interest in the land sufficient to give a deed of trust.

409.   Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL, concealed the fact that the assets of Erie Land Fund, LLC, were wholly inadequate to justify the purported Security and Collateral Agent Agreement.

410.   Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL, concealed the fact that

1   the assets of Colorado Investment Group, LLC, were wholly inadequate to justify the purported

2   assets then being carried on the books and records of Erie Land Fund, LLC.

3   411.    Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL, concealed the fact the

4   supposed project had been undertaken with at least $1 million less than would be needed to

5   pursue the annexation as represented.

6   412.    Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL, concealed the fact

7   the land had been purchased at approximately four times its fair market value.

8   413.    Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL, failed to disclose the

9   full nature of the annexation process, particularly those regarding a "statutory town" and rural

10   lands and applicable general plans.

11   414.    The information concealed was material in that it misled the Erie Land Fund Plaintiffs as

12   to the true nature and extent of the financial aspects of the project, intended use of funds,

13   potential profitability, security of investment, and time for return of investment.

14   415.    The Erie Land Fund Plaintiffs justifiably relied on these Defendants to provide full and

15   complete information without omission.

16   416.    If  the Erie Land Fund Plaintiffs had been aware of the concealed information, they would

17   not have made their investments.

18   417.    As a result, the Erie Land Fund Plaintiffs have been damaged as alleged herein.

19   418.    The conduct of these Defendants as described above, involved malice, oppression and

20   fraud, and such conduct was clearly despicable.  Such despicable and fraudulent conduct was

21   plainly conducted by the individual defendants as officers, directors, and/or managing agents of

22   these entity Defendants and/or was ratified by the entity defendants.  Accordingly, the Court

23   should assess punitive damages against these Defendants.

24   419.    Wherefore, the Erie Land Fund Plaintiffs pray for damages as set forth below.

25          **2.      Count 2: Violation of Section 10b and Rule 10b-5 of the Securities**

26                  **Exchange Act of 1934 (Against Defendants BUCHHOLZ, FISCHER,**

27                  **and SOLOMON CAPITAL).**

28   420.    Paragraphs 387 through 417 are re-alleged and incorporated here.

---

**CASE NO.: C 08-03535 RMW**      **FOURTH AMENDED COMPLAINT**     

421.    These Defendants engaged in a course of fraudulent activities  to secure money from investors on the basis of misrepresentations and omissions which they knew were false or recklessly disregarded the accuracy thereof in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

422.    These Defendants violated §10(b) and Rule 10b-5 of the 1934 Act in that they:

        a.    Employed devices, schemes and artifices to defraud these Plaintiffs;

        b.    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        c.    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon these Plaintiffs.

423.    The Erie Land Fund Plaintiffs have suffered damages in that, in reliance on these Defendants' representations their investments have become worthless.

424.    As a direct and proximate result of these Defendants' violation of §10(b) and Rule 10b-5 of the 1934 Act, these Plaintiffs have been injured in their business and property.  As herein alleged. Portions of these Plaintiffs' investments have been transferred to the Defendants or third parties. These Plaintiffs have incurred and continue to incur legal fees and costs and seek to recover such losses and any potential judgments against Defendants in the pending lawsuits.

425.    WHEREFORE, the Erie Land Fund Plaintiffs pray for judgment as hereinafter set forth.

        **3.    Count 3: Violation of Section 12(a) of the Securities Act of 1933 (Against Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL).**

426.    Paragraphs 387 through 417 are re-alleged and incorporated here.

427.    These Defendants violated 15 U.S.C. § 77l  in that they:

        (a)    Offered to sell a security by use of oral communications; and,

        (b)    Made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances

1    under which they were made, not misleading, and/or substantially participated in

2    the preparation thereof knowing of intended use for dissemination and solicitation

3    of investors.

4    428.   These Plaintiffs suffered damages as herein alleged and in reliance on the statements of

5    these Defendants as alleged herein.

6    429.   As a direct and proximate result of these Defendants' violation of §12(a) of the

7    1933 Act, the Erie Land Fund Plaintiffs have been injured in their business and property as

8    herein alleged.

9    430.   Portions of Plaintiffs' investments have been transferred to these Defendants or third

10   parties.

11   431.   As a direct and proximate result of the wrongful conduct these Defendants, the Erie Land

12   Fund Plaintiffs are entitled to restitution of monies invested with interest

13   thereon.

14   432.   WHEREFORE, the Erie Land Fund Plaintiffs pray for judgment as hereinafter set forth.

15                    **4.    Count 4:    Breach of Contract (Against Defendants BUCHHOLZ,**

16                              **FISCHER, and SOLOMON CAPITAL).**

17   433.   Paragraphs 387 through 400 are re-alleged and incorporated here.

18   434.   Erie Land Fund, LLC, and Colorado Investment Group, LLC, were alter egos of

19   Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL.

20   435.   The contracts with the Erie Land Fund Plaintiffs included, but were not limited to, the

21   promissory notes and the agreements to provide security by deed of trust.

22   436.   The promissory notes have all become due and no payment has been made despite

23   demand therefore.

24   437.   These defendants breached the agreement to provide security by deed of trust.

25   438.   As a result of these breaches, the Erie Land Fund Plaintiffs have been damaged as alleged

26   herein.

27   439.   WHEREFORE, the Erie Land Fund Plaintiffs pray for judgment as hereinafter set forth.

28   /////

---

**CASE NO.: C 08-03535 RMW      FOURTH AMENDED COMPLAINT**          Page 88 of  164

XII . **ALLEGATIONS AND COUNTS REGARDING THE COLORADO CONDOS FUND. (Allegations and Counts Include Defendants BUCHHOLZ, RDB DEVELOPMENT, LLC,  FISCHER, and SOLOMON CAPITAL Only.)**

    A.     **Factual Allegations Common to All Counts Including Specific Misrepresentations and Falsity Thereof and Specific Concealment of Material Facts, All Incorporated Later as to Specific Counts.**

440.   Paragraphs 1 through 74 and 82 through 113 are re-alleged and incorporated here. Inclusion of paragraphs 1 through 74 and 82 through 113 in their entirety is for the purpose of formally including the pertinent details regarding plaintiffs and defendants specifically referenced in this section and is not intended to expand the scope of plaintiffs' claims by the plaintiffs specifically stated in this section as against the defendants as specifically alleged in this section.

441.   "Colorado Condo Fund Plaintiffs" hereafter refers to and includes (with the dates of investment and respective amounts of principal provided and/or net loss of investment and/or principal amount claimed by them as damages), Mike and Renee Brogdon ($100,000; April 2006), Kwei Choong ($100,134; April 2006), Timothy and Lori Gale ($100,000; April 2006 ), Jeff Lawrence ($200,000; September 2006), Kathy Ury ($53,655; April 2006 ), Bob Winger and Nancy Winger ($200,000; April 2006 ), James Wong ($25,000; March 2006); the total amount so referenced  for these plaintiffs as to this project/fund being $778,789.

442.   Around March 2006, Defendants BUCHHOLZ and FISCHER, caused SOLOMON CAPITAL to begin soliciting investors for the Colorado Condos Fund Note Program.

443.   The Colorado Condo Fund Plaintiffs delivered their money during March and April 2006, pursuant to Secured Promissory Note Purchase Agreements between them and Colorado Condos Fund, LLC.

444.   Colorado Condos Fund, LLC, subsequently gave the Colorado Condo Fund Plaintiffs secured promissory notes and related security agreements related to the assets of Colorado Condos Fund, LLC.

445.   The secured promissory notes all had maturity  dates of three years from the dates of the

1  Secured Promissory Note Purchase Agreements.

2  446.    The interest rates on the promissory notes varied based on amount invested with rates of

3  16% for investments between $25,000 and less than $100,000, 18% for investments of

4  $100,000 and less than $200,000, and 20% for investments of $200,000 or more.

5  447.    Although not able to fully specify the full extent without discovery, the Colorado Condo

6  Fund Plaintiffs are informed and believe and thereon allege that defendants BUCHHOLZ and

7  FISCHER caused Defendant SOLOMON CAPITAL and entities controlled by them to take in

8  funds, including, but not limited to, Daystream Deer Creek, LLC, and Daystream Cherry Creek,

9  LLC, such as the sum of $34,800 from Diane Bryson who then received a promissory note

10  issued by Daystream Cherry Creek, LLC.

11  448.    Solicitation included the use of written materials provided to investors including a

12  package of documents entitled the Colorado Condos Fund Note Program labeled and dated

13  "Solomon Capital March 2006" and which were given to the Colorado Condo Fund Plaintiffs.

14  449.    The written materials stated the fund was being formed to raise $5 million to be used as

15  financing for condominium projects in Colorado.

16  450.    The written materials stated Colorado Condos Fund, LLC, was an entity then being

17  formed as a Delaware limited liability company, and of which Defendant SOLOMON

18  CAPITAL, INC., would be a manager.

19  451.    Defendant FISCHER, signed numerous documents on behalf of Colorado Condos Fund,

20  LLC, in which she represented she was a manager.

21  452.    The Colorado Condos Fund Note Program written materials stated and BUCHHOLZ and

22  FISCHER orally represented the fund would be making loans regarding projects in Colorado

23  referred to as Courtyards at Deer Creek and Courtyards at Cherry Creek (later known as

24  Courtyards at Parker).

25  453.    While soliciting and accepting money from the Colorado Condo Fund Plaintiffs,

26  Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL concealed their then ongoing

27  and intended activities including the creation of artificial profits on land sales and siphoning of

28  money as purported fees for which services were neither intended to be rendered nor actually

1  rendered.

2  454.   Defendants BUCHHOLZ and FISCHER caused the creation of several entities for the

3  sole purpose of using them as intermediaries in land sales to create artificial price increases

4  regarding the Deer Creek and Cherry Creek projects.

5  455.   Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL concealed their

6  orchestration of the Deer Creek property sale that generated an artificial profit of $681,715 in

7  three days carried out as described immediately below.

8  456.   BUCHHOLZ and FISCHER caused the creation of Clear Creek South, LLC, a limited

9  liability company that used the address of 20 Great Oaks, Boulevard.

10  457.   Clear Creek South, LLC, was formed on March 2, 2006 and dissolved several months

11  later.

12  458.   On March 14, 2006, Clear Creek South, LLC, purchased the Deer Creek property for

13  $1,543,765.

14  459,   On March 17, 2006 Clear Creek South, LLC, sold the property to Courtyards at Deer

15  Creek, LLC, for $2,225,480 thereby creating an artificial profit of $681,715 in three days.

16  460.   Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL concealed their

17  orchestration of the Cherry Creek property sale that generated an instant and artificial profit of

18  $3,178,487 carried out as described immediately below.

19  461.   BUCHHOLZ and FISCHER caused the creation of Monta Vista, LLC, a limited liability

20  company that used the address of 20 Great Oaks, Boulevard.

21  462.   Monta Vista, LLC, was formed on March 2, 2006 and dissolved several months later.

22  463.   On April 28, 2006, Monta Vista, LLC, purchased the Cherry Creek property for

23  $6,584,943.

24  464.   On April 28, 2006, the same day, Monta Vista, LLC, sold the Cherry Creek property to

25  the Courtyards at Cherry, Creek, LLC, for $9,763,430 creating an instant and artificial profit of

26  $3,178,487.

27  465.   The Colorado Condo Fund Plaintiffs are informed and believe that Clear Creek South,

28  LLC, and Monta Vista, LLC, were formed for the sole purpose of acting as "straw" buyers and

---

**CASE NO.: C 08-03535 RMW      FOURTH AMENDED COMPLAINT      Page 91 of 164**

1   sellers to conceal the artificial profits based on both having been formed the at same time,

2   having been dissolved soon after the land sales, and both engaged in the transactions from 20

3   Great Oaks Boulevard, San Jose (a principal place of business of Defendants BUCHHOLZ,

4   FISCHER, and SOLOMON CAPITAL), and there being no record of either entity ever engaging

5   in any other business activity.

6   466.   The Colorado Condo Fund Plaintiffs are informed and believe Defendants BUCHHOLZ

7   and FISCHER diverted substantial portions of the artificial profits, the full extent of which is not

8   presently or reasonably determinable without discovery.

9   467.   The information concealed was material in that it was of a type, nature  and extent

10  reasonably relied on by reasonable investors.

11  468.   The Colorado Condo Fund Plaintiffs justifiably relied on Defendants BUCHHOLZ,

12  FISCHER, and SOLOMON CAPITAL to provide full and complete information without

13  omission.

14  469.   If the Colorado Condo Fund Plaintiffs had known the concealed information, they would

15  not have invested.

16  470.   The Colorado Condos Fund Note Program written materials represented the fund

17  managers would operate and conduct themselves in such a fashion as to protect the Colorado

18  Condo Fund Plaintiffs as if they were members of a limited liability company.

19  471.   The representations was false and misleading in that Defendants BUCHHOLZ,

20  FISCHER, and SOLOMON CAPITAL had no intention of so protecting fund assets or Colorado

21  Condo Fund Plaintiffs, were orchestrating the "straw transactions" set forth above, and never

22  disclosed the nature and details of the "straw transactions" to the Colorado Fund Plaintiffs.

23  472.   The representations were material in that they were of a type and nature and extent

24  reasonably relied on by the Colorado Condo Fund Plaintiffs, especially as to representing a

25  heightened expectation of oversight and trust.

26  473.   The Colorado Condo Fund Plaintiffs justifiably relied on Defendants BUCHHOLZ,

27  FISCHER, and SOLOMON CAPITAL to provide full and complete information without

28  omission.

---

**CASE NO.: C 08-03535 RMW        FOURTH AMENDED COMPLAINT        Page 92 of  164**

474.   If the Colorado Condo Fund Plaintiffs had known the true facts, they would not have invested.

475.   The Colorado Condo Fund Plaintiffs are also informed and believe that Defendant RDB DEVELOPMENT, LLC, an entity controlled by Defendant BUCHHOLZ took a "development fee" of at least $600,000 without intention of ever performing or actually rendering services of such value and in contravention of the representations made to the Colorado Condo Fund Plaintiffs.

476.   As a result of the misrepresentations and concealment of material facts, the Colorado Condo Fund Plaintiffs have suffered the damages alleged herein.

477.   The Colorado Condo Fund Plaintiffs were eventually given a Balance Sheet for the Colorado Condos Fund, LLC, dated February 13, 2008 that stated Total Equity of  negative $108,050.23, effectively a negative net worth.

> **B.   Specific Counts.**
>
> > **1.   Count One:  FRAUD (Misrepresentation and Concealment Against Defendants BUCHHOLZ, RDB DEVELOPMENT, FISCHER, and SOLOMON CAPITAL).**

478.   Paragraphs 440 through 477 are re-alleged and incorporated here.

479.   Defendants BUCHHOLZ, RDB DEVELOPMENT, LLC, FISCHER, and SOLOMON CAPITAL made and/or participated in the making of, and/or authorized and ratified the making of the misrepresentations and concealment of material facts and information.

480.   These Defendants, individually and collectively made the multiple representations which, individually and collectively, led the Colorado Condo Fund Plaintiffs to believe that funds would be allocated, used, and safe guarded as presented to them.

481.   The representations were false in that Defendants BUCHHOLZ, RDB DEVELOPMENT, LLC, FISCHER, and SOLOMON CAPITAL were actually engaged in orchestrating the straw transactions regarding the purchase and sale of land.

482.   The representations were material.

483.   The Colorado Condo Fund Plaintiffs justifiably relied on the individual and collective

1  representations in deciding to invest.

2  484.    If the Colorado Condo Fund Plaintiffs had known the true facts, these Plaintiffs would

3  not have invested.

4  485.    The Colorado Condo Fund Plaintiffs justifiably relied on these Defendants to provide full

5  and complete information without omission including, but not limited to, the fact that once these

6  Defendants undertook to speak and make the representations, they incurred a duty to make full

7  and complete disclosure without omission.

8  486.    The information concealed was material

9  487.    If the Colorado Condo Fund Plaintiffs had known the concealed information, they would

10  not have invested.

11  488.    As a consequence the Colorado Condo Fund Plaintiffs have suffered the damages alleged

12  herein.

13  489.    The conduct of these Defendants as described above, involved malice, oppression and

14  fraud, and such conduct was clearly despicable.  Such despicable and fraudulent conduct was

15  plainly conducted by the individual defendants as officers, directors, and/or managing agents of

16  these entity Defendants and/or was ratified by the entity defendants.  Accordingly, the Court

17  should assess punitive damages against these Defendants.

18  490.    Wherefore, the Colorado Condo Fund Plaintiffs pray for damages as set forth below.

19          **2.      Count 2:  VIOLATION OF SECTION 10B AND RULE 10B-5 OF**

20                   **THE SECURITIES EXCHANGE ACT OF 1934 (Against Defendants**

21                   **BUCHHOLZ, FISCHER, and SOLOMON CAPITAL.)**

22  491.    Paragraphs 440 through 488 are re-alleged and incorporated here.

23  492.    Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL engaged in a course of

24  fraudulent activities  to secure money from the Colorado Condo Fund Plaintiffs for the purpose

25  of buying and selling land at a grossly and artificially inflated price and substantially participated

26  in the creation, dissemination, approval, and presentation of the false statements specified above,

27  which they knew or recklessly disregarded were misleading in that they contained

28  misrepresentations and failed to disclose material facts necessary in order to make the statements

1  made, in light of the circumstances under which they were made.

2  493.   These  Defendants violated §10(b) and Rule 10b-5 of the 1934 Act in that they:

3          a.      Employed devices, schemes and artifices to defraud the Colorado Condo Fund
4                  Plaintiffs;

5          b.      Made untrue statements of material facts and omitted to state material facts
6                  necessary in order to make the statements made, in light of the circumstances
7                  under which they were made, not misleading; or

8          c.      Engaged in acts, practices and a course of business that operated as a fraud or
9                  deceit upon the Colorado Condo Fund Plaintiffs.

10  494.   The Colorado Condo Fund Plaintiffs have suffered damages in that, in reliance on these
11  Defendants' representations and being unaware of the material omissions their investments were
12  not used as represented and instead were used to secretly buy and sell land at a grossly and
13  artificially inflated price and divert the artificial profits for their own benefit and, in addition,
14  siphon funds for services never rendered.

15  495.   As a direct and proximate result of these Defendants' violations of §10(b) and Rule 10b-5
16  of the 1934 Act, the Colorado Condo Fund Plaintiffs have been injured in their business and
17  property as herein alleged. Portions of Colorado Condo Fund Plaintiffs' investments have been
18  transferred to these Defendants.

19  496.   The Colorado Condo Fund Plaintiffs have incurred and continue to incur legal fees and
20  costs to recover such losses and any potential judgments against these Defendants in the pending
21  lawsuit.

22  497.   WHEREFORE, The Colorado Condo Fund Plaintiffs pray for judgment as hereinafter set
23  forth.

24          3.      **Count 3:  VIOLATION OF SECTION 12(A) OF THE SECURITIES**
25                  **ACT OF 1933 (Against Defendants BUCHHOLZ, FISCHER, and**
26                  **SOLOMON CAPITAL.)**

27  498.   Paragraphs 440 through 488 are re-alleged and incorporated here.

28  499.   Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL violated 15 U.S.C. §

771 in that they:

    (a)    Offered to sell a security by means that included oral communication; and,

    (b)    Made untrue statements of material facts and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or substantially participated in the preparation thereof knowing of intended use for dissemination and solicitation of investors.

500.    The Colorado Condo Fund Plaintiffs suffered damages as herein alleged and in reliance on the statements of these Defendants, including, but not limited to, their investments were not used as represented and instead were used to secretly buy and sell land at a grossly and artificially inflated prices and divert the artificial profits for their own benefit and siphon funds for services never rendered.

501.    As a direct and proximate result of these Defendants' violations of §12(a) of the 1933 Act, The Colorado Condo Fund Plaintiffs have been injured in their business and property as herein alleged.

502.    Portions of Colorado Condo Fund Plaintiffs' investments have been transferred to these Defendants or third parties.

503.    The Colorado Condo Fund Plaintiffs have incurred and continue to incur legal fees and costs to recover such losses and any potential judgments against Defendants in the pending lawsuits.

504.    As a direct and proximate result of these Defendants' wrongful conduct, The Colorado Condo Fund Plaintiffs are entitled to restitution of monies invested with interest thereon.

505.    WHEREFORE, the Colorado Condo Fund Plaintiffs pray for judgment as hereinafter set forth.

    **4.    Count 4: BREACH OF CONTRACT (Against Defendants BUCHHOLZ, RDB DEVELOPMENT, LLC, FISCHER, and SOLOMON CAPITAL.)**

506.    Paragraphs 440 through 477 are re-alleged and incorporated here.

507.    Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL induced the Colorado

1    Condo Fund Plaintiffs to make their investments by promising Secured Promissory Notes.

2    508.    Colorado Condos Fund, LLC, was an alter ego of Defendants BUCHHOLZ, FISCHER,

3    and SOLOMON CAPITAL.

4    509.    The Colorado Condo Fund issued each of the Colorado Condo Fund Plaintiffs Secured

5    Promissory Notes for the amounts of their investments herein alleged.

6    510.    The  Secured Promissory Notes provided for maturity and payment on the third

7    anniversary of the date of the respective agreements to purchase notes.

8    511.    Despite the Colorado Condo Fund Plaintiffs eventually being given a "Deer Creek-

9    Profitability Summary" dated April 8, 2008 that stated investor profits for Deer Creek were

10   slightly more than $1 million, all of the notes have become due and have not been paid.

11   512.    Failure to pay constitutes a breach of the agreements to pay.

12   513.    As a consequence the Colorado Condo Fund Plaintiffs have suffered the damages alleged

13   herein.

14   514.    Wherefore, the Colorado Condo Fund Plaintiffs pray for damages as set forth below.

15   **XIII.    ALLEGATIONS AND COUNTS REGARDING GILBERT OFFICE (also known as**

16   **Red Mountain Professional Plaza) (Including Allegations and Counts Against**

17   **Defendants EQUITY ENTERPRISES, INC., EQUITY ENTERPRISES NEVADA,**

18   **INC., BUCHHOLZ, FISCHER, VENTO, VENTO FAMILY TRUST.)**

19       **A.    Factual allegations common to all counts.**

20   515.    Paragraphs 1 through 74 and 82 through 113 are re-alleged and incorporated here.

21   Inclusion of paragraphs 1 through 74 and 82 through 113 in their entirety is for the purpose of

22   formally including the pertinent details regarding plaintiffs and defendants specifically

23   referenced in this section and is not intended to expand the scope of plaintiffs' claims by the

24   plaintiffs specifically stated in this section as against the defendants as specifically alleged in this

25   section.

26   516.    "Gilbert Office Plaintiffs" hereafter refers to and includes (all of whom invested   during

27   November 2003 with the dates of investment and respective amounts of principal provided

28   and/or net loss of investment and/or principal amount claimed by them as damages)  Yu-Sze Yen

---

**CASE NO.: C 08-03535 RMW        FOURTH AMENDED COMPLAINT        Page 97 of  164**

1   ($46,293), Mike and Renee Brogdon ($23,182), Cynthia Semenoff ($11,573 or more), Kathy

2   Ury ($13,138.75), the total amount so referenced  for these plaintiffs as to this project/fund being

3   $94,187.

4   517.    In November 2003, Defendants BUCHHOLZ and FISCHER caused Defendant EQUITY

5   ENTERPRISES, INC., to begin soliciting investors, including use of written materials, for a

6   project generally referred to as Gilbert Office and later known as Red Mountain Professional

7   Plaza.

8   518.    The written materials given to the Gilbert Office Plaintiffs included a Development Pro

9   Forma that closely resembles the content and format of other similar documents known to have

10  come from one or more GRACE DEFENDANTS, particularly the materials regarding Solomon

11  Towers attributable to VENTO who substantially participated in the preparation and delivery of

12  information and documents, particularly the Development Pro Forma and the representation of

13  land cost and total project cost.

14  519.    VENTO knew the preparation of information and documents was intended for

15  dissemination to third persons for the purpose of soliciting investment.

16  520.    Gilbert Office Plaintiffs received membership interests in EENI-GILBERT OFFICE

17  INVESTORS, LLC, a Nevada limited liability company.

18  521.    EENI-Gilbert Office Investors, LLC, was managed by Defendant EQUITY

19  ENTERPRISES NEVADA, INC., which was controlled by Defendant RONALD BUCHHOLZ.

20  522.    The written materials given to Gilbert Office Plaintiffs stated EENI-Gilbert Office

21  Investors, LLC, would in turn purchase a membership interest in the Project Owner.

22  523.    The Project Owner was Gilbert Road Office Investors, L.L.C., an Arizona limited liability

23  company formed on August 22, 2003, of which the VENTO FAMILY TRUST was a manager

24  and a member with an interest of 20% or greater.

25  524.    JONATHAN VENTO was a trustee of the VENTO FAMILY TRUST and was therefore

26  able to and did effectively control the affairs of Gilbert Road Office Investors, L.L.C.

27  525.    Gilbert Office Plaintiffs were required to sign a "Communication Acknowledgment" on

28  letterhead of EQUITY ENTERPRISES, INC., that Equity Enterprises would be the "central

1  point of communication" and that "Equity Enterprises has an agreement with our development

2  partners that individual investors will not attempt to contact them, obtain project information, or

3  visit the development site without prior written permission from Equity Enterprises ..." and that

4  investor members would "not attempt to contact the local developer, general contractor, sub-

5  contractors, government agencies, realtors, brokers, or other related parties."

6  **B.    Specific Counts.**

7  **1.    Count 1: FRAUD (Misrepresentation and Concealment Against**

8  **Defendants EQUITY ENTERPRISES, INC., EQUITY ENTERPRISES**

9  **NEVADA, INC., BUCHHOLZ, FISCHER, VENTO, VENTO FAMILY**

10  **TRUST)**

11  526.   Paragraphs 515 through 525 are re-alleged and incorporated here.

12  **a.    Affirmative Misrepresentations**

13  527.   The Development Pro Forma provided to Gilbert Office Plaintiffs represented the land

14  cost was $1,090,045.

15  528.   The representation was false and misleading in that the land had been acquired by Gilbert

16  Road Office Investors, LLC, on November 19, 2003 for the sum of $783,470.16 and on the basis

17  of a journal entry related to Gilbert Road Office Investors, LLC, dated November 19, 2003

18  indicating a payment to Stewart Title by a check issued by "EEI" for $756,000 as the acquisition

19  cost of the property (there having been a prior payment of $30,000 as earnest money), these

20  Defendants created an artificial profit of $306,575 which these Defendants took substantially all

21  for their own benefit and created the ability to do by over-funding escrow with investor money

22  and loans.

23  529.   The representation was material as being of the type and nature relied on by reasonable

24  investors.

25  530.   The Gilbert Office Plaintiffs justifiably relied on the representation in

26  deciding to invest.

27  531.   If the Gilbert Office Plaintiffs had known the truth, they would not have invested.

28  532.   As a result, the Gilbert Office Plaintiffs have suffered the damages alleged herein.

---

**CASE NO.: C 08-03535 RMW        FOURTH AMENDED COMPLAINT        Page 99 of  164**

**b.    Concealment of Material Facts.**

533.    Defendants EQUITY ENTERPRISES, INC., EQUITY ENTERPRISES NEVADA, INC., RONALD BUCHHOLZ, FISCHER, JONATHAN VENTO, VENTO FAMILY TRUST, concealed numerous facts and transactions which should have been disclosed to the Gilbert Office Plaintiffs.

534.    Despite the representation as to land cost, Defendants EQUITY ENTERPRISES, INC., EQUITY ENTERPRISES NEVADA, INC., RONALD BUCHHOLZ, FISCHER, JONATHAN VENTO, and the VENTO FAMILY TRUST caused escrow to over-funded so as to be able to immediately divert cash for their own benefit.

535.    On the basis of title company documents, the Gilbert Office Plaintiffs are informed and believe and thereon allege these Defendants concealed the fact they grossly over-funded the purchase escrow by submitting excess cash derived from investors including the Gilbert Office Plaintiffs and loans from M&I Marshall Ilsley Bank.

536.    These Defendants concealed multiple disbursements made to themselves from the over-funded escrow.

537.    Despite the absence of any indication of any meaningful costs, expenses, or commissions associated with acquisition of the land, these Defendants concealed multiple disbursements out of escrow made to themselves or for their benefit:

      a.    $340,045 for "purchase of land to Gilbert Road Office Investors";

      b.    $50,000 for a development fee to Shea Commercial;

      c.    $45,115 for supposed reimbursements to Equity Enterprises of California;

      d.    $150,000 to Shea Realty stated as being a land acquisition fee; and

      e.    $150,000 to the VENTO FAMILY TRUST stated as being a land acquisition fee.

538.    The information concealed was material.

539.    The Gilbert Office Plaintiffs justifiably relied on these defendants to provide full and complete information without omission.

540.    If the Gilbert Office Plaintiffs had known the concealed information, they would not have invested.

541.   As a result, the Gilbert Office Plaintiffs have suffered the damages alleged herein.

542.   The conduct of these Defendants as described above, involved malice, oppression and fraud, and such conduct was clearly despicable.  Such despicable and fraudulent conduct was plainly conducted by the individual defendants as officers, directors, and/or managing agents of these entity Defendants and/or was ratified by the entity defendants.  Accordingly, the Court should assess punitive damages against these Defendants.

543.   Wherefore, the Gilbert Office Plaintiffs pray for judgment as later set forth.

        **2.**    **Count 2: BREACH OF FIDUCIARY DUTY (Against Defendants EQUITY ENTERPRISES, INC., EQUITY ENTERPRISES NEVADA, INC., BUCHHOLZ, FISCHER, VENTO, VENTO FAMILY TRUST.)**

544.   Paragraphs 515 through 542  are re-alleged and incorporated here.

545.   Defendants EQUITY ENTERPRISES, INC., EQUITY ENTERPRISES NEVADA, INC., FISCHER and BUCHHOLZ had a special relationship with the Gilbert Office Plaintiffs as a result of one or more reasons, in that they assumed a fiduciary position in relation to the Gilbert Office Plaintiffs as investment advisers, trustees of accounts, as managers, managing partners of projects, co-venturers, and/or as co-members of the limited liability companies and therefore were fiduciaries as to the Gilbert Office Plaintiffs.

546.   As manager of  Gilbert Office Investors, LLC, Defendants VENTO FAMILY TRUST and in turn Defendant VENTO, owed a fiduciary duty to members of Gilbert Office Investors, LLC, which purportedly included EEI-Gilbert Office, LLC, a duty that directly or indirectly flowed through and/or inured to the benefit of members of EEI-Gilbert Office, LLC.

547.   VENTO was substantially and materially involved in creation of information and documentation provided to Defendants EQUITY ENTERPRISES, INC., and BUCHHOLZ.

548.   VENTO knew the information and documentation given to Defendants EQUITY ENTERPRISES, INC., and BUCHHOLZ would be used to raise funds from investors such as the Gilbert Office Plaintiffs.

549.   VENTO knew Defendants EQUITY ENTERPRISES, INC., BUCHHOLZ, and FISCHER, and the entities controlled by them did not have the financial ability to make the

1    investment.

2    550.   At the time, VENTO knew Defendants EQUITY ENTERPRISES, INC., FISCHER,

3    BUCHHOLZ, and EQUITY ENTERPRISES NEVADA, INC., and the entities controlled by

4    them could only make the investment by raising funds from investors such as the Gilbert Office

5    Plaintiffs.

6    551.   Defendant VENTO, knew EQUITY ENTERPRISES, FISCHER, BUCHHOLZ, and

7    EQUITY ENTERPRISES NEVADA, INC., were soliciting investors such as the Gilbert Office

8    Plaintiffs in such a fashion that would give rise to special and/or fiduciary  relationships with

9    investors such as the Gilbert Office Plaintiffs.

10   552.   As a result of the above and participation in the misrepresentations and concealment of

11   material facts, VENTO incurred fiduciary obligations equivalent to those owed by Defendants

12   EQUITY ENTERPRISES, INC., FISCHER, BUCHHOLZ, and EQUITY ENTERPRISES

13   NEVADA, INC., and the entities controlled by them to the Gilbert Office Plaintiffs.

14   553.   As those in special, confidential, and fiduciary relationships, express or implied,  these

15   Defendants owed a duty of utmost care, integrity, honesty and loyalty toward the Gilbert Office

16   Plaintiffs.

17   554.   These Defendants breached their fiduciary duty to the Gilbert Office Plaintiffs by

18   participating in the making of the misrepresentations and failing to make full disclosure of all

19   material facts concerning the transactions that might have affected investment decisions and by

20   misuse of funds as alleged herein.

21   555.   As a direct and proximate result of the breach of fiduciary duty by these Defendants, the

22   Gilbert Office Plaintiffs have been injured in their business and property as herein alleged.

23   556.   The Gilbert Office Plaintiffs have incurred and continue to incur legal fees and costs to

24   recover such losses and any potential judgments against these Defendants in the pending

25   lawsuits.

26   557.   The conduct of these Defendants as described above, involved malice, oppression and

27   fraud, and such conduct was clearly despicable.  Such despicable and fraudulent conduct was

28   plainly conducted by the individual defendants as officers, directors, and/or managing agents of

---

**CASE NO.: C 08-03535 RMW        FOURTH AMENDED COMPLAINT        Page 102 of  164**

1   these entity Defendants and/or was ratified by the entity defendants.  Accordingly, the Court

2   should assess punitive damages against these Defendants.

3   558.   Accordingly, the Court should assess punitive damages against these Defendants.

4   559.   WHEREFORE, the Gilbert Office Plaintiffs pray for judgment as hereinafter set forth.

5          **3.      Count 3: ACCOUNTING (Against Defendants, EQUITY**

6                    **ENTERPRISES, INC., EQUITY ENTERPRISES NEVADA, INC.,**

7                    **BUCHHOLZ, FISCHER, VENTO, VENTO FAMILY TRUST)**

8   560.   Paragraphs 515 through 559 are re-alleged and incorporated here.

9   561.   In addition to the artificial profit and disbursements from escrow alleged above,

10  additional basis exists for an accounting.

11  562.   The Development Pro Forma represented Total Project Cost to be $3,613,592.

12  563.   On the basis of available deed records, the Gilbert Office Plaintiffs are informed and

13  believe and thereon allege that gross sales were or approximated $5,087,550.

14  564.   Based on based on the representation of Total Project Cost in the Development Pro Forma

15  there should have been a profit of at least or about $1,473,985, but the Gilbert Office Plaintiffs

16  were told there had been a loss on their investments.

17  565.   These Plaintiffs are informed and believe and/or thereon allege that  these defendants

18  manipulated the financial activity of the project so as to cause damage, precise amount which

19  plaintiffs are unable to further specify because any and all such information and/or documents

20  are in the possession of one or more these defendants and has never been supplied to these

21  plaintiffs in a meaningful fashion despite the duty on one or more these defendants to so supply,

22  except to the extent of the  collective losses alleged herein.

23  566.   Demands for accounting have been made by one or more of these Plaintiffs and to the

24  extent individual demands have been made, such individual demands have been made in the

25  nature of being on behalf of all those affected.

26  567.   Despite the fiduciary and other duties and requests to do so, the pertinent these

27  Defendants have never provided full, complete, and accurate accountings of transactions.

28  568    These Plaintiffs are entitled to an accounting based on the unexplained transactions set

---

CASE NO.: C 08-03535 RMW      **FOURTH AMENDED COMPLAINT**      Page 103 of  164

1   forth above, the appearance that one or more of these Defendants diverted funds for their own

2   benefit, the disparity between what these have been told and provided, and the direct and indirect

3   fiduciary or similar duties owed.

4    569.   Without such accountings, these Plaintiffs are unable to ascertain what sum if any is due

5   on their notes and/or investments and from whom as the information and documents are in the

6   custody and control of one or more of these Defendants. Full and fair accountings of all income,

7   assets, expenses, liabilities and distributions related to the investments and projects are necessary

8   to determine what sums are due to whom and from whom.

9   570.   WHEREFORE, the Gilbert Office Plaintiffs pray for judgment as hereinafter set forth.

10  **XIV.   ALLEGATIONS AND COUNTS REGARDING OSBORN COMMONS (also**

11  **referred to as Scottsdale Lofts, X-Ten Wine Lofts, and Ten Lofts) (Including**

12  **Allegations and Counts Against Defendants BUCHHOLZ, FISCHER, EQUITY**

13  **ENTERPRISES, INC., EQUITY ENTERPRISES-NEVADA, INC., RDB**

14  **DEVELOPMENT, LLC, ZELTOR, LLC, ZELEZNAK, VENTO FAMILY TRUST,**

15  **VENTO INVESTMENTS, LLC, VENTO, GRACE CAPITAL, LLC.)**

16      **A.    Factual Allegations Common to All Counts.**

17  571.   Paragraphs 1 through 74 and 82 through 113 are re-alleged and incorporated here.

18  Inclusion of paragraphs 1 through 74 and 82 through 113 in their entirety is for the purpose of

19  formally including the pertinent details regarding plaintiffs and defendants specifically

20  referenced in this section and is not intended to expand the scope of plaintiffs' claims by the

21  plaintiffs specifically stated in this section as against the defendants as specifically alleged in this

22  section.

23  572.   "Osborn Commons Plaintiffs" hereafter refers to and includes (with the respective

24  amounts of principal provided and/or net loss of investment and/or principal amount claimed by

25  them as damages) Jack and Diane Greer ($50,000; September 2004), Jeff Lawrence ($34,000;

26  November 2004), Matt and Julie Rogers ($50,000; October 2004), James Wong ($50,000;

27  September 2004), the total amount so referenced  for these plaintiffs as to this project/fund being

28  $184,000.

---

**CASE NO.: C 08-03535 RMW      FOURTH AMENDED COMPLAINT      Page 104 of  164**

573.    During or about October 2004, Defendants BUCHHOLZ and FISCHER caused

Defendant EQUITY ENTERPRISES to begin soliciting investors for a condominium project in

Scottsdale, Arizona.

574.    The Osborn Commons Plaintiffs were solicited to invest and did invest by purchase of

membership interests in EENI- Scottsdale Lofts, LLC, a Delaware limited liability company

managed by EQUITY ENTERPRISES-NEVADA, INC., of which the principals were RONALD

BUCHHOLZ and FISCHER (then known as Charice Buchholz).

575.    Solicitation included use of a Confidential Private Offering Memorandum entitled

Osborn Commons, Scottsdale, AZ, Equity Enterprises, October 2004.

576.    Based on its contents and statements therein, the Osborn Commons Plaintiffs are

informed and believe and thereon allege a substantial portion of the material information in

Confidential Private Offering Memorandum was provided by or was caused to be provided by

Defendants VENTO and ZELEZNAK including, but not necessarily limited to, provision of

photographs, architectural drawings, a Development Pro Forma, the Project Owner Financial

Summary and balance sheet for Osborn Commons Investors, LLC, as of September 13, 2004,

financial analysis, the Executive Summary, Property Highlights, and Market Analysis, all of

which constituted material information of a type and nature on which a reasonably prudent

investor would rely.

577.    The Offering Memorandum stated the Project Owner was Osborn Commons Investors,

LLC, managed by ZELTOR, LLC, whose principal is DONALD ZELEZNAK, and the VENTO

FAMILY TRUST whose principal is JONATHAN VENTO.

578.    The Offering Memorandum stated ZELTOR, LLC, and the VENTO FAMILY TRUST

would oversee acquisition, construction, development, sales, and daily operations.

579.    The Offering Memorandum stated GRACE CAPITAL, LLC, wholly owned by VENTO

and ZELEZNAK would provide development services for a fee and that Vento Consulting, LLC,

wholly owned by JONATHAN VENTO would provide construction management services for a

fee.

580.    The Osborn Commons Plaintiffs are informed and believe and thereon allege the material

1  information in and the drafting of the Confidential Private Offering Memorandum went through

2  several iterations prior to dissemination to potential investors and in which VENTO and

3  ZELEZNAK participated.

4  581.   At the time Defendants VENTO and ZELEZNAK participated in provision of the

5  information and documents and revisions, they knew the material was intended for dissemination

6  to solicit investors, knew Defendants BUCHHOLZ and FISCHER and  the entities controlled by

7  them did not have the independent financial ability to participate in the project, and knew

8  Defendants BUCHHOLZ and FISCHER were soliciting investors to purchase membership

9  interests in a limited liability thereby giving  rise to fiduciary duties owed by them or entities

10  controlled to members.

11  582.   The Offering Memorandum stated the Project Owner Managers, Defendants ZELTOR

12  and the VENTO FAMILY TRUST, had been relied on for the completeness and accuracy of

13  financial and other information regarding the Project Owner, Osborn Commons Investors, LLC.

14  583.   The Osborn Commons Plaintiffs purchased their membership interests on the

15  representation in the Offering Memorandum that EENI-Scottsdale Lofts, LLC, would obtain a

16  membership interest in Osborn Commons Investors, LLC, the Project Owner.

17  584.   Osborn Commons Investors, LLC, is an Arizona limited liability company formed  March

18  1, 2004 of which Defendants VENTO INVESTMENTS, LLC, and ZELTOR were members and

19  THE VENTO FAMILY TRUST and ZELTOR were managers.

20  **B.   Specific Counts.**

21  **1.   Count 1: FRAUD (Misrepresentation and Concealment Against**

22  **Defendants BUCHHOLZ, FISCHER, EQUITY ENTERPRISES,**

23  **EQUITY ENTERPRISES-NEVADA, INC., RDB DEVELOPMENT,**

24  **LLC, ZELTOR, LLC, ZELEZNAK, VENTO FAMILY TRUST,**

25  **VENTO INVESTMENTS, LLC, VENTO, GRACE CAPITAL, LLC.)**

26  585.   Paragraphs 571 through 584 are re-alleged and incorporated here.

27  **a.   Affirmative misrepresentations**.

28  586.   The Confidential Private Offering Memorandum given to the Osborn Commons Plaintiffs

contained multiple misrepresentations.

587.    The Memorandum stated the project would include the building of a modern loft condominium complex of 93 units.

588.    The representation was false in that and based on statements made on or around April 9, 2004 and attributable to VENTO and ZELEZNAK, and GRACE CAPITAL, LLC, they had plans to start a 56-unit condo project called Osborn Commons, a public statement by VENTO and attributable to GRACE CAPITAL, LLC on August 1, 2005 reiterated plans for a 56-unit condo project, and as of December 2005 there were only plans for 82 units.

589.    The Memorandum stated the project was in the design and review phase, construction was projected to commence April 2005, and the expected completion date was April 2006.

590.    The representation was false and misleading in that the status of the design and review phase was such that construction could not have commenced in April 2005, Osborn Commons Investors, LLC, did not acquire the final parcel of land until March 2005, construction could not have been completed April 2006 as further evidenced by the fact the building permits did not issue until June 26, 2006.

591.    The Memorandum stated the closest comparable was selling for $375 per square foot and based the financial projections on a sales price of $300 per square foot, an the average sales price would be $394,088.70 per unit.

592..    The representations were false in that the units were actually then being estimated at a mid-range price of about $250,000 and a maximum of $400,000 resulting in pricing far below the average price of $394,088 per unit indicated in the Confidential Private Offering Memorandum.

593.    The Memorandum stated Total Construction Cost as $22,260,605, Total Project Cost as $26,620,899 and that total loans were expected to be $21,296,719.

594.    The representation was false and misleading in that it was based on a project represented as being 93 units and a total of $41,400,000 was borrowed for the project which ultimately comprised a maximum of 82 units.

595.    The Memorandum stated $250,000 was payable to RDB DEVELOPMENT, LLC, (a

1  BUCHHOLZ entity) as a Project Management Fee, to be paid in installments, subject to any

2  approval or terms that may be required by Project Lenders.

3  596.    The representation was false and misleading in that neither Defendants RDB

4  DEVELOPMENT, LLC, nor BUCHHOLZ were in a position of being able to provide such

5  services, never intended to provide such services, any such services by RDB DEVELOPMENT,

6  LLC, and/or BUCHHOLZ were completely unnecessary in view of the others being

7  compensated for such services, and as further evidenced by the fact that on October 8, 2004,

8  EQUITY ENTERPRISES, INC., disbursed $250,000 to Defendant BUCHHOLZ before any

9  such services were rendered or project loans obtained.

10  597.    The Memorandum stated there were no prior business relationships between the Manager

11  and the Project Owners.

12  598.    The representation was false and misleading in that the individuals and entities involved

13  in this project had multiple other business relationships as demonstrated by the allegations

14  regarding the other projects and funds herein.

15  599.    The Memorandum stated reservations had been taken on 20% of the units, the sales team

16  believed the project would sell out before construction was completed, and pre-sale deposits

17  were stated as being $1,500,000.

18  600.    Based on documents and communications subsequently received, the Osborn Commons

19  Plaintiffs are informed and believe and thereon allege the representations were false and

20  misleading in that there was no sales team per se then in place as the Memorandum indicated,

21  reservations had not been taken on 20% of the units and in this respect such a representation

22  could only have been false and misleading in view of the number of units represented as

23  intended for construction, and that pre-sale deposits of $1,500,000 had not been received.

24  601.    A letter dated May 21, 2007, on letterhead of "Ten Lofts" and signed off by DONALD

25  ZELEZNAK, JONATHAN VENTO, and Ryan Zeleznak stated "the project pro forma profit

26  remains at or above originally projected levels" had the effect of reiterating and reinforcing the

27  misrepresentations alleged above.

28  602.    The representations, individually and collectively, were material in that they were of a

1  type and nature reasonably relied on by reasonable investors including, but not limited to,

2  evaluation of investment risk, potential profit, and time for return of investment.

3  603.   The representations, individually and collectively, were justifiably relied on by the

4  Osborn Commons Plaintiffs in deciding to invest in that they were of a type and nature

5  reasonably relied on by reasonable investors including, but not limited to, evaluation of

6  investment risk, potential profit, and time for return of investment.

7  604.   Had any of the true facts been known, much less the collective falsity of the

8  misrepresentations and facts not disclosed, the Osborn Commons Plaintiffs would not have

9  invested.

10  605.   As a consequence, the Osborn Commons Plaintiffs have suffered the damages alleged

11  herein.

12                    **b.      Material Facts Concealed.**

13  606.   Despite the representation in the Memorandum that as of September 13, 2004 total

14  Investor Equity Deposits were $1,500,000, these Defendants concealed the fact Defendants

15  VENTO INVESTMENTS, LLC, and ZELTOR, LLC, had only contributed $45 each to equity

16  capital for their membership interests.

17  607.   Despite the complete absence of any indication of commissions or similar expenses for

18  land acquisition in the Memorandum and as ultimately evidenced by its Balance Sheet dated

19  December 31, 2007, these Defendants concealed the fact that Osborn Commons Investors, LLC,

20  received $270,000 as "Brokerage Commissions" attributable to acquisition of the land.

21  608.   DEFENDANTS VENTO and ZELEZNAK concealed that fact they intended to give or

22  had given a membership interest for an equity contribution of $10 to RJZ Associates, LLC, an

23  Arizona limited liability company of which ZELEZNAK'S son was the member and manager.

24  609.   The information concealed was material in that it misled investors as to the true nature

25  and extent of the financial aspects of the project, intended use of funds, potential profitability,

26  and time for return of investment.

27  610.   The Osborn Commons Plaintiffs justifiably relied on these Defendants to provide full and

28  complete information without omission.

---

611.   If the Osborn Commons Plaintiffs had been aware of the concealed information, they would not have invested.

612.   As a result, the Osborn Commons Plaintiffs have been damaged as alleged herein.

613.   The conduct of these Defendants as described above, involved malice, oppression and fraud, and such conduct was clearly despicable.  Such despicable and fraudulent conduct was plainly conducted by the individual defendants as officers, directors, and/or managing agents of these entity Defendants and/or was ratified by the entity defendants.  Accordingly, the Court should assess punitive damages against these Defendants.

614.   Wherefore, the Osborn Commons Plaintiffs pray for damages as set forth below.

      **2.**    **Count 2: BREACH OF FIDUCIARY DUTY (Against Defendants BUCHHOLZ, FISCHER, EQUITY ENTERPRISES, EQUITY ENTERPRISES-NEVADA, INC., RDB DEVELOPMENT, LLC, ZELTOR, LLC, ZELEZNAK, VENTO FAMILY TRUST, VENTO INVESTMENTS, LLC, VENTO, GRACE CAPITAL, LLC.)**

615.   Paragraphs 571 through 613 are re-alleged and incorporated here.

616.   Defendants EQUITY ENTERPRISES, INC., BUCHHOLZ, FISCHER, EQUITY ENTERPRISES-NEVADA, INC., and RDB DEVELOPMENT, LLC, had a special relationship with the Osborn Commons Plaintiffs in that they assumed a fiduciary position in relation to the Osborn Commons Plaintiffs as investment advisers, trustees of accounts, as managers, managing partners of projects, co-venturers, and/or as co-members of the limited liability companies.

By virtue of their involvement in the project, having participated in the creation and distribution of material information to investors, and knowing the facts and circumstances as to how Defendants BUCHHOLZ, FISCHER, EQUITY ENTERPRISES, and entities controlled by them obtained investor money, Defendants ZELTOR, LLC, DONALD ZELEZNAK, VENTO FAMILY TRUST, VENTO INVESTMENTS, LLC, JONATHAN VENTO, GRACE CAPITAL, LLC, incurred the equivalent of fiduciary duties owed to the Osborn Commons Plaintiffs.

617.   As those in special, confidential, and fiduciary relationships, express or implied,  these Defendants owed a duty of utmost care, integrity, honesty and loyalty toward the Osborn

1  Commons Plaintiffs.

2  618.   These Defendants breached their fiduciary duty to the Osborn Commons Plaintiffs by

3  participating in the making of the misrepresentations and failing to make full disclosure of all

4  material facts concerning the transactions that might have affected investment decisions and by

5  misuse of funds as alleged herein.

6  619.   As a direct and proximate result of the breach of fiduciary duty by these Defendants, the

7  Osborn Commons Plaintiffs have been injured in their business and property as herein alleged.

8  620.   The Osborn Commons Plaintiffs have incurred and continue to incur legal fees and costs

9  to recover such losses and any potential judgments against these Defendants in the pending

10  lawsuits.

11  621.   The conduct of these Defendants as described above, involved malice, oppression and

12  fraud, and such conduct was clearly despicable.  Such despicable and fraudulent conduct was

13  plainly conducted by the individual defendants as officers, directors, and/or managing agents of

14  these entity Defendants and/or was ratified by the entity defendants.  Accordingly, the Court

15  should assess punitive damages against these Defendants.

16  622.   Accordingly, the Court should assess punitive damages against these Defendants.

17  623.   WHEREFORE, the Osborn Commons Plaintiffs pray for judgment as hereinafter set

18  forth.

19          **3.    Count 3: ACCOUNTING (Against Defendants BUCHHOLZ,**

20                 **FISCHER, EQUITY ENTERPRISES, EQUITY ENTERPRISES-**

21                 **NEVADA, INC., RDB DEVELOPMENT, LLC, ZELTOR, LLC,**

22                 **ZELEZNAK, VENTO FAMILY TRUST, VENTO INVESTMENTS,**

23                 **LLC, VENTO, GRACE CAPITAL, LLC.)**

24  624.   Paragraphs 571 through 612 and 616 through 620 are re-alleged and incorporated here.

25  625.   The Balance Sheet of Osborn Commons Investors, LLC, dated December 31, 2007 states

26  total assets of $50,091,088 and total liabilities of $45,475,700 and Total Investor Equity

27  Deposits  of $4,466,250.

28  626.   Despite the representation Osborn Commons Investors, LLC, would acquire and own the

---

1   land, by Grant Deed dated March 9, 2006 and signed by DONALD ZELEZNAK as Managing

2   Member, Osborn Commons Investors, LLC, conveyed five of the parcels (Parcels 1, 2, 3, 4, 5 of

3   Orange Acres) to Osborn Partners III, LLC, an Arizona limited liability company controlled

4   directly and indirectly by VENTO and ZELEZNAK for consideration of $10 and did so without

5   required or other notice to other members and those otherwise entitled to know so as to deprive

6   members and investors of their fair share of the assets and value of the project.

7   627.    The Combined Balance Sheet for Osborn Commons, LLC, dated as of December 31,

8   2007 states "Sales and Marketing & Promotion" to be in the amount of $1,559,945.54 that

9   includes commissions for "Internal Sales" in the sum of $42,125, and "Sales Management" in

10  the sum of $279,066.64, which these Plaintiffs are informed and believe was an artificially

11  inflated amount and/or otherwise diverted to some or all of the GRACE DEFENDANTS for

12  their own direct or indirect benefit without making required disclosures.

13  628.    On or about December 11, 2006, Defendant RDB Development, LLC, and later also on

14  behalf of EENI-Scottsdale Lofts, LLC, BUCHHOLZ began making requests for documents and

15  information and an opportunity to inspect the books and records of Osborn Commons Investors,

16  LLC, (the Project Owner) which was managed by ZELTOR, LLC, whose principal is DONALD

17  ZELEZNAK, and the VENTO FAMILY TRUST, whose principal is JONATHAN VENTO, and

18  that the requests were first long ignored by VENTO and ZELEZNAK, then resisted, then

19  responded to in wholly inadequate fashion and as of this date have yet to reasonably respond and

20  that such a failure to respond is a violation of the fiduciary duties and other obligations to

21  provide information.

22  629.    The Osborn Commons  Plaintiffs are informed and believe and thereon allege that despite

23  affirmative duty to do so and  despite demands to do so, Osborn Commons, LLC, has never

24  provided a meaningful accounting or financial statements or financial reports that provide a true

25  and accurate depiction of the affairs of the project.

26  630.    Based on the above, the Osborn Commons Plaintiffs have claims for damages as alleged

27  herein and potentially more based on the above facts that tend to indicate potential profit and/or

28  equity available for distributions.

---

631. Based on documents ultimately disseminated to the Osborn Commons Plaintiffs and other investors, these Plaintiffs are informed and believed and thereon allege that GRACE CAPITAL and/or other GRACE DEFENDANTS received hundreds of thousands of dollars in commissions and/or purported sales management without ever disclosing the intent to take such money or disclosing its receipt.

632. Demands for accounting have been made by one or more Osborn Commons Plaintiffs and to the extent individual demands have been made, such individual demands have been made in the nature of being on behalf of all those affected.

633. Despite the duty and requests to do so, these Defendants have not provided the Osborn Commons Plaintiffs with full, complete, and accurate accountings of transactions related to Plaintiffs' investments.

634. The Osborn Commons Plaintiffs are entitled to an accounting based on the unexplained transactions set forth above, the appearance that one or more of these Defendants diverted funds for their own benefit, and the disparity between what Osborn Commons Plaintiffs have been told and what little has been provided to date.

635. The Osborn Commons Plaintiffs are informed and believe and or thereon allege that these Defendants manipulated the financial activity of the project so as to cause damage, the precise amount which these Plaintiffs are unable to further specify because any and all such information and/or documents are in the possession of one or more of these Defendants and have never been supplied to these Plaintiffs in a meaningful fashion despite the duty on one or more these Defendants to do so supply, except to the extent that the Osborn Commons Plaintiffs have the individual and collective losses alleged herein.

636. At a minimum, the Osborn Commons Plaintiffs are entitled to an accounting based on the disparities alleged above.

637. The Osborn Commons Plaintiffs are entitled to full, fair, and accurate accountings from these Defendants, all of whom have a duty and/or ability to so provide.

638. Without such accountings, the Osborn Commons Plaintiffs are unable to ascertain what sum if any is due on their notes and/or investments and from whom as the information and

1   documents are in the custody and control of these Defendants and full and fair accountings of all

2   income, assets, expenses, liabilities and distributions related to the investments and projects are

3   necessary to determine what sums are due to whom and from whom.

4   639.   WHEREFORE, the Osborn Commons Plaintiffs pray for judgment as hereinafter set

5   forth.

6   **XV.   ALLEGATIONS AND COUNTS AS TO RAY RANCH. (Including Allegations and**

7   **Counts Against BUCHHOLZ, FISCHER, EQUITY ENTERPRISES, INC., EENI,**

8   **VENTO, and GRACE CAPITAL, LLC.)**

9   **A.   Factual Allegations Common to All Counts.**

10   640.   Paragraphs 1 through 74 and 82 through 113 are re-alleged and incorporated here.

11   Inclusion of paragraphs 1 through 74 and 82 through 113 in their entirety is for the purpose of

12   formally including the pertinent details regarding plaintiffs and defendants specifically

13   referenced in this section and is not intended to expand the scope of plaintiffs' claims by the

14   plaintiffs specifically stated in this section as against the defendants as specifically alleged in this

15   section.

16   641.   "Ray Ranch Plaintiffs" hereafter refers to and includes (with the respective amounts of

17   principal provided and/or principal amount claimed by them as their  minimum damages) James

18   Bryson ($44,133; May 2003), Wayne and Candise Canto ($22,066.35; May 2003), Bob and

19   Nancy Winger ($22,066; July 2003), the total amount so referenced  for these plaintiffs as to this

20   project/fund being $88,265.35.

21   642.   Starting April 2003, Defendants BUCHHOLZ, FISCHER, and EQUITY ENTERPRISES,

22   INC., began soliciting investments for and circulated documents regarding an office

23   condominium project ultimately known as "Ray Ranch Professional Plaza" on Ray Road in

24   Chandler, Arizona, that included a Development Pro Forma dated April 11, 2003.

25   643.   The Development Pro Forma closely resembles the content and format of other similar

26   documents known to have come from one or more GRACE DEFENDANTS, particularly the

27   materials regarding Solomon Towers and is alleged to have emanated from one or more GRACE

28   DEFENDANTS on that basis.

---

**CASE NO.: C 08-03535 RMW      FOURTH AMENDED COMPLAINT      Page 114 of  164**

644.    The Ray Ranch Plaintiffs delivered funds for memberships interests in EEI-Ray Ranch, LLC, an entity formed by and controlled directly and/or indirectly by Defendants BUCHHOLZ, FISCHER, and EQUITY ENTERPRISES, INC., on the representation EEI-Ray Ranch, LLC, would in turn obtain a membership interest in the "project owner" which turned out to be Ray Road Office Investors, LLC.

645.    Defendants BUCHHOLZ, FISCHER, and EQUITY ENTERPRISES, INC., disseminated additional documents to the Ray Ranch Plaintiffs, the extent of which, if any, involved one or more GRACE DEFENDANTS is not presently known nor subject to reasonable determination without discovery

646.    Ray Road Office Investors, LLC, is/was an Arizona limited liability company formed September 25, 2002 by Shea Commercial (an entity with which VENTO worked until early 2004), VENTO, and EQUITY ENTERPRISES, INC.

647.    At the time of formation, JONATHAN VENTO was a manager and a member with in interest of 20% or greater and continued to act as a manager until at least some time in 2004 or 2005, if not longer.

648.    As a manager and a member with an interest of 20% or greater and knowing material information was intended to be disseminated to investors, VENTO was obligated to provide full, complete, and accurate information to members of Ray Road Office Investors, LLC, and owed them a fiduciary duty.

649.    At a minimum, Defendants VENTO and GRACE CAPITAL, LLC, participated in the preparation of the Development Pro Forma and gave it to BUCHHOLZ, FISCHER, and/or EQUITY ENTERPRISES, INC., knowing and intending that it would be used to solicit investors such as the Ray Ranch Plaintiffs and they knew Defendants BUCHHOLZ, FISCHER, and EQUITY ENTERPRISES, INC., and/or other entities controlled by them did not have the independent  financial wherewithal to make the investment and that funds would have to be solicited and obtained from investors.

650.    VENTO knew that BUCHHOLZ, FISCHER, and EQUITY ENTERPRISES, INC., were going to solicit investors to purchase membership interests in a limited liability company which

1  in turn would have a membership interest in Ray Road Office Investors, LLC.

2  651.    The Development Pro Forma included multiple misrepresentations and failed to include

3  material facts as further alleged below.

4  652.    On July 7, 2005, EQUITY ENTERPRISES transferred  $500,000 to "Gateway" (an

5  entity/recipient previously unknown to Plaintiffs) and attributed to Ray Ranch and which is

6  believed to have been merely a means of diverting money for the benefit of Defendants,

7  BUCHHOLZ and FISCHER to the detriment of the Ray Ranch Plaintiffs.

8  653.    On July 16, 2004, EQUITY ENTERPRISES deposited $500,000 into its account and

9  attributed the money to Ray Ranch and which is believed to have been merely a means of

10  diverting money for the benefit of Defendants BUCHHOLZ and FISCHER, to the detriment of

11  the Ray Ranch Plaintiffs.

12  654.    On July 25, 2003, EQUITY ENTERPRISES took $500,000 of income as Ray Ranch

13  profits and debited a note regarding "EE CA" (presumably an Equity Enterprises California

14  entity) and which is believed to have never been formally perfected or paid and was merely a

15  means of diverting money for the benefit of Defendants BUCHHOLZ and FISCHER to the

16  detriment of the Ray Ranch Plaintiffs.

17      **B.    Specific Counts.**

18          **1.    Count 1: FRAUD (Misrepresentation and Concealment Against**

19              **Defendants BUCHHOLZ, FISCHER, EQUITY ENTERPRISES, INC.,**

20              **EENI, VENTO, and GRACE CAPITAL, LLC.**

21          **a.    Affirmative Misrepresentations.**

22  655.    Paragraphs 640 through 654 are re-alleged and incorporated here.

23  65.    The written materials provided by Defendants BUCHHOLZ, FISCHER, and EQUITY

24  ENTERPRISES, INC., to the Ray Ranch Plaintiffs represented investors would receive 50% of

25  the profits that derived to EEI-Ray Ranch, LLC, and did so in a fashion representing that 50% of

26  all profits would devolve to investors and the Ray Ranch Plaintiffs.

27  657.    The representation was false and misleading in that it failed to disclose what interest EEI-

28  Ray Ranch, LLC, would have in Ray Road Office Investors, LLC, and the structure of EEI-Ray

---

**CASE NO.: C 08-03535 RMW        FOURTH AMENDED COMPLAINT        Page 116 of 164**

1   Ranch, LLC, and its interest in Ray Road Office Investors, LLC was such that far less than 50%

2   of the profits could devolve to the investors and the Ray Ranch Plaintiffs.

3   658.   The Development Pro Forma represented a need to a "Development Fee" of $450,000 and

4   "Construction Management Fees" of $150,000, and "Total Construction Cost" of $7,727,100.

5   659.   The representations were false in that in that (1) no such fees were reasonably necessary

6   to undertake and further the project, (2) neither EENI, BUCHHOLZ, FISCHER, nor EQUITY

7   ENTERPRISES, INC., were in a position to render such services, (3)  EENI, BUCHHOLZ,

8   FISCHER, and EQUITY ENTERPRISES, INC., did not intend to render such services, and (4)

9   the builder/contractor for the project, Caviness Construction Company, Inc., had agreed to

10  perform the work and services necessary as part of the total contact price of $6,640,288.

11  660.   Defendant EQUITY ENTERPRISES, INC., at the direction of and with the knowledge of

12  Defendants BUCHHOLZ, FISCHER, ultimately disbursed a total of $819,632.79 as follows:

13          a.      On or about February 18, 2004, $30,000 to VENTO as being attributed to Ray

14                  Ranch and without specification of purpose;

15          b.      From November 17, 2003 to June 29, 2004, a total of $702,500 for purported

16                  development and construction fees of which $75,000 was disbursed to RDB on

17                  November 17, 2003; $30,000 to VENTO; $60,000 to "M&I" (presumably M&I

18                  Marshall Ilsley Bank); and the  rest to Shea Commercial; and

19          c.      Pursuant to a journal entry in the books and records of Ray Road Office Investors,

20                  LLC, dated May 16, 2007,  $119,132.79 was paid to Shea Commercial for "pre-

21                  development work."

22  661.   Some or all of the above referenced transactions and disbursements to Shea Commercial

23  were made to fulfill obligations incurred by Defendants including but not limited to VENTO,

24  EENI, THE VENTO FAMILY TRUST, BUCHHOLZ, EEI, ZELTOR, LLC, and ZELEZNAK

25  pursuant to a Settlement Agreement and Mutual Release, dated June 10, 2004, that resolved at

26  least five lawsuits that collectively involved the referenced defendants as to interests asserted by

27  third parties, such interests never having been disclosed to the Ray Road Plaintiffs or other

28  Plaintiffs herein others.

1   662.   The Development Pro Forma represented the "Total Projected Profit" as

2   $2,793,905 and this profit would be split equally ($1,396,952 each) as between "Equity

3   Enterprises" and "Investors."

4   663.   The representations were false in that it was represented all profits would be split between

5   "Equity Enterprises" and "Investors" even though the membership structure of Ray Road Office

6   Investors, LLC, was such that far less than 100% of the profits would devolve to "Equity

7   Enterprises" and "Investors."

8   664.   The Development Pro Forma represented "Total Loan Amount" would be $8,564,556."

9   665.   The representation was false in that Ray Road Office Investors, LLC, borrowed a total of

10   $9.6 million ($6.1 million plus $3.5 million), the reason for the excess borrowing being for the

11   pertinent Defendants to purloin funds for their own benefit.

12   666.   In addition to the Development Pro Forma, Defendants BUCHHOLZ, FISCHER, and

13   EQUITY ENTERPRISES, INC., circulated additional documents that represented $2.2 million

14   was needed as required equity from investors based on a loan to value ratio of 80%.

15   667.   The representation was false in that such an amount was not necessary to go forward with

16   the project based on such a loan to value ratio, the reason for making such a representation was

17   to create a "cushion" for payment of unreasonable and purported development and construction

18   fees, and because of undisclosed interests as alleged further below.

19   668.   The additional documents represented that investors were being sought only to the extent

20   necessary to secure the property and construction financing.

21   669.   The representations were false in that investors were being sought to provide an amount

22   well in excess of that reasonably necessary to fund the project and to create an excess pool of

23   funds to be improperly diverted as further alleged herein

24   670.   The additional documents represented the business and affairs of the project shall be

25   managed by Defendant EQUITY ENTERPRISES, INC. (Managing Member) on behalf of EEI-

26   Ray Ranch, LLC.

27   671.   The representation was false in that at the time first made, EEI-Ray Ranch, LLC, had

28   neither the right nor  authority and at not time thereafter was expected to have the right or

---

**CASE NO.: C 08-03535 RMW   FOURTH AMENDED COMPLAINT   Page 118 of  164**

1    authority to manage the business or affairs of the project, the right of control rested with Shea

2    Commercial, and at a minimum Defendants VENTO and subsequently GRACE CAPITAL

3    retained and exercised control over the project evidenced in part by the fact that during the time

4    period of July 2004 through January 2005, the contractor, Caviness Construction Company,

5    Inc.,was communicating directly with and submitting applications for payment to VENTO, care

6    of Defendant GRACE CAPITAL, some of which noted "GRACE CAPITAL" as "owner."

7    672.    The additional documents provided to investors by Defendants BUCHHOLZ, FISCHER,

8    and EQUITY ENTERPRISES, INC., represented an Arizona limited liability company had

9    already been formed for this project.

10    673.    The representation was false in that Defendants BUCHHOLZ, FISCHER, and EQUITY

11    ENTERPRISES, INC., had not formed any entity for the project and did not form EEI-Ray

12    Ranch, LLC, until May 20, 2003 (of which EQUITY ENTERPRISES, INC., a California

13    corporation was manager), and EEI-Ray Ranch 10K, LLC, on June 12, 2003.

14    674.    The additional documents provided to investors by Defendants BUCHHOLZ, FISCHER,

15    and EQUITY ENTERPRISES, INC., represented the equity for this project and the distribution

16    of profits would be kept separate from other projects and  are not co-mingled.

17    675.    The representation was false in that Defendants BUCHHOLZ, FISCHER, and EQUITY

18    ENTERPRISES, INC., completely commingled the funds for this project with money of other

19    funds and projects in the accounts of EQUITY ENTERPRISES, INC., and an entity referred to

20    in their records as "Equity Enterprises Partnership."

21    676.    The additional documents provided to investors by Defendants BUCHHOLZ, FISCHER,

22    and EQUITY ENTERPRISES, INC., represented the Managing Member would personally

23    guarantee any loan.

24    677.    The representation was false in that there was neither intention to guarantee any loan nor

25    was any such loan ever guaranteed by the "Managing Member."

26    678.    The representations, individually and collectively, were material in that they were of a

27    type and nature reasonably relied on by reasonable investors including, but not limited to,

28    evaluation of investment risk and potential profit.

679.    The representations, individually and collectively, were justifiably relied on by the Ray Ranch Plaintiffs in deciding to invest in that they were of a type and nature reasonably relied on by reasonable investors including, but not limited to, evaluation of investment risk and potential profit.

680.    Had any of the true facts been known, much less the collective falsity of the misrepresentations and facts not disclosed, the decision to invest would not have been made by the Ray Ranch Plaintiffs .

681    As a consequence, the Ray Ranch Plaintiffs have suffered the damages alleged herein.

### b.    Concealment of Material Facts.

682.    Defendants BUCHHOLZ, FISCHER, and EQUITY ENTERPRISES, INC., concealed the full nature  and extent of interests already held by others in Ray Road Office Investors, LLC.

683.    Defendants VENTO, EENI, THE VENTO FAMILY TRUST, BUCHHOLZ, EEI, ZELTOR, LLC, and ZELEZNAK failed to disclose Ray Road Office Investors, LLC, had originally been formed, in part, by VENTO and Shea Commercial, and that Ray Road Office Investors, LLC, was subject to contracts and agreements with Shea Commercial.

684.    The information concealed was material in that it misled investors as to the true nature and extent of the financial aspects of the project, intended use of funds, and potential profitability.

685.    The Ray Ranch Plaintiffs justifiably relied on these Defendants to provide full and complete information without omission.

686.    If the Ray Ranch Plaintiffs had been aware of the concealed information, they would not have made their investments.

687.    As a result, the Ray Ranch Plaintiffs have been damaged as alleged herein.

688.    The conduct of these Defendants as described above, involved malice, oppression and fraud, and such conduct was clearly despicable.  Such despicable and fraudulent conduct was plainly conducted by the individual defendants as officers, directors, and/or managing agents of these entity Defendants and/or was ratified by the entity defendants.  Accordingly, the Court should assess punitive damages against these Defendants.

---

689.   Wherefore, the Ray Ranch Plaintiffs pray for damages as set forth below.

    **2.**    **Count 2: BREACH OF FIDUCIARY DUTY (Against Defendants EQUITY ENTERPRISES, INC., BUCHHOLZ, FISCHER, VENTO)**

690.   Paragraphs 640 through 689 are re-alleged and incorporated here.

691.   Defendants EQUITY ENTERPRISES, INC., BUCHHOLZ, and FISCHER had a special relationship with the Ray Ranch Plaintiffs as a result of one or more reasons, in that they assumed a fiduciary position in relation to the Ray Ranch Plaintiffs as investment advisers, trustees of accounts, as managers, managing partners of projects, co-venturers, and/or as co-members of the limited liability companies.

692.   As such, Defendants EQUITY ENTERPRISES, INC., BUCHHOLZ, and FISCHER were fiduciaries as to the Ray Ranch Plaintiffs.

693.   As manager of  Ray Road Office Investors, LLC, and by dissemination of financial statements regarding Ray Ranch Office Investors, LLC, VENTO owed a fiduciary duty to members of Ray Road Office Investors, LLC, which purportedly included EEI-Ray Ranch, LLC, a duty that directly or indirectly flowed through and/or inured to the benefit of members of EEI-Ray Ranch, LLC.

694.   Defendant VENTO was substantially and materially involved in creation of information and documentation provided to Defendants EQUITY ENTERPRISES, INC., BUCHHOLZ and FISCHER.

695.   VENTO knew the information and documentation given to Defendants EQUITY ENTERPRISES, INC., BUCHHOLZ, and FISCHER would be used by them to raise funds from investors such as the Ray Road Plaintiffs.

696.   Defendant VENTO knew neither Defendants EQUITY ENTERPRISES, INC., BUCHHOLZ, and FISCHER nor the entities controlled by them had the financial ability to make the investment and could only make the investment by raising funds from investors such as the Ray Ranch Plaintiffs.

697.   Defendant VENTO knew EQUITY ENTERPRISES, BUCHHOLZ, and FISCHER were soliciting investors such as the Ray Ranch Plaintiffs in such a fashion that EQUITY

1  ENTERPRISES, BUCHHOLZ, and FISCHER would have special and/or fiduciary

2  relationships with investors such as the Ray Ranch Plaintiffs and participated in the acts

3  complained of herein to such an extent he incurred special and/or fiduciary relationships with

4  investors such as the Ray Ranch Plaintiffs .

5  698.   As a result of the above and participation in the misrepresentations and concealment of

6  material facts, VENTO incurred fiduciary obligations equivalent to those owed by Defendants

7  EQUITY ENTERPRISES, INC., BUCHHOLZ, and FISCHER, and the entities controlled by

8  them to the Ray Ranch Plaintiffs.

9  699.   As those in special, confidential, and fiduciary relationships, express or implied,  these

10  Defendants owed a duty of utmost care, integrity, honesty and loyalty toward the Ray Ranch

11  Plaintiffs.

12  700.   These Defendants breached their fiduciary duty to the Ray Ranch Plaintiffs by

13  participating in the making of the misrepresentations and failing to make full disclosure of all

14  material facts concerning the transactions that might have affected investment decisions and by

15  misuse of funds as alleged herein.

16  701.   As a direct and proximate result of the breach of fiduciary duty by these Defendants, the

17  Ray Ranch Plaintiffs have been injured in their business and property as herein alleged.

18  702.   The Ray Ranch Plaintiffs have incurred and continue to incur legal fees and costs to

19  recover such losses and any potential judgments against these Defendants in the pending

20  lawsuits.

21  703.   The conduct of these Defendants as described above, involved malice, oppression and

22  fraud, and such conduct was clearly despicable.  Such despicable and fraudulent conduct was

23  plainly conducted by the individual defendants as officers, directors, and/or managing agents of

24  these entity Defendants and/or was ratified by the entity defendants.  Accordingly, the Court

25  should assess punitive damages against these Defendants.

26  704.   Accordingly, the Court should assess punitive damages against these Defendants.

27  705.   WHEREFORE, the Ray Ranch Plaintiffs pray for judgment as hereinafter set forth.

28  /////

1   **3.   Count 3: CONSTRUCTIVE FRAUD (Against Defendants,**
2   **BUCHHOLZ, FISCHER, EQUITY ENTERPRISES, EENI, and**
3   **VENTO)**

4   706.   Paragraphs 640-687, and 691-701 are re-alleged and incorporated here.

5   707.   To the extent Defendants  BUCHHOLZ, FISCHER, EQUITY ENTERPRISES, EENI,
6   and VENTO had fiduciary or other special or other confidential relationship obligations, those
7   obligations included the duty to make full and complete disclosures without omissions
8   irrespective of whether the representations and/or omissions were wilfull or negligent.

9   708.   Defendants BUCHHOLZ, FISCHER, EQUITY ENTERPRISES, EENI, and VENTO
10  provided incorrect and incomplete information.

11  709.   The Ray Ranch Plaintiffs were entitled to and did reasonably and justifiably rely on the
12  accuracy of what was provided to them.

13  710.   The Ray Ranch Plaintiffs were entitled to and did reasonably and justifiably rely on the
14  these Defendants not to omit material information.

15  711.   These Defendants made misrepresentations as alleged herein and failed to disclose
16  material facts of a type and nature that would reasonably and justifiably be relied  on by
17  investors such as the Ray Ranch Plaintiffs.

18  712.   The Ray Ranch Plaintiffs were unaware of the false and intentionally misleading nature
19  of the aforementioned representations and material omissions and justifiably relied thereon.

20  713.   As a result of the failure to make full disclosure of material facts and misrepresentations,
21  Ray Ranch Plaintiffs transferred the funds as alleged herein and have been damaged as alleged
22  herein. Such damages may include, but are not limited to, actual damages, interest thereon,
23  punitive damages, attorney's fees, and other damages according to proof.

24  714.   WHEREFORE, the Ray Ranch Plaintiffs pray for judgment as hereinafter set forth.

25  **4.   Count 4: ACCOUNTING (Against Defendants BUCHHOLZ,**
26  **FISCHER, EQUITY ENTERPRISES, EENI, and VENTO)**

27  715.   Paragraphs 640-687, and 691-701 are re-alleged and incorporated here.

28  716.   The Ray Ranch Plaintiffs are informed and believe and thereon allege that total sales

---

**CASE NO.: C 08-03535 RMW       FOURTH AMENDED COMPLAINT       Page 123 of  164**

1   generated by and related to the project were at least $5,362.466.

2   717.   Pursuant to tax documents in the name of EEI-Ray Ranch 10k, LLC, and signed by

3   Defendant, FISCHER, EEI-Ray Ranch 10k, LLC, had invested a total of $1,980,000 in Ray

4   Road Office Investors, LLC.

5   718.   Pursuant to IRS Form 1065 for tax year 2004 and signed by Defendant, FISCHER, Ray

6   Road Office Investors, LLC, began the year with assets of $8,372,133 and ended the year with

7   assets of $8,882,331.

8   719.   Members of EEI-Ray Ranch, LLC, subsequently received financial statements regarding

9   "Ray Ranch Office Investors, LLC."

10   720.   Title to the property, the majority of pertinent and substantial transactions, and subsequent

11   loans were taken in the name of Ray Road Office Investors, LLC.

12   721.   The Ray Ranch Plaintiffs had been told they would receive 50% of the profits.

13   722.   As best as can be recalled or determined by resort to documents, the investors/members

14   EEI-Ray Ranch, LLC, were not informed, directly or indirectly, of the involvement of Ray Road

15   Office Investors, LLC, until about June 2007 when EQUITY ENTERPRISES disseminated a

16   letter dated June 11, 2007 addressed as "Dear Ray Ranch Office Condos Investor" that included

17   a profit and loss and balance sheet referring to "Ray Road Office Investors, LLC."

18   723.   The Profit and Loss represented a net loss of $365,659.67 with the loss attributed to

19   actual construction costs of $93 per square foot rather than $67 per square foot as the

20   Development Pro Form had stated, a disparity of nearly $3 million for which there has been no

21   meaningful accounting or detailed information provided.

22   724.   Demands for accounting have been made by one or more Ray Ranch Plaintiffs and to the

23   extent individual demands have been made, such individual demands have been made in the

24   nature of being on behalf of all those affected.

25   725.   Despite the duty and requests to do so, the pertinent Defendants have not provided the

26   Ray Ranch Plaintiffs with full, complete, and accurate accountings of transactions related to

27   Plaintiffs' investments.

28   726.   The Ray Ranch Plaintiffs are entitled to an accounting based on the unexplained

CASE NO.: C 08-03535 RMW        FOURTH AMENDED COMPLAINT        Page 124 of 164

1  transactions set forth above, the appearance that one or more diverted funds for their own

2  benefit, and the disparity between what Ray Ranch Plaintiffs have been told and provided.

3   727.   The Ray Ranch Plaintiffs are informed and believe and or thereon allege that

4  these defendants manipulated the financial activity of the project so as to cause damage, precise

5  amount which plaintiffs are unable to further specify because any and all such information

6  and/or documents are in the possession of one or more defendants and has never been supplied

7  to plaintiffs in a meaningful fashion despite the duty on one or more defendants to so supply,

8  except to the extent that the Ray Ranch Plaintiffs have collective losses in the minimum amount

9  of $88,265.35 based on the respective amounts of principal provided and/or principal amount

10  claimed by them.

11  728.   At a minimum, Plaintiffs are entitled to an accounting based on the nearly $3 million

12  disparity between projected and actual construction costs.

13  729.   The Ray Ranch Plaintiffs are entitled to full, fair, and accurate accountings from the

14  pertinent Defendants, all of whom have a duty and/or ability to so provide.

15  730.   Without such accountings, the Ray Ranch Plaintiffs are unable to ascertain what sum if

16  any is due on their notes and/or investments and from whom as the information and documents

17  are in the custody and control of Defendants. Full and fair accountings of all income, assets,

18  expenses, liabilities and distributions related to the investments and projects are necessary to

19  determine what sums are due to whom and from whom.

20  731.   WHEREFORE, the Ray Ranch Plaintiffs pray for judgment as hereinafter set forth.

21  **XVI.   ALLEGATIONS AND COUNTS REGARDING  ST. CHARLES**

22  **(Including allegations and counts against BUCHHOLZ, RDB DEVELOPMENT, LLC,**

23  **FISHER, EQUITY ENTERPRISES, INC.,  EQUITY ENTERPRISES NEVADA, INC.,**

24  **VENTO FAMILY TRUST, VENTO)**

25       **A.     Factual Allegations Common to All Counts.**

26  732.   Paragraphs 1 through 74 and 82 through 113 are re-alleged and incorporated here.

27  Inclusion of paragraphs 1 through 74 and 82 through 113 in their entirety is for the purpose of

28  formally including the pertinent details regarding plaintiffs and defendants specifically

1  referenced in this section and is not intended to expand the scope of plaintiffs' claims by the

2  plaintiffs specifically stated in this section as against the defendants as specifically alleged in this

3  section.

4  733.    "St. Charles Plaintiffs" hereafter refers to and includes (with the respective amounts of

5  principal provided and/or net loss of investment and/or principal amount claimed by them as

6  damages) Yu-Sze Yen ($50,000; January 2004), Jack and Diane Greer ($50,000; January 2004),

7  the total amount so referenced  for these plaintiffs as to this project/fund being $100,000.

8  734.    Beginning late 2003, Defendants BUCHHOLZ and FISHER caused Defendant EQUITY

9  ENTERPRISES, INC., to begin soliciting investors for an office condominium  project in St.

10  Charles, Illinois, that was variously referred to by them as St. Charles and also as Dunham

11  Professional Plaza.

12  735.    Solicitation of the St. Charles Plaintiffs included use of written documents provided to

13  them prior to making their investments.

14  736.    The written documents stated investors would receive membership interests in a limited

15  liability company that would in turn invest in another entity that would act as owner and

16  developer.

17  737.    The St. Charles Plaintiffs invested by purchase of membership interests in EENI - St.

18  Charles Office Investors, LLC, a Nevada limited liability company formed January  2004 of

19  which the manager was EQUITY ENTERPRISES NEVADA, INC., an entity controlled by

20  BUCHHOLZ.

21  738.    The St. Charles Plaintiffs were required to sign a "Communication Acknowledgement"

22  [sic] that Equity Enterprises would be the "central point of communication" and that "Equity

23  Enterprises has an agreement with our development partners that individual investors will not

24  attempt to contact them, obtain project information, or visit the development site without prior

25  written permission from Equity Enterprises ..." and that investor members would "not attempt to

26  contact the local developer, general contractor, sub-contractors, government agencies, realtors,

27  brokers, or other related parties."

28  739.    The project had originally been conceived and undertaken by St. Charles Office Investors,

1    LLC, an Arizona limited liability company formed August 2003 and of which the original

2    managers and members were Defendants VENTO FAMILY TRUST (JONATHON VENTO

3    (TRUSTEE)) and Shea Realty,  Inc.

4    740.    VENTO worked with Shea until early 2004.

5    741.    The written documents given to the St. Charles Plaintiffs included a Development Pro

6    Forma titled "St Charles Condo Office" dated July 4, 2003.

7    742.    The Development Pro Forma closely resembles the content and format of other similar

8    documents known to have come from one or more GRACE DEFENDANTS, and in this instance

9    particularly VENTO.

10   743.    Additional evidence of VENTO's involvement is evidenced by an agreement by which

11   Shea Realty was to reimburse EQUITY ENTERPRISES $100,000 related to this project, an

12   agreement made as part of an agreement to resolve disputes between Shea Realty and VENTO,

13   and of which there is no record of Shea Realty ever paying these funds.

14   744.    Additional evidence of VENTO's involvement includes a Construction Management

15   Agreement stated as being between EENI-Dunham and "RDB ATTN Jonathan Vento."

16   745.    EENI- Dunham Suites, LLC, was an Arizona limited liability company formed March

17   2004 of which Defendant BUCHHOLZ was the manager.

18   746.    The St. Charles Plaintiffs are informed and believe that the only reason for the formation

19   and involvement of EENI-Dunham Suites, LLC, was to use the entity as a straw buyer to conceal

20   the artificial profit as alleged further below.

21   747.    Additional evidence of VENTO's involvement is demonstrated by the fact that on March

22   3, 2004, Monarch Design and Construction, LLC, (of Elgin, IL) wrote to VENTO at GRACE

23   CAPITAL (jjv@gracecap.net) regarding a project review and proposal for th

24   St. Charles project. The signature line on the proposal was stated as being for GRACE

25   CAPITAL, although it was crossed out and the proposal signed by Chris Beck for EQUITY

26   ENTERPRISES, INC.

27   /////

28   /////

B.     **Specific Counts**

1.     **Count 1: FRAUD (Misrepresentation and Concealment Against Defendants BUCHHOLZ, RDB DEVELOPMENT, LLC, FISHER, EQUITY ENTERPRISES, INC.,  EQUITY ENTERPRISES NEVADA, INC., VENTO FAMILY TRUST, and VENTO)**

748.     Paragraphs 732 through 747 are re-alleged and incorporated here.

a.     **Affirmative Misrepresentations.**

749.     The written materials given to the St. Charles Plaintiffs contained multiple misrepresentations.

750.     The Development Pro Forma represented land cost as $2,038,608.

751.     The representation was false in that the land was acquired for $1,656,500 on or about March 16, 2004, an artificial profit of $382,108 which St. Charles Plaintiffs allege were diverted in whole or in large part by these Defendants for their own direct and/or indirect benefit.

752.     The Development Pro Forma represented there would be Development Fees of $200,000 to be paid to a third-party developer to oversee the project from conception through final delivery and Construction Fees of $100,000.

753.     The representation was false in that a total of $819,000 was disbursed for such fees and alleged "various costs" including $138,000 to Defendantt EQUITY ENTERPRISES for no specified reason, $285,000 to Defendant RDB DEVELOPMENT for "various costs", $300,000 to Defendant RDB DEVOLPMENT for "development fees", and  $75,000 to Defendant RDB DEVELOPMENT for "construction management."

754.     The written materials stated there would not be any commingling of investor funds or funds attributable to this project.

755.     The representation was false in that investor funds or funds attributable to this project were commingled with funds of EQUITY ENTERPRISES.

756.     The Development Pro Forma stated Total  Construction Cost would be $3,432,067.

757.     The representation was false in that these Defendants undertook to obtain at least $4,460,000 and as much as $8,920,000 in loans for the purpose of diverting as much thereof as

---

**CASE NO.: C 08-03535 RMW        FOURTH AMENDED COMPLAINT        Page 128 of  164**

1    possible and that they did so by methods not yet reasonably determinable and which  ultimately

2    resulted in giving the lender a deed in lieu of foreclosure and by quitclaim recorded July 13,

3    2007.

4    758.    The representations, individually and collectively, were material as being of the type and

5    nature reasonably relied on by reasonable investors and the St. Charles Plaintiffs.

6    759.    The St. Charles Plaintiffs justifiably relied on the individual and collective representations

7    in deciding invest.

8    760.    If the St. Charles Plaintiffs had known the true facts, they would not have invested.

9    761.    As a result, the St. Charles Plaintiffs have suffered the damages alleged herein.

10                         **b.    Material Facts Concealed.**

11    762.    The written materials given to the St. Charles Plaintiffs failed to include material facts.

12    763.    These Defendants failed to disclose the project had been conceived and undertaken at a

13    point int time when VENTO was working with one or more of the Shea entities.

14    764.    These Defendants failed to disclose the project was potentially or actually subject to

15    contracts and agreements with one or more of the Shea entities, the full extent of which cannot

16    now be reasonably specified.

17    765.    These Defendants failed to disclose their intention to over-borrow on the project, divert

18    funds therefrom, and execute collateral agreements so as to impair the the project beyond

19    viability.

20    766.    The undisclosed intentions and actions of these Defendants resulted in foreclosure  and

21    the giving of a quitclaim deed to the lender.

22    767.    The information concealed was material.

23    768.    The St. Charles Plaintiffs  justifiably relied on these Defendants to provide them with full

24    and complete information without omission.

25    769.    If the St. Charles Plaintiffs had known the concealed information, they would not have

26    invested.

27    770.    As a result of the concealment of material facts and misrepresentations, the St. Charles

28    Plaintiffs have suffered damages alleged herein.

771.   The conduct of these Defendants as described above, involved malice, oppression and fraud, and such conduct was clearly despicable.  Such despicable and fraudulent conduct was plainly conducted by the individual defendants as officers, directors, and/or managing agents of these entity Defendants and/or was ratified by the entity defendants.  Accordingly, the Court should assess punitive damages against these Defendants.

772.   Wherefore, the St. Charles Plaintiffs pray for damages as hereinafter set forth.

> **2.**     **Count 2: BREACH OF FIDUCIARY DUTY Against EQUITY ENTERPRISES, INC., BUCHHOLZ, FISCHER, VENTO FAMILY TRUST, and VENTO.**

773.   Paragraphs 732 through 772 are re-alleged and incorporated here.

774.   Defendants EQUITY ENTERPRISES, INC., BUCHHOLZ, and FISCHER had a special relationship with the St. Charles Plaintiffs in that they assumed a fiduciary position in relation to the St. Charles Plaintiffs as investment advisers, trustees of accounts, as managers, managing partners of projects, co-venturers, and/or as co-members of the limited liability companies.

775.   As such, Defendants EQUITY ENTERPRISES, INC., BUCHHOLZ, and FISCHER were fiduciaries as to the St. Charles Plaintiffs.

776.   As manager of  St. Charles Office Investors, LLC, and by dissemination of financial statements regarding St. Charles Office Investors, LLC, VENTO FAMILY TRUST and effectively VENTO owed a fiduciary duty to members of St. Charles Office Investors, LLC, which purportedly included EEI-St. Charles, LLC.

777.   Because VENTO knew the other defendants did not have independent financial wherewithal to engage in transaction, knew they would need to solicit investors to do so, knew the method of solicitation would give  rise to investors such as the St. Charles Plaintiffs, was substantially and materially involved in creation of information and documentation provided to Defendants, EQUITY ENTERPRISES, INC., BUCHHOLZ, and FISCHER, and knew the information and documentation he provided would be used by them to raise funds from investors such as the St. Charles Plaintiffs, he incurred fiduciary obligations to the St. Charles Plaintiffs.

778.   VENTO knew Defendants EQUITY ENTERPRISES, INC., BUCHHOLZ, and

1  FISCHER, and the entities controlled by them did not have the financial ability to make the
2  investment.

3  779.    As a result of the above and participation in the misrepresentations and concealment of
4  material facts, VENTO incurred fiduciary obligations equivalent to those owed by Defendants
5  EQUITY ENTERPRISES, INC., BUCHHOLZ, and FISCHER, and the entities controlled by
6  them to the St. Charles Plaintiffs.

7  780.    As those in special, confidential, and fiduciary relationships, express or implied,  these
8  Defendants owed a duty of utmost care, integrity, honesty and loyalty toward the St. Charles
9  Plaintiffs.

10  781.    These Defendants breached their fiduciary duty to the St. Charles Plaintiffs by
11  participating in the making of the misrepresentations and failing to make full disclosure of all
12  material facts, concealment of material facts, and the self-dealing concerning the transactions
13  that might have affected investment decisions and by misuse of funds as alleged herein.

14  782.    As a direct and proximate result of the breach of fiduciary duty by these Defendants, the
15  St. Charles Plaintiffs have been injured in their business and property as herein alleged.

16  783.    The St. Charles Plaintiffs have incurred and continue to incur legal fees and costs to
17  recover such losses and any potential judgments against these Defendants in the pending
18  lawsuits.

19  784.    The conduct of these Defendants as described above, involved malice, oppression and
20  fraud, and such conduct was clearly despicable.  Such despicable and fraudulent conduct was
21  plainly conducted by the individual defendants as officers, directors, and/or managing agents of
22  these entity Defendants and/or was ratified by the entity defendants.  Accordingly, the Court
23  should assess punitive damages against these Defendants.

24  785.    Accordingly, the Court should assess punitive damages against these Defendants.

25  786.    WHEREFORE, the St. Charles Plaintiffs pray for judgment as hereinafter set forth.

26  **XVII. ALLEGATIONS AND COUNTS REGARDING WAILEA TOWN CENTER.**

27          **(Including Allegations and Counts Against Defendants BUCHHOLZ, FISCHER,**

28          **EQUITY ENTERPRISES, INC., VENTO, and THE VENTO FAMILY TRUST.)**

---

**CASE NO.: C 08-03535 RMW       FOURTH AMENDED COMPLAINT       Page 131 of  164**

**A.    Factual Allegations Common to All Counts**.

787.    Paragraphs 1 through 74 and 82 through 113 are re-alleged and incorporated here. Inclusion of paragraphs 1 through 74 and 82 through 113 in their entirety is for the purpose of formally including the pertinent details regarding plaintiffs and defendants specifically referenced in this section and is not intended to expand the scope of plaintiffs' claims by the plaintiffs specifically stated in this section as against the defendants as specifically alleged in this section.

788.    "Wailea Town Center Plaintiffs" hereafter refers to and includes (with the respective amounts of principal provided and/or principal amount claimed by them as their minimum damages and dates of investment) Mike and Renee Brogdon ($27,223.48; August 2003), Wayne and Candise Canto ($36,297.98; August 2003), Tina McCraw ($18,149; October 2003), Len Turner ($36,298; August 2003),  the total amount so referenced  for these plaintiffs as to this project/fund being $117,968.46.

789.    During the summer of 2003, Defendants BUCHHOLZ and FISCHER caused EQUITY ENTERPRISES, INC., to begin soliciting investments related to a project generally referred to as Wailea Town Center in Wailea, Maui, Hawaii.

790.    Documents used in solicitation included, but were not limited to, subscription agreements, an Operating Agreement for EEI-Wailea Town Center, LLC, a California limited liability company (which stated the manager was and would be EQUITY ENTERPRISES, INC.,),  pro forma financial statements, and a Development Pro Forma titled  Wailea Town Center Condo Office.

791.    The Wailea Town Center Plaintiffs were required to sign a "Communication Acknowledgment" on letterhead of EQUITY ENTERPRISES, INC., that Equity Enterprises would be the "central point of communication" and that "Equity Enterprises has an agreement with our development partners that individual investors will not attempt to contact them, obtain project information, or visit the development site without prior written permission from Equity Enterprises ..." and that investor members would "not attempt to contact the local developer, general contractor, sub-contractors, government agencies, realtors, brokers, or other related

1    parties."

2    792.    The written materials stated investors would receive membership interests in EEI-Wailea

3    Town Center, LLC, of which the manager would be Defendant EQUITY ENTERPRISES, INC.,

4    and that EEI-Wailea Town Center, LLC, would in turn obtain an interest in another limited

5    liability company that would own and develop the project.

6    793.    As eventually determined, the owner and developer was Wailea Town Center Investors,

7    LLC.

8    794.    Wailea Town Center Investors, LLC, was an Arizona limited liability company formed

9    June 16, 2003.

10   795.    One of the original managers and members of Wailea Town Center Investors, LLC, was

11   Shea Wailea, LLC.

12   796.    Shea Wailea, LLC, was an Arizona limited liability company formed June 12, 2003 of

13   which the members and managers were Defendant THE VENTO FAMILY TRUST

14   (JONATHON VENTO, TRUSTEE) and Shea Realty, Inc.

15   797.    Defendant VENTO worked with Shea Realty, Inc., and other Shea entities until about

16   January 2004.

17   798.    As a result of the above described structure regarding Wailea Town Center Investors,

18   LLC, VENTO was at all times authorized to exercise control and did exercise control over

19   Wailea Town Center Investors, LLC, and the project.

20   799.    Based on the content and appearance of the written materials given to the Wailea Town

21   Center Plaintiffs, particularly the pro forma financial information, the Wailea Town Center

22   Plaintiffs are informed and believe and thereon allege the pro forma financial information was

23   provided by or was caused to be provided by Defendant VENTO and at the time VENTO knew

24   the information and materials would be used to solicit investors, knew Defendants

25   BUCHHOLZ, FISCHER, EQUITY ENTERPRISES and the entities controlled by them did not

26   have the independent financial ability to participate in the project, knew investors were being

27   solicited to purchase membership interests in a limited liability company, and that Defendants

28   BUCHHOLZ, FISCHER, EQUITY ENTEPRISES and/or the entities controlled would owe

CASE NO.: C 08-03535 RMW        FOURTH AMENDED COMPLAINT        Page 133 of  164

1  fiduciary duties to investors such as the Wailea Town Center Plaintiffs.

2  800.   The Wailea Town Center Plaintiffs made their investments for  membership interests in

3  EEI-Wailea Town Center, LLC, and on the representation EEI-Wailea Town Center, LLC,

4  would then obtain an interest in another limited liability company that would own and develop

5  the project ultimately determined to be Wailea Town Center Investors, LLC.

6        **B.   Specific Counts.**

7           **1.   Count 1: FRAUD (Misrepresentation and Concealment Against**

8                  **Defendants BUCHHOLZ, FISCHER, EQUITY ENTERPRISES, INC.,**

9                  **VENTO and the VENTO FAMILY TRUST.)**

10  801.   Paragraphs 787 through 800 are re-alleged and incorporated here.

11               **a.   Affirmative Misrepresentations**.

12  802.   The written materials given to the Wailea Town Center Plaintiffs contained multiple

13  misrepresentations.

14  803.   The Development Pro Forma stated Land Cost as $3,294,391 and was stated in such a

15  manner to indicate the land was going to be purchased in the future.

16  804.   The representation was false in that according to public records, the property had already

17  been purchased by Wailea Town Center Investors, LLC, on July 31, 2003 for the sum of

18  $2,255,600, thereby creating an artificial profit of $1,038,791 which these Plaintiffs are

19  informed and believe and thereon allege were diverted to the direct and/or indirect benefit of one

20  or more defendants, these Plaintiffs being unable to further specify because the information is

21  within the control of one or more these Defendants and these Defendants having failed to adduce

22  meaningful accounting and/or financial statements to the Wailea Town Center Plaintiffs despite

23  affirmative duty to do so.

24  805.   The representation was material in that it was of a type and nature reasonably relied on by

25  reasonable investors and the Wailea Town Center Plaintiffs including, but not limited to,

26  evaluation of investment risk, potential profit, and time for return of investment.

27  806.   The representation was justifiably relied on by the Wailea Town Center Plaintiffs in

28  deciding to invest in that it was of a type and nature reasonably relied on by reasonable investors

1  evaluate investment risk, potential profit, and time for return of investment.

2  807.    Had any of the true facts been known, the Wailea Town Center Plaintiffs would not  have

3  invested .

4  808.    As a consequence, the Wailea Town Center Plaintiffs have suffered the damages alleged

5  herein.

6              **b.      Concealment of Material Facts.**

7  809.    Although the written materials stated a development fee would be paid to Shea

8  Commercial, Inc., to oversee development, these Defendants concealed the true nature and

9  extent of the obligations and commitments to Shea Commercial, Inc., and other Shea entities.

10  810.    Defendants BUCHHOLZ, FISCHER, and EQUITY ENTERPRISES concealed the fact

11  they intended to take and did take at least $200,000 as purported management fees despite the

12  fact they did not intend to render any such services and that the structure of the project was such

13  that they did not even have the right to directly participate in the management of the project.

14  811.    The information concealed was material in that it misled the Wailea Town Center

15  Plaintiffs  as to the true nature and extent of the financial aspects of the project, intended use of

16  funds, potential profitability, and time for return of investment.

17  812.    The Wailea Town Center Plaintiffs justifiably relied on these Defendants to provide full

18  and  complete information without omission.

19  813.    If  the  Wailea Town Center Plaintiffs had been aware of the concealed information, they

20  would not have made their investments.

21  814.    As a result, the Wailea Town Center Plaintiffs have been damaged as alleged herein.

22  815.    The conduct of these Defendants as described above, involved malice, oppression and

23  fraud, and such conduct was clearly despicable.  Such despicable and fraudulent conduct was

24  plainly conducted by the individual defendants as officers, directors, and/or managing agents of

25  these entity Defendants and/or was ratified by the entity defendants.  Accordingly, the Court

26  should assess punitive damages against these Defendants.

27  816.    Wherefore, the Wailea Town Center Plaintiffs pray for damages as set forth below.

28  /////

---

1

2.     **Count 2: BREACH OF FIDUCIARY DUTY Against Defendants**

2           **EQUITY ENTERPRISES, INC., BUCHHOLZ, FISCHER, VENTO,**

3           **THE VENTO FAMILY TRUST.**

4    817.   Paragraphs 787 through 816 are re-alleged and incorporated here.

5    818.   Defendants EQUITY ENTERPRISES, INC., BUCHHOLZ, FISCHER, and the entities

6    controlled by them had a special relationship with the Wailea Town Center Plaintiffs in that they

7    assumed a fiduciary position in relation to the Wailea Town Center Plaintiffs as investment

8    advisers, trustees of accounts, as managers, managing partners of projects, co-venturers, and/or

9    as co-members of the limited liability companies and as such were fiduciaries as to the Wailea

10   Town Center Plaintiffs.

11   819.   Being in a position to control the affairs of Wailea Town Center Office Investors, LLC,

12   and by dissemination of financial statements regarding Wailea Town Center Office Investors,

13   LLC, VENTO and the THE VENTO FAMILY TRUST owed a fiduciary duty to members of

14   Wailea Town Center Office Investors, LLC, which purportedly included EEI-Wailea Town

15   Center, LLC, a duty that directly or indirectly flowed through and/or inured to the benefit of

16   members of EEI-Wailea Town Center, LLC.

17   820.   VENTO was substantially and materially involved in creation of information and

18   documentation provided to Defendants, EQUITY ENTERPRISES, INC., BUCHHOLZ, and

19   FISCHER.

20   821.   VENTO knew the information and documentation given to Defendants, EQUITY

21   ENTERPRISES, INC., BUCHHOLZ, and FISCHER, would be used by them to raise funds from

22   investors such as the Wailea Town Center Plaintiffs.

23   822.   At the time, VENTO knew Defendants EQUITY ENTERPRISES, INC., BUCHHOLZ,

24   FISCHER, and the entities controlled by them did not have the financial ability to make the

25   investment.

26   823.   At the time, VENTO knew Defendants EQUITY ENTERPRISES, INC., BUCHHOLZ,

27   and FISCHER and the entities controlled by them could only make the investment by raising

28   funds from investors such as the Wailea Town Center Plaintiffs.

---

**CASE NO.: C 08-03535 RMW      FOURTH AMENDED COMPLAINT      Page 136 of 164**

824.    Defendant VENTO, knew EQUITY ENTERPRISES, BUCHHOLZ, and FISCHER were soliciting investors such as the Wailea Town Center Plaintiffs in such a fashion that EQUITY ENTERPRISES, BUCHHOLZ, and FISCHER would have special and/or fiduciary relationships with investors such as the Wailea Town Center Plaintiffs and participated in the acts complained of herein to such an extent he incurred special and/or fiduciary  relationships with investors such as the Wailea Town Center Plaintiffs .

825.    As a result of the above and participation in the misrepresentations and concealment of material facts, VENTO incurred fiduciary obligations equivalent to those owed by Defendants EQUITY ENTERPRISES, INC., BUCHHOLZ, and FISCHER, and the entities controlled by them to the Wailea Town Center Plaintiffs.

826.    As those in special, confidential, and fiduciary relationships, express or implied,  these Defendants owed a duty of utmost care, integrity, honesty and loyalty toward the Wailea Town Center Plaintiffs.

827.    These Defendants breached their fiduciary duty to the Wailea Town Center Plaintiffs by participating in the making of the misrepresentations and failing to make full disclosure of all material facts concerning the transactions that might have affected investment decisions and by misuse of funds as alleged herein.

828.    As a direct and proximate result of the breach of fiduciary duty by these Defendants, the Wailea Town Center Plaintiffs have been injured in their business and property as herein alleged.

829.    The Wailea Town Center Plaintiffs have incurred and continue to incur legal fees and costs to recover such losses and any potential judgments against these Defendants in the pending lawsuits.

830.    The conduct of these Defendants as described above, involved malice, oppression and fraud, and such conduct was clearly despicable.  Such despicable and fraudulent conduct was plainly conducted by the individual defendants as officers, directors, and/or managing agents of these entity Defendants and/or was ratified by the entity defendants.  Accordingly, the Court should assess punitive damages against these Defendants.

1 managing agents of the entity Defendants and/or was ratified by the entity defendants.

2 831.   Accordingly, the Court should assess punitive damages against these Defendants.

3 832.   WHEREFORE, the Wailea Town Center Plaintiffs pray for judgment as hereinafter set

4 forth.

5       **3.      Count 3: ACCOUNTING Against Defendants BUCHHOLZ,**

6               **FISCHER, EQUITY ENTERPRISES, INC., VENTO, and THE**

7               **VENTO FAMILY TRUST.**

8 833.   Paragraphs 787 through 829 are re-alleged and incorporated here.

9 834.   The estimated Total Project Cost was stated as $13,399,330, building sales were

10 estimated as $16,052,400, and Total Project Profit was estimated as $1,589,926.

11 835.   Based on public records of deeds reflecting Wailea Town Center Investors, LLC, grossed

12 a total of $27,186,082 from sales attendant to the project;

13 836.   These Defendants created an artificial profit of about $1,038,791 based on the

14 discrepancy between represented land cost and actual land cost which these Plaintiffs are

15 informed and believed and thereon allege was diverted to the direct and/or indirect benefit of one

16 or more these Defendants.

17 837.   During or about April 2008, in writing from "Equity Enterprises" members/investors

18 were told that an additional and estimated total of $5,000,000 was expected to be received.

19 838.   As of this date, only the sum of approximately $1.15 million has been distributed by EEI-

20 Wailea Town Center, LLC, to individual member/investors.

21 839.   Based on the above and the existence of fiduciary obligations or the equivalent thereof

22 and comparing the pro rata financials used to solicit investments and considering distributions

23 and compared to the total gross sales $27,186,082 attendant to the project, there remains

24 approximately $13 million not accounted for in whole or in part and an amount realized by one

25 or more defendants the scope of which member/investors were never informed as actually being

26 realized or apprised that any or all of such an amount might not flow largely if not entirely to the

27 member/investors.

28 840.   Demands for accounting have been made by one or more Wailea Town Center Plaintiffs

---

1  and to the extent individual demands have been made, such individual demands have been made

2  in the nature of being on behalf of all those affected.

3  841.   Despite the duty and requests to do so, the pertinent Defendants have not provided the

4  Wailea Town Center Plaintiffs with full, complete, and accurate accountings of transactions

5  related to Plaintiffs' investments.

6  842.   The Wailea Town Center Plaintiffs are entitled to an accounting based on the unexplained

7  transactions set forth above, the appearance that one or more diverted funds for their own

8  benefit, and the disparity between what Wailea Town Center Plaintiffs have been told and

9  provided.

10  843.   At a minimum, the Wailea Town Center Plaintiffs are entitled to an accounting based on

11  the disparities alleged above and are necessary to determine what sums are due to whom and

12  from whom.

13  845.   WHEREFORE, the Wailea Town Center Plaintiffs pray for judgment as hereinafter set

14  forth.

15  **XVIII.  ALLEGATIONS AND COUNTS REGARDING MESA POINT (Including**

16      **Allegations and Counts Against to Defendants BUCHHOLZ, FISCHER, EENI, and**

17      **EQUITY ENTERPRISES, INC.)**

18      **A.      Factual Allegations Common to All Counts.**

19  846.   Paragraphs 1 through 74 and 82 through 113 are re-alleged and incorporated here.

20  Inclusion of paragraphs 1 through 74 and 82 through 113 in their entirety is for the purpose of

21  formally including the pertinent details regarding plaintiffs and defendants specifically

22  referenced in this section and is not intended to expand the scope of plaintiffs' claims by the

23  plaintiffs specifically stated in this section as against the defendants as specifically alleged in this

24  section.

25  847.   "Mesa Point Plaintiffs" hereafter refers to and includes (with the respective

26  amounts of principal provided and/or net loss of investment and/or principal amount claimed by

27  them as their minimum  damages) Wayne and Candise Canto ($75,000; first investment

28  September 2003 and membership interest exchanged for a promissory note November 2005),

1  Cynthia Semenoff ($25,000; September 2003), Laura Steele ($8,000 September 2003), Nicole

2  Steele ($8,000 September 2003), Jeffrey Steele ($24,000 September 2003), Len Turner and Jan

3  Turner ($25,000 September 2003), Kathy Ury ($33,100 September 2003), Bob and Nancy

4  Winger ($52,000 September 2003), the total amount so referenced for these plaintiffs as to this

5  project/fund being $250,100.

6  848.    In September 2003, Defendants BUCHHOLZ and FISCHER caused EQUITY

7  ENTERPRISES, INC., to begin soliciting investments for a project in Arizona involving

8  construction of fourplexes generally referred to as Mesa Point.

9  849.    Documents used in solicitation and given to the Mesa Point Plaintiffs included multiple

10  representations that individually and collectively indicated a definitive project intended for a

11  specific parcel of land without any indication of even the possibility of anything other than

12  construction of fourplexes on the specific parcel of land.

13  850.    The Mesa Point Plaintiffs made their investments on the basis of the documents given and

14  statements made by and/or on behalf of Defendants BUCHHOLZ, FISCHER, EENI, and

15  EQUITY ENTERPRISES, INC.

16  851.    The Mesa Point Plaintiffs initially invested by purchase of membership interests in

17  EENI-Mesa Point, LLC, an entity caused to have been formed by Defendants BUCHHOLZ,

18  FISCHER, EENI, and EQUITY ENTERPRISES, INC., for which EQUITY ENTERPRISES-

19  NEVADA, INC., a Nevada corporation was represented as the manager; and were later induced

20  to exchange their membership interests for promissory notes.

21  852.    The Mesa Point Plaintiffs were required to sign a Communication Acknowledgment on

22  letterhead of EQUITY ENTERPRISES, INC., that Equity Enterprises would be the "central

23  point of communication" and that "Equity Enterprises has an agreement with our development

24  partners that individual investors will not attempt to contact them, obtain project information, or

25  visit the development site without prior written permission from Equity Enterprises ..." and that

26  investor members would "not attempt to contact the local developer, general contractor, sub-

27  contractors, government agencies, realtors, brokers, or other related parties."

28  853.    All expressions and reasonable inferences would lead a reasonable investor to reasonably

---

**CASE NO.: C 08-03535 RMW        FOURTH AMENDED COMPLAINT        Page 140 of 164**

1 conclude that due diligence had been conducted, that the specific land had been or could be

2 acquired and that the project could go forward as represented.

3    **B.    Specific Counts.**

4        **1.    Count 1: FRAUD (Misrepresentation and ConcealmentAgainst**

5            **Defendants BUCHHOLZ, FISCHER, EENI, and EQUITY**

6            **ENTERPRISES, INC.)**

7 854.    Paragraphs 846 through 853 are re-alleged and incorporated here.

8 855.    The documents first given to the Mesa Point Plaintiffs contained multiple

9 misrepresentations.

10 856.    The Mesa Point Plaintiffs were given photographs of the land so as to indicate the

11 specific land on which the project would be constructed

12 857.    However, the presentation of these photographs was false and misleading in that the land

13 depicted had not been acquired nor was acquisition of that land reasonably foreseeable for the

14 stated development purpose.

15 858.    The documents to the Mesa Point Plaintiffs included a  pro forma financial summary that

16 stated land cost as $425,000 and total project cost of $2,595,280.

17 859.    The representations were false and misleading in that no land was then being sought for

18 acquisition and there was no basis for indicating a total project cost of any amount.

19 860.    The documents given to the Mesa Point Plaintiffs stated the project would consist of a

20 new fourplex development in approximately 3.2 acres just off Apache Trail in Mesa, Arizona

21 861.    The representation was false and misleading in that there was no meaningful effort  to

22 acquire the 3.2 acres, much less for the Land Cost as represented in the pro forma financial

23 summary, and there were was no such project being built as represented.

24 862.    The documents given to the Mesa Point Plaintiffs stated investors would also have the

25 equivalent of a right of first refusal to purchase units when available for sale.

26 863.    The representation was false and misleading in that there were was neither such a project

27 nor units being built as represented.

28 864.    The documents given to the Mesa Point Plaintiffs stated construction could begin on or

1    about March 1, 2004 and be completed by January 31, 2005.

2    865.   The representations were false and misleading in that there was no land then owned or

3    obtainable on which to build anything within such a time frame.

4    866.   The documents given to the Mesa Point Plaintiffs stated "development partners" were

5    already in existence.

6    867.   The representation was false and misleading in that there were no development partners

7    then in existence.

8    868.   By a document dated September 8, 2004 addressed to "Dear Mesa Point Investor" it was

9    stated that "At the time the pool was created, we had a target property off Apache Trail in

10   eastern Mesa under contract" and that after further due diligence it was decided that obtaining

11   entitlements would add 2 years and $1-2 million in cost so "The Fund Manger chose to acquire a

12   better investment property" and "acquired five parcels located on Ella Street in western Mesa,

13   near the Tempe boarder [sic] and Hwy 101" and that "we have received reservations for all 16

14   fourplexes."

15   869.   The representations were false and misleading in that there had not been property under

16   contract as stated and there could not have been reservations for all 16 fourplexes because, as

17   best as can be determined by resort to public records, it appears the request to establish a multi-

18   residential condominium subdivision was not made until August 2006.

19   870.   After the supposed change of plans stated above, the Mesa Point Plaintiffs were given a

20   "Development Proforma" regarding the supposedly "better investment property" dated 8-25-04

21   referenced 16 Four Plex's, Land Cost of $912,000 for approximately 1.6 acres, and total project

22   costs of $4,725,249.

23   871.   The representation was false in that the land had been acquired for a total cost of

24   $575,300 (5 lots purchased from March 2004 to August 2004) thereby creating an artificial

25   profit of $336,700 which these defendants diverted for their own personal benefit.

26   872.   During or about November 2005, members were presented with a proposal from EENI-

27   Mesa Point, LLC, to exchange their membership interests for promissory notes on the

28   representation it would maximize the value of their investments.

---

**CASE NO.: C 08-03535 RMW      FOURTH AMENDED COMPLAINT      Page 142 of 164**

873.     The representation was false and misleading because the "company" in which membership interests were held was EENI-MESA POINT, LLC,  an *Arizona* limited liability company, notes were given by EENI-Mesa Point, LLC,  a *Nevada* limited liability company, an entity with no apparent interest in the project or other ability to pay and provided for a due date of September 2008.

874.     The misrepresentations and information concealed were material in that they were of a type and nature reasonably relied on by reasonable investors in evaluating the risk and reward of their investments.

875.     The Mesa Point Plaintiffs justifiably relied on Defendants BUCHHOLZ, FISCHER, EENI and EQUITY ENTERPRISES to provide full and complete information without omission.

876.     The Mesa Point Plaintiffs justifiably relied on the representations made in deciding to invest and to subsequently exchange their membership interests for promissory notes.

877.     If the Mesa Point Plaintiffs had known the true facts and/or had known the concealed information, they would not have invested.

878.     As a result of the misrepresentations and omissions, the Mesa Point Plaintiffs have suffered the damages alleged herein.

879.     The conduct of these Defendants as described above, involved malice, oppression and fraud, and such conduct was clearly despicable.  Such despicable and fraudulent conduct was plainly conducted by the individual defendants as officers, directors, and/or managing agents of these entity Defendants and/or was ratified by the entity defendants.  Accordingly, the Court should assess punitive damages against these Defendants.

880.     Wherefore, the Mesa Point Plaintiffs pray for damages as hereinafter set forth.

**2.       Count 2: BREACH OF FIDUCIARY DUTY (Against Defendants BUCHHOLZ, FISCHER, EENI, and EQUITY ENTERPRISES, INC.)**

881.     Paragraphs 846 through 878 are re-alleged and incorporated here.

882.     Defendants BUCHHOLZ, FISCHER, EENI, AND EQUITY ENTERPRISES, INC., had a special relationship with the Mesa Point Plaintiffs in that these Defendants assumed a fiduciary position in relation to the Mesa Point Plaintiffs as investment advisers, trustees of accounts, as

---

**CASE NO.: C 08-03535 RMW       FOURTH AMENDED COMPLAINT       Page 143 of  164**

1   managers, managing partners of projects, co-venturers, and/or as co-members of the limited

2   liability companies.

3   883.   As those in special, confidential, and fiduciary relationships, express or implied, these

4   Defendants owed a duty of utmost care, integrity, honesty and loyalty.

5   884.   These Defendants breached their duties by the misrepresentations and concealment of

6   material facts as alleged as to (1) their original investments and (2) the inducement to exchange

7   membership interests for promissory notes issued by an unrelated entity.

8   885.   As members of a limited liability company, the Mesa Point Plaintiffs were improperly

9   excluded from participation regarding the purported change of plans as to the land to be acquired

10  and developed, the result of which was committing the members to a project materially and

11  substantially different from that represented as being the basis for investment and precluding

12  them from being able to pursue their rights and opportunity to recover their investments on the

13  basis of changed circumstances.

14  886.   As a direct and proximate result of the breach of fiduciary duty by these Defendants, the

15  Mesa Point Plaintiffs have been injured in their business and property as herein alleged.

16  887.   The Mesa Point Plaintiffs have incurred and continue to incur legal fees and costs to

17  recover such losses and any potential judgments against these Defendants in the pending lawsuit.

18  888.   Some or all of the above referenced Defendants' conduct involved malice, oppression and

19  fraud, and was clearly despicable.

20  889.   Such despicable and fraudulent conduct was plainly conducted by the individual

21  defendants as officers, directors, and/or managing agents of the entity Defendants and/or was

22  ratified by the entity defendants.

23  890.   Accordingly, the Court should assess punitive damages against these Defendants.

24  891.   WHEREFORE, the Mesa Point Plaintiffs pray for judgment as hereinafter set forth.

25          **3.      Count 3: ACCOUNTING (Against Defendants BUCHHOLZ,**

26                  **FISCHER, EENI, and EQUITY ENTERPRISES, INC.)**

27  892.   Paragraphs 846 through 853 and 881 through 887 are re-alleged and incorporated here.

28  893.   At no time were the Mesa Point Plaintiffs ever provided with meaningful accounting or

---

**CASE NO.: C 08-03535 RMW      FOURTH AMENDED COMPLAINT      Page 144 of 164**

1  financial statements despite defendants duty to so provide.

2  894.   Mesa Point Plaintiffs received documents indicating an unspecified membership interest

3  in EENI-MESA POINT, LLC, *an Arizona limited liability company*, subsequent to which they

4  received IRS Form 1065 (Schedule K-1) stating interests based on capital and as to profits and

5  losses.

6  895.   Demands for accounting have been made by one or more of these Plaintiffs and to the

7  extent individual demands have been made, such individual demands have been made in the

8  nature of being on behalf of all those affected.

9  896.   Despite the duty and requests to do so, the pertinent these Defendants have never

10  provided full, complete, and accurate accountings of transactions.

11  897.   These Plaintiffs are entitled to an accounting based on the unexplained transactions set

12  forth above, the appearance that one or more of these Defendants diverted funds for their own

13  benefit, and the disparity between what these have been told and provided.

14  898.   These Plaintiffs are informed and believe and or thereon allege that  these defendants

15  manipulated the financial activity of the project so as to cause damage, precise amount which

16  plaintiffs are unable to further specify because any and all such information and/or documents

17  are in the possession of one or more defendants and has never been supplied to plaintiffs in a

18  meaningful fashion despite the duty on one or more defendants to so supply, except to the extent

19  of the  collective losses alleged herein.

20  899.   Without such accountings, the Mesa Point Plaintiffs are unable to ascertain what sum if

21  any is due on their notes and/or investments and from whom as the information and documents

22  are in the custody and control of one or more of these Defendants.

23  900.   Full and fair accountings of all income, assets, expenses, liabilities and distributions

24  related to the investments and projects are necessary to determine what sums are due to whom

25  and from whom.

26  901.   WHEREFORE, the Mesa Point  Plaintiffs pray for judgment as hereinafter set forth.

27      **4.      Count 4: BREACH OF CONTRACT Against Defendants BUCHHOLZ,**

28          **FISCHER, EENI, and EQUITY ENTERPRISES, INC.)**

---

902.   Paragraphs 846 through 853 are re-alleged and incorporated here.

903.   All of the promissory notes issued have become due and remain unpaid.

904.   Demand for payment has been made and none has been forthcoming.

905.   As a result, the Mesa Point Plaintiffs have been damaged as alleged herein.

906.   WHEREFORE, the Mesa Point Plaintiffs pray for judgment as hereinafter set forth.as hereinafter set forth.

## XIX.   ALLEGATIONS AND COUNTS REGARDING OC INVESTORS, LLC.

### (All Allegations and Counts Are Against Defendants Buchholz, Fischer, Solomon Capital)

#### A.   Factual Allegations Common to All Counts.

907.   Paragraphs 1 through 74 and 82 through 113 are re-alleged and incorporated here. Inclusion of paragraphs 1 through 74 and 82 through 113 in their entirety is for the purpose of formally including the pertinent details regarding plaintiffs and defendants specifically referenced in this section and is not intended to expand the scope of plaintiffs' claims by the plaintiffs specifically stated in this section as against the defendants as specifically alleged in this section.

908.   "OC Investor Plaintiffs" hereafter refers to and includes (with the respective amounts of principal provided and/or net loss of investment and/or principal amount claimed by them) Juan and Brenda Bettaglio ($400,000; April 2005), Frank Carbajal and Megan Carbajal ($82,000; September 2005), Jim Coates and/or JKAT Properties ($975,000; March and April 2005), Eric Gold ($180,000; July 2005), Brian and Debra Starr ($200,000; April 2005) the total amount so referenced for these plaintiffs as to this project/fund being $1,837,000 and claimed by them as their minimum damages.

909.   In March of 2005, Defendants BUCHHOLZ and FISCHER caused SOLOMON CAPITAL to begin began soliciting investment for four office condo building projects in and around Chicago, Illinois.

910.   Defendants BUCHHOLZ and FISCHER generally referred to the four projects as Hoffman Estates, Naperville, Itasca, and Crystal Lake and then Arroyo Mountain as dicussed

1  below.

2  911.    Naperville is within two counties, Will County and DuPage County and the OC Investor

3  Plaintiffs are informed and believe that what was referred to as Naperville involved land in Will

4  County.

5  912.    Prospective investors were solicited by methods including written documents and a visit

6  to Chicago on March 21, 2005, joined and hosted by Defendants BUCHHOLZ and FISCHER.

7  913.    Beginning March 22, 2005, prospective investors, including the OC Investor Plaintiffs,

8  began receiving written communications and documents including, but not limited to:

9          a.      An email dated March 22, 2005 stating investors would become members of OC

10                 Investors, LLC, an Illinois limited liability company;

11         b.      A pro forma for "OC Investors, LLC," dated March 22, 2005 that stated the equity

12                 required for the four  projects was $5,381,000, and the total profit would be

13                 $7,378,309, and the profit to OC would be  $3,689,155;

14         c.      A Development Pro Forma titled "Crystal Lake Condo Office" dated March 8,

15                 2005 that stated Land Cost as $4,760,237;

16         d.      A Development Pro Forma titled "Naperville Condo Office" dated March 8, 2005

17                 that stated Land Cost as $3,044,844;

18         e.      A Development Pro Forma titled "Hoffman Estates Condo Office" dated March 8,

19                 2005 that stated Land Cost  as $1,410,255; and

20         f.      A Development Pro Forma titled "Itasca Condo Office" dated March 8, 2005 that

21                 stated Land Cost  as $5,082,363.

22  914.    An email dated March 22, 2005 stated the estimated time for completion was an average

23  of 12 months with some to finish and pay out sooner.

24  915.    During the visit to Chicago and continuing thereafter, Defendant BUCHHOLZ orally

25  stated a lot of pre-development work had been done, including the issuance of permits, and the

26  projects were ready to start being built.

27  916.    The OC Investor Plaintiffs eventually received membership interests in OC Investors,

28  LLC, an Illinois limited liability company, formed March 30, 2005, of which Defendant RNC

1  HOLDINGS, LLC, was a manager, and which in turn was managed by Defendants BUCHHOLZ
2  and FISCHER.

3  917.    The OC Investor Plaintiffs are informed and believe and thereon allege that, as further
4  described below, the cash available to profit from the artificial profits as to purported land costs
5  and undeserved fees was created by raising a total of about $6.64 million from investors and
6  obtaining loans from Union National Bank that totaled $7.3 million plus approximately $2
7  million from Insymphony Private Capital, LLC, which were  secured by the property.

8  918.    The Crystal Lake property was ultimately lost by foreclosure or deed in lieu of
9  foreclosure by July 2007.

10  919.    The Hoffman Estates property was ultimately lost by foreclosure or deed in lieu of
11  foreclosure by July 2007.

12  920.    The Itasca property was ultimately lost by foreclosure or deed in lieu of foreclosure by
13  July 2007.

14  921.    In addition to the alter egos included by incorporation and on the basis of the facts
15  demonstrated below, the OC Investors allege that the following entities were the alter egos of
16  Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL: OC Investors, LLC; Crystal
17  Lake Office Condos, LLC; Naperville Office Condos, LLC; Hoffman Estates Office Condos,
18  LLC; and Arroyo Mountain, LLC.

19          **B.    Specific Counts.**

20                  **1.    Count 1: FRAUD (Misrepresentation and Concealment Against**
21                          **DEFENDANTS BUCHHOLZ, RDB DEVELOPMENT, LLC,**
22                          **FISCHER, SOLOMON CAPITAL)**

23  922.    Paragraphs 907 through 922 are re-alleged and incorporated here.

24                  **a.    Affirmative Misrepresentations.**

25  923.    Defendants BUCHHOLZ and FISCHER made and/or caused the making of multiple
26  misrepresentations and did so using the guise of RDB DEVELOPMENT, LLC, and SOLOMON
27  CAPITAL.

28  924.    The Development Pro Forma titled "Crystal Lake Condo Office" dated March 8, 2005

---

1  stated Land Cost as $4,760,237.

2  925.    The representation was false in that Defendants BUCHHOLZ and FISCHER had

3  effectively acquired the land for $1,245,209 and did so by making the acquisition in the name of

4  Crystal Lake Office Condos, LLC, an Illinois limited liability company managed by them and by

5  purchasing from Crystal Lake Office Investors, LLC, an Arizona limited liability company of

6  which the managers and members were Vento Investments, LLC, and Zeltor, LLC.

7  926.    The Development Pro Forma titled "Naperville Condo Office" dated March 8, 2005 that

8  stated Land Cost as $3,044,844.

9  927.    The representation was false in that, based on public records of the Will County

10  Recorder's Office, Defendants BUCHHOLZ and FISCHER had  effectively acquired the land

11  for $715,473 and did so by making the acquisition in the name of

12  Naperville Office Condos, LLC, of which they were managers and by purchasing from

13  Naperville Office Investors, LLC, an Arizona limited liability company of which the members

14  and managers included the Vento Family Trust.

15  928.    The Development Pro Forma titled "Hoffman Estates Condo Office" dated March 8, 2005

16  stated Land Cost as $1,410,255.

17  929.    The representation was false in that Defendants BUCHHOLZ and FISCHER had

18  effectively acquired the land for a price reported in public documents for as little as $381,500

19  and did so by making the acquisition in the name of Hoffman Estates Office Condos, LLC, an

20  Illinois limited liability company managed by them and by purchasing from Hoffman Estates

21  Office Investors, LLC, an Arizona limited liability company or which the members and

22  managers were Vento Investments and Zeltor, LLC.

23  930.    The pro forma for "OC Investors, LLC," dated March 22, 2005 stated the equity required

24  for the four  projects was $5,381,000, and the total profit would be $7,378,309, and the "profit to

25  OC" would be  $3,689,155.

26  931.    The statement as to equity required was false and misleading in view of the multiple

27  misrepresentations regarding land cost as alleged above.

28  932.    During the visit to Chicago and continuing thereafter, Defendant BUCHHOLZ orally

1  stated a lot of pre-development work had been done, including the issuance of permits, and the

2  projects were ready to start being built.

3  933.    The representations were false in that  pre-development work had not been done as

4  represented, actual permits had not issued, and none of the projects were remotely close to being

5  ready for building to start.

6  934.    An email dated March 22, 2005 stated the estimated time for completion was an average

7  of 12 months with some to finish and pay out sooner.

8  935.    The representation was false in that the current status of the properties and projects  were

9  such that there was no reasonable possibility that such completion and/or payout dates were

10  possible.

11  936.    The representations were material as being of the type and nature relied on by reasonable

12  investor.

13  937.    The OC Investor Plaintiffs justifiably relied on the representation in

14  deciding to invest.

15  938.    If the OC Investor Plaintiffs had known the truth, they would not have invested.

16  939.    As a result, the OC Investor Plaintiffs have suffered the damages alleged herein.

17                          **b.     Material Facts Concealed.**

18  940.    Defendants BUCHHOLZ and FISCHER concealed the fact price of the land had been

19  artificially increased so as to affect the viability of each project and result in improper diversion

20  of funds and, based on statements made by Sam Stafford, Defendants BUHHOLZ and FISCHER

21  stated to others the land sale prices had been artificially increased by at least $500,000 or more.

22  941.    Defendants BUCHHOLZ and FISCHER concealed the fact they intended to take

23  exorbitant sums for supposed fees without intending to render such services and without being in

24  a position to be able to render such services, as evidenced in part by at least $1.375 million in

25  supposed developer fees being taken directly and indirectly by Defendant BUCHHOLZ for

26  projects that were never moved along and allowed to go back to lenders.

27  942.    Defendants BUCHHOLZ and FISCHER concealed the fact they intended to take and did

28  take additional, substantial, and unwarranted sums that went to FISCHER via  ALABANZA, the

---

**CASE NO.: C 08-03535 RMW      FOURTH AMENDED COMPLAINT      Page 150 of  164**

1   precise amount not subject to reasonable specification without an accounting as prayed for

2   below.

3   943.    Defendants BUCHHOLZ and FISCHER concealed the fact they intended to take and did

4   take additional, substantial, and unwarranted sums for supposedly repaying loans  made by

5   Defendant RNC HOLDINGS, such loans never having been made by RNC HOLDINGS, the

6   precise amount not subject to reasonable specification without an accounting as prayed for

7   below.

8   944.    Defendants BUCHHOLZ and FISCHER concealed the fact acquisition of  three of the

9   properties involved their use of Real Estate Consultants, Inc. (RECI), a Chicago-based broker of

10  which Vento was either a co-owner or in which he intended to purchase an interest.

11  945.    Defendants BUCHHOLZ and FISCHER concealed the fact they used assets of OC

12  Investors, LLC, as collateral for personal loans, a fact ultimately revealed an attorney for

13  BUCHHOLZ and FISCHER.

14  946.    The information concealed was material.

15  947.    The OC Investor Plaintiffs justifiably relied on these defendants to provide full and

16  complete information without omission.

17  948.    If the OC Investor Plaintiffs had known the concealed information, they would not have

18  invested.

19  949.    As a result, the OC Investor Plaintiffs have suffered the damages alleged herein.

20              **c.      Misrepresentations and Concealment of Material Facts Specific**

21                      **to Arroyo Mountain.**

22  950.    Defendants BUCHHOLZ and FISCHER made and/or caused the making of  numerous

23  representations and concealment of material facts as to the intended and actual  use of funds and

24  assets of OC Investors, LLC, specific to a project they referred to as Arroyo Mountain in the

25  nature of a ponzi scheme as alleged below.

26  951.    In June 2005, Defendants BUCHHOLZ and FISCHER stated they had decided to buy a

27  new property, a residential project in Arizona to be named Arroyo Mountain and were able to

28  meet equity requirement necessary to purchase the land without raising additional funds.

---

1    952.    The representation was false in that additional funds were acquired by a loan of

2    $2,250,000 at 25% annual interest from InSymphony Capital and in doing so, concealed the fact

3    they fact they cross-collateralized the loan with other properties including other properties of OC

4    Investors, LLC, and properties they were buying for themselves.

5    953.    The representation was also false in that Arroyo Mountain was not a new property and in

6    making the statement concealed the fact Arroyo Mountain was just a new name for an earlier

7    project known as Deer Valley.

8    954.    Defendants BUCHHOLZ and FISCHER concealed the fact they, primarily through

9    Defendant RDB DEVELOPMENT, LLC, they had previously had put together an investor group

10    for the project known as  Deer Valley that never got built.

11    955.    Title to the Arroyo Mountain property ultimately ended up with Arroyo Mountain, LLC,

12    was a limited liability company that included 20 Great Oaks Blvd., Suite 230, San Jose, CA

13    95119-1399, as a place of business and controlled by BUCHHOLZ and FISCHER pursuant to a

14    purchase from 27th Avenue Investors, LLC, an Arizona limited liability company of which

15    Vento Investments, LLC, and Zeltor, LLC were managers and members.

16    956.    Defendants BUCHHOLZ and FISCHER concealed the fact they intended to and did use

17    money raised via OC Investors, LLC, to pay off Deer Valley investors at a profit and then be

18    able to tout the Deer Valley "success" as an inducement to future investors.

19    957.    The representations were material as being of the type and nature relied on by reasonable

20    investors.

21    958.    The OC Investor Plaintiffs justifiably relied on the representations in

22    deciding to invest.

23    959.    If the OC Investor Plaintiffs had known the truth, they would not have invested.

24    960.    As a result, the OC Investor Plaintiffs have suffered the damages alleged herein.

25    961.    The information concealed was material.

26    962.    The OC Investor Plaintiffs justifiably relied on these defendants to provide full and

27    complete information without omission.

28    963.    If the OC Investor Plaintiffs had known the concealed information, they would not have

---

**CASE NO.: C 08-03535 RMW       FOURTH AMENDED COMPLAINT        Page 152 of  164**

1   invested.

2   964.    As a result, the OC Investor Plaintiffs have suffered the damages alleged herein.

3   965.    The conduct of these Defendants as described above, involved malice, oppression and

4   fraud, and such conduct was clearly despicable.  Such despicable and fraudulent conduct was

5   plainly conducted by the individual defendants as officers, directors, and/or managing agents of

6   these entity Defendants and/or was ratified by the entity defendants.  Accordingly, the Court

7   should assess punitive damages against these Defendants.

8   966.    Wherefore, the OC Investor Plaintiffs pray for judgment as later set forth.

9        **2.    Count 2: BREACH OF FIDUCIARY DUTY (Against DEFENDANTS**

10            **BUCHHOLZ, RDB DEVELOPMENT, LLC, FISCHER, SOLOMON**

11            **CAPITAL)**

12   967.    Paragraphs 907 through 966 are re-alleged and incorporated here.

13   968.    Defendants FISCHER, BUCHHOLZ, RDB DEVELOPMENT, LLC, and SOLOMON

14   CAPITAL had a special relationship with the OC Investor Plaintiffs in that they directly and/or

15   indirectly  assumed a fiduciary position in relation to the OC Investor Plaintiffs as investment

16   advisers, trustees of accounts, as managers, managing partners of projects, co-venturers, and/or

17   as co-members of the limited liability companies and therefore were fiduciaries as to the OC

18   Investor Plaintiffs.

19   969.    As those in special, confidential, and fiduciary relationships, express or implied,  these

20   Defendants owed a duty of utmost care, integrity, honesty and loyalty toward the OC Investor

21   Plaintiffs.

22   970.    These Defendants breached their fiduciary duty to the OC Investor Plaintiffs by

23   participating in the making of the misrepresentations and failing to make full disclosure of all

24   material facts concerning the transactions that might have affected investment decisions and by

25   misuse of funds as alleged herein.

26   971.    As a direct and proximate result of the breach of fiduciary duty by these Defendants, the

27   OC Investor Plaintiffs have been injured in their business and property as herein alleged.

28   972.    The OC Investor Plaintiffs have incurred and continue to incur legal fees and costs to

**CASE NO.: C 08-03535 RMW      FOURTH AMENDED COMPLAINT      Page 153 of  164**

1  recover such losses and any potential judgments against these Defendants in the pending

2  lawsuits.

3  973.    The conduct of these Defendants as described above, involved malice, oppression and

4  fraud, and such conduct was clearly despicable.  Such despicable and fraudulent conduct was

5  plainly conducted by the individual defendants as officers, directors, and/or managing agents of

6  these entity Defendants and/or was ratified by the entity defendants.  Accordingly, the Court

7  should assess punitive damages against these Defendants.

8  974.    WHEREFORE, the OC Investor Plaintiffs pray for judgment as hereinafter set forth.

9          **3.      Count 3: ACCOUNTING (Against DEFENDANTS BUCHHOLZ,**

10                   **FISCHER, SOLOMON CAPITAL)**

11  975.    Paragraphs 907 through 964 and 968 through 972 are re-alleged and incorporated here.

12  976.    Defendants FISCHER, BUCHHOLZ and SOLOMON CAPITAL profited by the

13  artificial profits related to land sales and the money taken for services claimed, but never

14  rendered.

15  977.    The OC Investor Plaintiffs are informed and believe and/or thereon allege that  these

16  defendants manipulated the financial activity of the project so as to cause damage, precise

17  amount which plaintiffs are unable to further specify because any and all such information

18  and/or documents are in the possession of one or more these defendants and has never been

19  supplied to these plaintiffs in a meaningful fashion despite the duty on one or more these

20  defendants to so supply, except to the extent of the  collective losses alleged herein.

21  978.    Demands for accounting have been made by one or more of these Plaintiffs and to the

22  extent individual demands have been made, such individual demands have been made in the

23  nature of being on behalf of all those affected.

24  979.    Despite the duty and requests to do so, the pertinent these Defendants have never

25  provided full, complete, and accurate accountings of transactions.

26  980.    These Plaintiffs are entitled to an accounting based on the unexplained transactions set

27  forth above, the appearance that one or more of these Defendants diverted funds for their own

28  benefit, and the disparity between what these have been told and provided.

1    981.   Without such accountings, these Plaintiffs are unable to ascertain what sum if any is due

2    on their notes and/or investments and from whom as the information and documents are in the

3    custody and control of one or more of these Defendants. Full and fair accountings of all income,

4    assets, expenses, liabilities and distributions related to the investments and projects are necessary

5    to determine what sums are due to whom and from whom.

6    982.   WHEREFORE, the OC Investor Plaintiffs pray for judgment as hereinafter set forth.

7    **XX.   ALLEGATIONS AND COUNTS REGARDING THE CHICAGO CONDO FUND**

8    **(All Allegations and Counts Are Against Defendants BUCHHOLZ, FISCHER and**

9    **SOLOMON CAPITAL, INC.)**

10   **A.   Factual Allegations Common to All Counts.**

11   983.   Paragraphs 1 through 74 and 82 through 113 are re-alleged and incorporated here.

12   Inclusion of paragraphs 1 through 74 and 82 through 113 in their entirety is for the purpose of

13   formally including the pertinent details regarding plaintiffs and defendants specifically

14   referenced in this section and is not intended to expand the scope of plaintiffs' claims by the

15   plaintiffs specifically stated in this section as against the defendants as specifically alleged in this

16   section.

17   984.   "Chicago Condo Fund Plaintiffs" hereafter refers to and includes (with the dates of and

18   respective amounts of principal provided and/or net loss of investment and/or principal amount

19   claimed by them as their minimum damages) Mike Baker ($49,542.39; September and October

20   2006), Cynthia Semenoff ($35,000; October 2006), the total amount so referenced  for these

21   plaintiffs as to this project/fund being and claimed as their minimum damages as $84,542.39.

22   985.   Chicago Condo Fund, LLC, is a Delaware limited liability company,  that

23   included 20 Great Oaks Blvd., Suite 230, San Jose, CA 95119-1002 among its places of

24   business.

25   986.   In addition to the alter ego allegations  included by incorporation and on the basis of the

26   facts  demonstrated below,  the Chicago Condo Fund Plaintiffs allege Chicago Condo Fund,

27   LLC, was the alter ego of Defendants BUCHHOLZ, FISCHER, and SOLOMON CAPITAL,

28   Inc.

---

**CASE NO.: C 08-03535 RMW      FOURTH AMENDED COMPLAINT      Page 155 of  164**

987.    Around August 2006, Defendants BUCHHOLZ and  FISCHER caused Defendant
SOLOMON CAPITAL, INC., to begin  disseminating documents and making  presentations
soliciting investors for a fund referred to as Chicago Condo Fund which purportedly would
invest in office condominium projects in the Chicago area.

988.    During and about August 2006, SOLOMON CAPITAL, INC., held what it called a
"showcase" to present and disseminate documents, including a Confidential Private Offering
Memorandum, soliciting investment for the Chicago Office Condo Fund Note Program. Written
solicitation continued thereafter. Subsequent written communications to potential investors
stated the fund offered a "guaranteed return of 14% per year and provides monthly cash flow."

989.    Solicitation included written materials including, but limited to, a document titled
Chicago Condo Fund Note Program, Issuer Chicago Condo Fund, LLC, Solomon Capital,
September 2006 (the "Note Program").

990.    The Note Program stated the company was seeking $8 million from investors to make
loans  regarding three projects in the Chicago area and generally referred to as Naperville, Itasca,
and Hoffman Estates.

991.    The projects referred to as Naperville, Itasca, and Hoffman Estates were three of the
projects referenced in the ALLEGATIONS AND COUNTS REGARDING  OC INVESTORS,
LLC, set forth herein elsewhere.

992.    The Note Program stated the fund company as being Chicago Office Condo Fund, LLC, a
Delaware limited liability company to be managed by Defendant SOLOMON CAPITAL, INC.,
of which Defendants BUCHHOLZ and FISCHER were principals, and  the sole member would
be Defendant RNC Holdings, LLC, formed by Defendants BUCHHOLZ and FISCHER.

993.    The Note Program stated investors would receive secured promissory notes bearing
interest at 14% with a one year  term subject to a six month extension.

994.    The Note Program stated the security for the notes would be all the assets of Chicago
Office Condo  Fund, LLC.

995.    The Note Program stated investor money would be used to buy out the then existing
mezzanine financing in place regarding the Naperville, Itasca, and Hoffman Estates projects.

---

996.    The Note Program stated the Naperville, Itasca, and Hoffman Estates were already 80% financed by institutional lenders.

997.    Of the Chicago Condo Fund Plaintiffs, Mike Baker received a Secured Promissory Noted from the Chicago Condo Fund, LLC, dated October 1, 2006 for the principal amount of $49,542.39 and Cynthia Semenoff received a Secured Promissory Noted from the Chicago Condo Fund, LLC, dated October 1, 2006 for the principal amount of $35,000, both bearing interest at 14% with an initial maturity date of one year subject to a six month extension pursuant to related Note Purchase Agreements.

      **B.**    **Specific Counts.**

          **1.**      **Count One: FRAUD (Misrepresentation and Concealment Against Defendants BUCHHOLZ, FISCHER and SOLOMON CAPITAL, INC.)**

998.    Paragraphs 983 through 997 are re-alleged and incorporated here.

          **a.**      **Affirmative Misrepresentations**.

999.    The Note Program stated investors would receive secured promissory notes bearing interest at 14% with a one year term subject to a six month extension and secured by all the assets of Chicago Office Condo Fund, LLC.

1001.  The representation was false and misleading in that the Chicago Office Condo Fund, LLC, had no assets because the projects represented (Naperville, Itasca, and Hoffman Estates) had been so over-leveraged, cross-collaterlized, and cash drained such that Defendants BUCHHOLZ and FISCHER knew those projects were doomed to fail.

1002.  The Note Program stated investor money would be used to buy out the then existing mezzanine financing in place regarding the Naperville, Itasca, and Hoffman Estates projects.

1003.  The representation was false and misleading in that the Chicago Office Condo Fund, LLC, had no realistic prospect of raising funds sufficient to do so, and because the projects represented (Naperville, Itasca, and Hoffman Estates) had been so over-leveraged, cross-collaterlized, and cash drained such that Defendants BUCHHOLZ and FISCHER knew those projects were doomed to fail.

1004.  The Note Program stated the Naperville, Itasca, and Hoffman Estates were already  80% financed by institutional lenders.

1005.  The representation was false and misleading in that the Naperville, Itasca, and Hoffman Estates projects had  been so over-leveraged, cross-collaterlized, and cash drained such  that Defendants BUCHHOLZ and FISCHER knew those projects were doomed to fail including the fact Defendants BUCHHOLZ and FISCHER had used the assets related to those projects as security for personal loans.

1006.  The representations were material in that they were of a type and nature reasonably relied on by reasonable investors including, but not limited to, evaluation of investment risk, potential profit, and time for return of investment.

1007.  The representations were justifiably relied on by the Chicago Condo Fund Plaintiffs in deciding to invest in that they were of a type and nature reasonably relied on by reasonable investors including, but not limited to, evaluation of investment risk, potential profit, and time for return of investment.

1008.  Had any of the true facts been known, much less the collective falsity of the misrepresentations and facts not disclosed, the Chicago Condo Fund Plaintiffs would not have invested.

1009.  As a consequence, the Chicago Condo Fund Plaintiffs have suffered the damages alleged herein.

### b.    Material Facts Concealed.

1010.  Defendants BUCHHOLZ and FISCHER concealed the fact the Naperville, Itasca, and Hoffman Estates projects had  been so over-leveraged, cross-collaterlized, and cash drained such that Defendants BUCHHOLZ and FISCHER knew those projects were doomed to fail including the fact Defendants BUCHHOLZ and FISCHER had used the assets related to those projects as security for personal loans.

1011.  Defendants BUCHHOLZ and FISCHER concealed the fact they had created artificial profits for themselves by misrepresenting land cost to OC Investor Plaintiffs regarding the Naperville, Itasca, and Hoffman Estates projects and drained cash therefrom such that they knew

1   the projects were doomed to fail.

2   1012.  Defendants BUCHHOLZ and FISCHER concealed the fact they intended to use or had

3   already used the assets of the CHICAGO CONDO FUND, LLC, as collateral for the project that

4   had come to be known as Sierra Vista in the context of the Allegations and counts regarding the

5   Erie Land Fund as alleged elsewhere herein.

6   1013.  The information concealed was material in that it misled the Chicago Condo Fund

7   Plaintiffs as to the true nature and extent of the financial aspects of the project, intended use of

8   funds, potential profitability, security of investment, and time for return of investment.

9   1014.  The Chicago Condo Fund Plaintiffs justifiably relied on these Defendants to provide full

10  and  complete information without omission.

11  1015.  If the  Chicago Condo Fund Plaintiffs had been aware of the concealed information, they

12  would not have made their investments.

13  1016.  As a result, the Chicago Condo Fund Plaintiffs have been damaged as alleged herein.

14  1017.  The conduct of these Defendants as described above, involved malice, oppression and

15  fraud, and such conduct was clearly despicable.  Such despicable and fraudulent conduct was

16  plainly conducted by the individual defendants as officers, directors, and/or managing agents of

17  these entity Defendants and/or was ratified by the entity defendants.  Accordingly, the Court

18  should assess punitive damages against these Defendants.

19  1018.  Wherefore, the Chicago Condo Fund Plaintiffs pray for damages as set forth below.

20          **2.      Count 2: BREACH OF CONTRACT (Against Defendants**

21                  **BUCHHOLZ, FISCHER and SOLOMON CAPITAL, INC.)**

22  1019.  Paragraphs 983 through 997 are re-alleged and incorporated here.

23  1020.  All of the promissory notes issued have become due and remain unpaid.

24  1021.  Demand for payment has been made and none has been forthcoming.

25  1022.  As a result, the  Chicago Condo Fund  Plaintiffs have been damaged as alleged herein.

26  1023.  WHEREFORE, the Chicago Condo Fund Plaintiffs pray for judgment as hereinafter set

27  forth.

28  **XXI.  PRAYER FOR RELIEF (By Plaintiff Group):**

---

1    Wherefore, Plaintiffs as referenced according to the specific allegations as to particular

2   projects and funds and as against the defendants against whom allegations are made as to the

3   particular projects and funds, by and through their attorneys, pray for judgment as follows:

4   **A.    The FCC Plaintiffs pray for relief against Defendants WILLIAM E.**

5   **BUCHHOLZ and FAMILY COMMUNITY CHURCH as follows:**

6       1.    For compensatory damages of $1,684,972 or as according to proof;

7       2.    For interest as according to fact, proof, and/or law;

8       3.    For recovery of attorneys' fees according to fact, proof, and/or law;

9       4.    For costs of suit herein incurred; and

10      5.    For such other and further relief as the Court may deem proper.

11  **B.    The Solomon Towers and Daystream Plaintiffs pray for relief as follows:**

12      1.    For compensatory damages of $516,353 or as according to proof;

13      2.    For interest as according to fact, proof, and/or law;

14      3.    For recovery of attorneys' fees according to fact, proof, and/or law;

15      4.    For costs of suit herein incurred;

16      5.    For punitive damages according to fact, proof, and/or law; and

17      6.    For such other and further relief as the Court may deem proper.

18  **C.    The LDF Plaintiffs pray for relief as follows:**

19      1.    For compensatory damages of $2,016,160.89 or as according to proof;

20      2.    For $2,016,160.89 or as according to proof for restitution;

21      3.    For interest as according to fact, proof, and/or law;

22      4.    For recovery of attorneys' fees according to fact, proof, and/or law;

23      5.    For costs of suit herein incurred;

24      6.    For punitive damages according to fact, proof, and/or law; and

25      7.    For such other and further relief as the Court may deem proper.

26  **D.    The Patriot Courtyards Plaintiffs pray for relief pray as follows:**

27      1.    For compensatory damages of $89,053 or as according to proof;

28      2.    For interest as according to fact, proof, and/or law;

---

3.   For recovery of attorneys' fees according to fact, proof, and/or law;

4.   For costs of suit herein incurred;

5.   For punitive damages according to fact, proof, and/or law; and

6.   For an accounting from Defendants  BUCHHOLZ, RDB DEVELOPMENT, LLC, FISCHER, EQUITY ENTERPRISES, INC., VENTO INVESTMENTS, LLC, JONATHAN VENTO, ZELTOR, LLC, DONALD ZELEZNAK, GRACE CAPITAL; and

7.   For such other and further relief as the Court may deem proper.

E.   **The Erie Land Fund Plaintiffs pray for relief as follows:**

1.   For compensatory damages of $345,000 or as according to proof;

2.   For interest as according to fact, proof, and/or law;

3.   For recovery of attorneys' fees according to fact, proof, and/or law;

4.   For costs of suit herein incurred;

5.   For punitive damages according to fact, proof, and/or law; and

6.   For such other and further relief as the Court may deem proper.

F.   **The Colorado Condo Fund Plaintiffs pray for relief as follows:**

1.   For compensatory damages of $778,789 or as according to proof;

2.   For interest as according to fact, proof, and/or law;

3.   For recovery of attorneys' fees according to fact, proof, and/or law;

4.   For costs of suit herein incurred;

5.   For punitive damages according to fact, proof, and/or law; and

6.   For such other and further relief as the Court may deem proper

G.   **The Gilbert Office Plaintiffs pray for relief as follows**:

1.   For compensatory damages of $94,187 or as according to proof;

2.   For interest as according to fact, proof, and/or law;

3.   For recovery of attorneys' fees according to fact, proof, and/or law;

4.   For costs of suit herein incurred;

5.   For punitive damages according to fact, proof, and/or law;

1        6.     For an accounting from Defendants EQUITY ENTERPRISES, INC.,

2              EQUITY ENTERPRISES NEVADA, INC., BUCHHOLZ, FISCHER,

3              VENTO, VENTO FAMILY TRUST; and

4        7.     For such other and further relief as the Court may deem proper.

5   **H.**    **The Osborn Commons Plaintiffs pray for relief as follows**:

6        1.     For compensatory damages of $184,000 or as according to proof;

7        2.     For interest as according to fact, proof, and/or law;

8        3.     For recovery of attorneys' fees according to fact, proof, and/or law;

9        4.     For costs of suit herein incurred;

10       5.     For punitive damages according to fact, proof, and/or law;

11       6.     For an accounting from Defendants BUCHHOLZ, FISCHER, EQUITY

12            ENTERPRISES, EQUITY ENTERPRISES-NEVADA, INC., RDB

13           DEVELOPMENT, LLC, ZELTOR, LLC, ZELEZNAK, VENTO FAMILY

14           TRUST, VENTO INVESTMENTS, LLC, VENTO, GRACE CAPITAL,

15           LLC.); and

16       7.     For such other and further relief as the Court may deem proper.

17   **I.**    **The Ray Ranch Plaintiffs pray for relief as follows:**

18        1.     For compensatory damages of $88,265.35. or as according to proof;

19        2.     For interest as according to fact, proof, and/or law;

20       3.     For recovery of attorneys' fees according to fact, proof, and/or law;

21       4.     For costs of suit herein incurred;

22       5.     For punitive damages according to fact, proof, and/or law;

23       6.     For an accounting from Defendants  BUCHHOLZ, FISCHER, EQUITY

24           ENTERPRISES, EENI, and VENTO; and

25       7.     For such other and further relief as the Court may deem proper.

26   **J.**    **The St. Charles Plaintiffs pray for relief as follows:**

27       1.     For compensatory damages of $100,000 or as according to proof;

28       2.     For interest as according to fact, proof, and/or law;

1        3.     For recovery of attorneys' fees according to fact, proof, and/or law;

2        4.     For costs of suit herein incurred;

3        5.     For punitive damages according to fact, proof, and/or law; and

4        6.     For such other and further relief as the Court may deem proper.

5   **K.**    **The Wailea Town Center Plaintiffs pray for relief as follows**:

6        1.     For compensatory damages of $117,968.46 or as according to proof;

7        2.     For interest as according to fact, proof, and/or law;

8        3.     For recovery of attorneys' fees according to fact, proof, and/or law;

9        4.     For costs of suit herein incurred;

10        5.     For punitive damages according to fact, proof, and/or law;

11        6.      For an accounting from Defendants BUCHHOLZ, FISCHER, EQUITY

12               ENTERPRISES, INC., VENTO, and THE VENTO FAMILY TRUST; and

13        7.     For such other and further relief as the Court may deem proper.

14   **L.**    **The Mesa Point Plaintiffs pray for relief as follows**:

15        1.     For compensatory damages of $250,100 or as according to proof;

16        2.     For interest as according to fact, proof, and/or law;

17        3.     For recovery of attorneys' fees according to fact, proof, and/or law;

18        4.     For costs of suit herein incurred;

19        5.     For punitive damages according to fact, proof, and/or law;

20        6.     For an accounting from Defendants BUCHHOLZ, FISCHER, EENI, and

21               EQUITY ENTERPRISES, INC.; and

22        7.     For such other and further relief as the Court may deem proper.

23   **M.**    **The OC Investor Plaintiffs pray for relief as follows:**

24        1.     For compensatory damages of $1,837,000 or as according to proof;

25        2.     For interest as according to fact, proof, and/or law;

26        3.     For recovery of attorneys' fees according to fact, proof, and/or law;

27        4.     For costs of suit herein incurred;

28        5.     For punitive damages according to fact, proof, and/or law;

6.     For an accounting from Defendants BUCHHOLZ, FISCHER, SOLOMON
        CAPITAL; and

7.     For such other and further relief as the Court may deem proper.

**N.     The Chicago Condo Fund  Plaintiffs pray for relief as follows:**

1.     For compensatory damages of $84,542.39 or as according to proof;

2.     For interest as according to fact, proof, and/or law;

3.     For recovery of attorneys' fees according to fact, proof, and/or law;

4.     For costs of suit herein incurred;

5.     For punitive damages according to fact, proof, and/or law;

6.     For such other and further relief as the Court may deem proper.

Dated: December 30, 2009            /s/_____

                                    Jeffrey M. Forster, Attorney for Plaintiffs

Dated: December 30, 2009            /s/_____

                                    Steven R. Levy, Attorney for Plaintiffs


**DEMAND FOR JURY TRIAL**


Plaintiffs hereby demand a trial by jury.


Dated: December 30, 2009            /s/_____

                                    Jeffrey M. Forster, Attorney for Plaintiffs

Dated: December 30, 2009            /s/_____

                                    Steven R. Levy, Attorney for Plaintiffs

# EXHIBIT A

# TO

# PLAINTIFFS' FOURTH AMENDED COMPLAINT

(Solomon Towers presentation materials)





**Greater Phoenix**

Population
City of Phoenix: 1,421,298
Maricopa County: 3,194,798
State of Arizona: 5,307,331

Phoenix covers more than 500 square miles and has a population of 1.4 million, ranking it the sixth largest city in the United States. A premier resort destination, Phoenix has more than 300 sun-filled days a year and an average temperature of 74 degrees.

More than 50 percent of the population is between 18 and 54 years of age, which is younger than the national average. The greater Phoenix area is a $50 billion marketplace driven by technology. World-leading companies such as Intel, Avnet, Motorola, AlliedSignal, Honeywell and Boeing Company have chosen Phoenix for their corporate and regional headquarters. Phoenix Sky Harbor International Airport is the fifth busiest airport in the U.S.























## Project Overview

- ▶ 10 Story high-rise, residential loft development
- ▶ Mid range price point: $400 psf
- ▶ 100 Units Planned
- ▶ Estimated Project Timeframe: 36 months



## Project Advantages & Benefits

- ► Central downtown Phoenix locations takes advantage of reverse migration trend
- ► Highly congruent with City of Phoenix general plan



## Comparative Sales Case: Monroe Towers

- ► Located 4 blocks south of our site
- ► Selling at $600 psf - $200 psf higher than the Solomon Tower proforma

8

## Residential Loft Buyer Analysis

Our local sales team is in place and ready to market the development once it is released. The sales team expects buyers to be from the following categories:

- 20% established, single professionals
- 25% empty-nesters
- 20% second home buyers
- 10% starter families
- 25% other, including investors



Solomon Tower
Proforma Numbers



## Development Proforma

| | |
|---|---|
| Land Area | 0.75 Acres |
| Land Cost psf | $ 153.05 |
| Building Area | 135,000 Gross Square Feet |
| Coverage | 413% |
| Number of Units | 100 |
| | |
| Total Land Cost | $ 5,000,000 |
| Closing Cost | 10,000 |
| Total Land Acquisition Cost | $ 5,010,000 |



## Development Proforma – 10 Stories

| Construction Costs | $ 27,000,00 |
|---|---|
| Permit Fees | 250,000 |
| Utility Connection Fees | 250,000 |
| Plan Review Fees | 50,000 |
| Construction Management | 500,000 |
| Architectural Design | 1,400,000 |
| Civil | 50,000 |
| Survey | 25,000 |
| Testing | 50,000 |
| Engineering | 50,000 |
| Signage | 25,000 |
| Legal Fees | 65,000 |
| Real Estate Taxes & Accounting | 75,000 |

## Development Proforma (cont.)

| | |
|---|---|
| Insurance | 900,000 |
| Marketing | 900,000 |
| Design Center Fees | 100,000 |
| Furniture, Furnishings & Equipment | 200,000 |
| Site Maintenance | 30,000 |
| Developer Fee | 1,000,000 |
| Interest Carry | 1,579,974 |
| Construction Finance Fees | 328,306 |
| Miscellaneous | 200,000 |
| Contingency | 1,000,000 |
| TOTAL CONSTRUCTION COST | $ 36,028,280 |
| TOTAL LAND COST | 5,010,000 |
| TOTAL PROJECT COST | $ 41,038,280 |

## Sales Proforma – 10 Stories

| | |
|---|---|
| Loft Sales | $54,225,000 |
| Sales Commissions (6%) | -3,253,500 |
| Closing Costs (0.75%) | -406,688 |
| Net Revenue | $50,564,813 |



11



Proforma Finance & Investment Analysis
10 Stories

| | |
|---|---|
| Total Project Costs | $41,038,280 |
| Total Loan Amount | $32,830,624 |
| Loan to Cost | 80% |
| Required Equity | 5,000,000 |
| TOTAL Solomon Tower, LLC PROFIT | 9,526,532 |
| Solomon Capital's Share (50%) | $4,763,266 |
| Investor's Profit (50%) | $ 4,763,266 |
| Total Return | Total: 190% |



Proforma Finance & Investment Analysis
15 Stories

| | |
|---|---|
| Total Project Costs | $55,196,644 |
| Total Loan Amount | $44,157,315 |
| Loan to Cost | 80% |
| Required Equity | $5,000,000 |

## Sales Proforma – 15 Stories

| | |
|---|---|
| Loft Sales | $81,225,000 |
| Sales Commissions (6%) | -4,873,500 |
| Closing Costs (0.75%) | -609,188 |
| Net Revenue | $75,742,313 |
| Solomon Tower, LLC Profit | $20,545,669 |
| | |
| Investors (50%) | $10,272,834 |
| Solomon Capital (50%) | $10,272,834 |
| | |
| Total Return | 410% |

## Next Steps

1. Form Partnership and Raise Capital (3 weeks)
   a. Turn in your Commitment Form and signed Operating Agreement by Friday, Feb. 11th
   b. Initial Capital Contributions by Monday, Feb. 28th
2. Acquire Land (60 days)
3. Explore Project Definition (9-12 months)
4. Proceed with Build-out & Marketing (2 years)

13



Juan P. Solano Issuer
Investor Docs

# Solomon Towers, LLC



A Private Investment Opportunity
February 2005













Z Lofts
100 Lofts
1/14/2005

Development Budget
Land Area                                       0.75 acres
Land Cost psf of Land Area         $      153.05
Building Area                                135,000 s.f.
Coverage                                     413%
Number of Units                          100 units

|  |  |  | PSF |  | Per Unit |  |
|---|---|---|---|---|---|---|
| Land | 5,000,000 | $ | 37.04 | $ | 50,000 |  |
| Closing Costs | 10,000 | $ | 0.07 | $ | 100 |  |
| Total Land Costs | 5,010,000 | $ | 37.11 | $ | 50,100 |  |
| Construction Costs | 27,000,000 | $ | 200.00 | $ | 270,000 |  |
| Permit Fees | 250,000 | $ | 1.85 | $ | 2,500 |  |
| Utility Connection Fees | 250,000 | $ | 1.85 | $ | 2,500 |  |
| Plan Review Fees | 50,000 | $ | 0.37 | $ | 500 |  |
| Construction Mgt Fees | 500,000 | $ | 3.70 | $ | 5,000 |  |
| Architecture | 1,400,000 | $ | 10.37 | $ | 14,000 |  |
| Civil | 50,000 | $ | 0.37 | $ | 500 |  |
| Survey | 25,000 | $ | 0.19 | $ | 250 |  |
| Testing | 50,000 | $ | 0.37 | $ | 500 |  |
| Engineering | 50,000 | $ | 0.37 | $ | 500 |  |
| Design Center Fees | 100,000 | $ | 0.74 | $ | 1,000 |  |
| Furniture, Furnishings & Equipment | 200,000 | $ | 1.48 | $ | 2,000 |  |
| Signage | 25,000 | $ | 0.19 | $ | 250 |  |
| Legal | 65,000 | $ | 0.48 | $ | 650 |  |
| Real Estate Taxes | 25,000 | $ | 0.19 | $ | 250 |  |
| Insurance | 900,000 | $ | 6.67 | $ | 9,000 |  |
| Marketing | 900,000 | $ | 6.67 | $ | 9,000 |  |
| Site Maintenance | 30,000 | $ | 0.22 | $ | 300 |  |
| Developer Fee | 1,000,000 | $ | 7.41 | $ | 10,000 |  |
| Miscellaneous | 200,000 | $ | 1.48 | $ | 2,000 |  |
| Contingency | 1,000,000 | $ | 7.41 | $ | 10,000 |  |
| Accounting | 50,000 | $ | 0.37 | $ | 500 |  |
| Interest Reserve 5.500% | 1,579,974 | $ | 11.70 | $ | 15,800 |  |
| Financing Fees 1.00% | 328,306 | $ | 2.43 | $ | 3,283 |  |
| Total Construction Costs | 36,028,280 | $ | 266.88 | $ | 360,283 |  |
| Total Project Costs | 41,038,280 | $ | 303.99 | $ | 410,383 |  |

## Sales Summary

| | Size | Quantity | $ psf | | | PSF | Per Unit |
|---|---|---|---|---|---|---|---|
| Unit A | 1350 | 100 | $ 400 | | 54,000,000 | $ 400.00 | $ 540,000 |
| Unit B | 0 | 0 | $ - | $ | - | $ - | |
| Unit C | 0 | 0 | $ - | $ | - | $ - | |
| Unit D | 0 | 0 | $ - | $ | - | $ - | |
| Lot Premiums | | 45 | $ 5,000 per unit | $ | 225,000 | $ 1.67 | $ 5,000 |
| | | | | | | | |
| Gross Sales Proceeds | | | | $ | 54,225,000 | $ 401.67 | $ 1,205,000 |
| Less: | | | | | | | |
| Sales Commission | | 6.00% | | | 3,253,500 | $ 24.10 | $ 72,300 |
| Closing Costs | | 0.75% | | | 406,688 | $ 3.01 | $ 9,038 |
| Net Sales Proceeds | | | | $ | 50,564,813 | $ 374.55 | $ 1,123,663 |

## Equity Analysis

| | | | |
|---|---|---|---|
| Total Project Costs | | $ | 41,038,280 |
| Loan to Cost | | | 80% |
| Loan Amount | | $ | 32,830,624 |
| Cash Equity | | $ | 5,000,000 |
| Project Profit | | $ | 9,526,532 |
| Manager Profit | 50% | $ | 4,763,266 |
| Investor Profit | 50% | $ | 4,763,266 |
| | | | |
| Project Cash on Cash Return | | | 191% |
| Investor Cash on Cash Return | | | 95% |

Z Lofts
150 Lofts
1/14/2005

Development Budget

| | | | | |
|---|---|---|---|---|
| Land Area | | 0.75 acres | | |
| Land Cost psf of Land Area | $ | 153.05 | | |
| Building Area | | 202,500 s.f. | | |
| Coverage | | 620% | | |
| Number of Units | | 100 units | | |

| | | | PSF | | Per Unit | |
|---|---|---|---|---|---|---|
| Land | 5,000,000 | $ | 24.69 | $ | 50,000 | |
| Closing Costs | 10,000 | $ | 0.05 | $ | 100 | |
| Total Land Costs | 5,010,000 | $ | 24.74 | $ | 50,100 | |
| | | | | | | |
| Construction Costs | 40,500,000 | $ | 200.00 | $ | 405,000 | |
| Permit Fees | 250,000 | $ | 1.23 | $ | 2,500 | |
| Utility Connection Fees | 250,000 | $ | 1.23 | $ | 2,500 | |
| Plan Review Fees | 50,000 | $ | 0.25 | $ | 500 | |
| Construction Mgt Fees | 500,000 | $ | 2.47 | $ | 5,000 | |
| Architecture | 1,400,000 | $ | 6.91 | $ | 14,000 | |
| Civil | 50,000 | $ | 0.25 | $ | 500 | |
| Survey | 25,000 | $ | 0.12 | $ | 250 | |
| Testing | 50,000 | $ | 0.25 | $ | 500 | |
| Engineering | 50,000 | $ | 0.25 | $ | 500 | |
| Design Center Fees | 100,000 | $ | 0.49 | $ | 1,000 | |
| Furniture, Furnishings & Equipment | 200,000 | $ | 0.99 | $ | 2,000 | |
| Signage | 25,000 | $ | 0.12 | $ | 250 | |
| Legal | 65,000 | $ | 0.32 | $ | 650 | |
| Real Estate Taxes | 25,000 | $ | 0.12 | $ | 250 | |
| Insurance | 900,000 | $ | 4.44 | $ | 9,000 | |
| Marketing | 900,000 | $ | 4.44 | $ | 9,000 | |
| Site Maintenance | 30,000 | $ | 0.15 | $ | 300 | |
| Developer Fee | 1,000,000 | $ | 4.94 | $ | 10,000 | |
| Miscellaneous | 200,000 | $ | 0.99 | $ | 2,000 | |
| Contingency | 1,000,000 | $ | 4.94 | $ | 10,000 | |
| Acounting | 50,000 | $ | 0.25 | $ | 500 | |
| Interest Reserve 5.500% | 2,125,071 | $ | 10.49 | $ | 21,251 | |
| Financing Fees 1.00% | 441,573 | $ | 2.18 | $ | 4,416 | |
| Total Construction Costs | 50,186,644 | $ | 247.84 | $ | 501,866 | |
| | | | | | | |
| Total Project Costs | 55,196,644 | $ | 272.58 | $ | 551,966 | |

## Sales Summary

| | Size | Quantity | $ psf | | | | PSF | Per Unit |
|---|---|---|---|---|---|---|---|---|
| Unit A | 1350 | 150 | $ | 400 | | 81,000,000 | $ 400.00 | $ 540,000 |
| Unit B | 0 | 0 | $ | - | $ | - | $ - | #DIV/0! |
| Unit C | 0 | 0 | $ | - | $ | - | $ - | #DIV/0! |
| Unit D | 0 | 0 | $ | - | $ | - | $ - | #DIV/0! |
| Lot Premiums | | 45 | $ | 5,000 per unit | $ | 225,000 | $ 1.11 | $ 5,000 |
| | | | | | | | | |
| Gross Sales Proceeds | | | | | $ | 81,225,000 | $ 401.11 | $ 1,805,000 |
| Less: | | | | | | | | |
| Sales Commission | | 6.00% | | | | 4,873,500 | $ 24.07 | $ 108,300 |
| Closing Costs | | 0.75% | | | | 609,188 | $ 3.01 | $ 13,538 |
| Net Sales Proceeds | | | | | $ | 75,742,313 | $ 374.04 | $ 1,683,163 |

## Equity Analysis

| | | |
|---|---|---|
| Total Project Costs | $ | 55,196,644 |
| Loan to Cost | | 80% |
| | | |
| Loan Amount | $ | 44,157,315 |
| | | |
| Cash Equity | $ | 5,000,000 |
| | | |
| Project Profit | $ | 20,545,669 |
| | | |
| Manager Profit | 50% | $ 10,272,834 |
| | | |
| Investor Profit | 50% | $ 10,272,834 |
| | | |
| Project Cash on Cash Return | | 411% |
| Investor Cash on Cash Return | | 205% |

# EXHIBIT B

## TO

## PLAINTIFFS' FOURTH AMENDED COMPLAINT

(Excerpts of Offering Memorandum re Luxury Development Fund)

# LUXURY DEVELOPMENT FUND NOTE PROGRAM

Confidential Private Offering Memorandum

$20,000,000 NOTES
ISSUER: LUXURY DEVELOPMENT FUND, LLC






SOLOMON CAPITAL
June 2005

526333 v3/HN

## LUXURY DEVELOPMENT FUND NOTE PROGRAM 2005
### $20,000,000

THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM (THE "MEMORANDUM") HAS BEEN PREPARED SOLELY FOR PROSPECTIVE INVESTORS ON A CONFIDENTIAL BASIS CONSIDERING THE PURCHASE OF PROMISSORY NOTES (THE "NOTES") FROM LUXURY DEVELOPMENT FUND, LLC (THE "COMPANY"). ANY REPRODUCTION OR DISTRIBUTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, OR THE DISCLOSURE OF ITS CONTENTS, WITHOUT THE PRIOR WRITTEN CONSENT OF SOLOMON CAPITAL, INC., ITS MANAGER (THE "MANAGER"), IS PROHIBITED. BY ACCEPTING THIS MEMORANDUM, EACH PROSPECTIVE INVESTOR AGREES TO THE FOREGOING.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE NOTES, THE COMPANY AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THE NOTES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL, STATE OR FOREIGN SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE NOTES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATE SECURITIES LAWS OR THE LAWS OF ANY FOREIGN JURISDICTION. THE NOTES WILL BE OFFERED AND SOLD UNDER THE EXEMPTION PROVIDED BY SECTION 4(2) OF THE ACT AND REGULATION D PROMULGATED THEREUNDER AND OTHER EXEMPTIONS OF SIMILAR IMPORT IN THE LAWS OF THE STATES AND OTHER JURISDICTIONS WHERE THE OFFERING WILL BE MADE. THE COMPANY WILL NOT BE REGISTERED AS AN INVESTMENT COMPANY UNDER THE INVESTMENT COMPANY ACT OF 1940 (THE "INVESTMENT COMPANY ACT"). CONSEQUENTLY, INVESTORS WILL NOT BE AFFORDED THE PROTECTIONS OF THE INVESTMENT COMPANY ACT.

THE NOTES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND THE APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. IN ADDITION, SUCH NOTES MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED, IN WHOLE OR IN PART, EXCEPT AS PROVIDED IN THE NOTE PURCHASE AGREEMENT REFERRED TO HEREIN. ACCORDINGLY, INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF AN INVESTMENT IN THE NOTES FOR AN INDEFINITE PERIOD OF TIME. THERE WILL BE NO PUBLIC MARKET FOR THE NOTES, AND THERE IS NO OBLIGATION ON THE PART OF ANY PERSON TO REGISTER THE NOTES UNDER THE ACT OR ANY STATE SECURITIES LAWS.

THE NOTES ARE OFFERED SUBJECT TO PRIOR SALE, AND SUBJECT TO THE RIGHT OF THE MANAGER OF THE FUND TO REJECT ANY SUBSCRIPTION IN WHOLE OR IN PART. AN INVESTMENT IN THE NOTES WILL INVOLVE SIGNIFICANT RISKS DUE TO, AMONG OTHER THINGS, THE NATURE OF THE COMPANY'S INVESTMENT LOANS AND THE NATURE OF THE NOTES. THERE CAN BE NO ASSURANCE THAT THE COMPANY'S OBJECTIVES WILL BE REALIZED. INVESTORS SHOULD HAVE THE FINANCIAL ABILITY AND WILLINGNESS TO ACCEPT THE RISKS AND LACK OF LIQUIDITY, WHICH ARE CHARACTERISTIC OF THE INVESTMENT DESCRIBED HEREIN.

PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL, TAX, INVESTMENT OR OTHER ADVICE. EACH PROSPECTIVE INVESTOR SHOULD MAKE ITS OWN INQUIRIES AND CONSULT ITS ADVISORS AS TO THE COMPANY AND THIS OFFERING AND AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING AN INVESTMENT IN THE NOTES.

THE COMPANY'S MANAGEMENT BASED ALL ESTIMATES AND PROJECTIONS AS TO EVENTS THAT MAY OCCUR IN THE FUTURE UPON THEIR BEST JUDGMENT AS OF THE DATE OF THIS MEMORANDUM (OR THE LATEST AMENDMENT OR SUPPLEMENT HERETO). WHETHER OR NOT SUCH ESTIMATES OR PROJECTIONS MAY BE ACHIEVED WILL DEPEND UPON THE COMPANY'S ACHIEVING ITS OVERALL BUSINESS OBJECTIVES AND THE AVAILABILITY OF FUNDS, INCLUDING FUNDS FROM THE SALE OF THE NOTES. WE DO NOT GUARANTEE THAT ANY OF THESE PROJECTIONS WILL BE ATTAINED. ACTUAL RESULTS WILL VARY FROM THE PROJECTIONS, AND SUCH VARIATIONS MAY BE MATERIAL. PRIOR TO THE SALE OF THE NOTES, THE COMPANY WILL PROVIDE YOU WITH THE OPPORTUNITY TO ASK MANAGEMENT, ITS COUNSEL AND ADVISORS QUESTIONS CONCERNING THE TERMS AND CONDITIONS OF THE OFFERING AND TO OBTAIN ANY ADDITIONAL INFORMATION IN THE COMPANY'S POSSESSION OR WHICH THE COMPANY CAN OBTAIN WITHOUT UNREASONABLE EFFORT OR EXPENSE.

CERTAIN INFORMATION CONTAINED HEREIN CONCERNING ECONOMIC TRENDS AND PERFORMANCE ARE BASED ON OR DERIVED FROM INFORMATION PROVIDED BY INDEPENDENT THIRD PARTY SOURCES. THE

COMPANY BELIEVES THAT SUCH INFORMATION IS ACCURATE AND THAT THE SOURCES FROM WHICH IT HAS BEEN OBTAINED ARE RELIABLE. THE COMPANY CANNOT GUARANTEE THE ACCURACY OF SUCH INFORMATION, HOWEVER, AND HAS NOT INDEPENDENTLY VERIFIED THE ASSUMPTIONS ON WHICH SUCH INFORMATION IS BASED.

THIS OFFERING IS SUBJECT TO THE TERMS DESCRIBED IN THIS MEMORANDUM. THIS MEMORANDUM IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE NOTE PURCHASE AGREEMENT AND THE LIMITED LIABILITY COMPANY OPERATING AGREEMENT OF THE COMPANY. NO PERSON HAS BEEN AUTHORIZED IN CONNECTION WITH THIS OFFERING TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN AS CONTAINED IN THIS MEMORANDUM. STATEMENTS IN THIS MEMORANDUM ARE MADE AS OF THE DATE HEREOF UNLESS STATED OTHERWISE HEREIN, AND NEITHER THE DELIVERY OF THIS MEMORANDUM AT ANY TIME, NOR ANY SALE HEREUNDER, SHALL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO SUCH DATE. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION TO ANY PERSON OR ENTITY TO WHICH IT IS UNLAWFUL TO MAKE SUCH OFFER OR SOLICITATION IN SUCH STATE OR JURISDICTION. PRIOR TO THE FINAL CLOSING OF THE COMPANY, THE MANAGER OF THE COMPANY AND ITS AFFILIATES RESERVE THE RIGHT TO MODIFY ANY OF THE TERMS OF THE OFFERING AND THE NOTES DESCRIBED HEREIN.

THIS MEMORANDUM WAS PREPARED SOLELY FOR YOU AND OTHER SELECTED POTENTIAL INVESTORS INTERESTED IN THIS PRIVATE PLACEMENT. WE MAY TERMINATE THIS OFFERING AT ANY TIME BEFORE A CLOSING.

<strong>CONFIDENTIAL/TRADE SECRET</strong>

BY TAKING RECEIPT OF THIS MEMORANDUM, YOU AGREE THAT ITS CONTENTS CONSTITUTE PROPRIETARY AND CONFIDENTIAL INFORMATION THAT SOLOMON CAPITAL, INC., ITS AFFILIATES, INVESTMENT FUNDS, COMPANIES PROGRAMS AND PORTFOLIO INVESTMENTS (THE "AFFECTED PARTIES") DERIVE INDEPENDENT ECONOMIC VALUE FROM NOT BEING GENERALLY KNOWN AND ARE THE SUBJECT OF REASONABLE EFFORTS TO MAINTAIN THEIR SECRECY. THE RECIPIENT FURTHER AGREES THAT THE CONTENTS OF THIS MEMORANDUM ARE A TRADE SECRET, THE DISCLOSURE OF WHICH ARE LIKELY TO CAUSE SUBSTANTIAL AND IRREPARABLE COMPETITIVE HARM TO THE AFFECTED PARTIES OR THEIR RESPECTIVE BUSINESSES. WHETHER OR NOT YOU INVEST IN THESE SECURITIES, YOU MAY NOT DISTRIBUTE THIS MEMORANDUM TO ANYONE OTHER THAN YOUR OWN FINANCIAL AND LEGAL ADVISORS, NOR MAY YOU MAKE COPIES OF THIS OR ANY OTHER DOCUMENT YOU RECEIVE, EXCEPT TO THE EXTENT NECESSARY TO CONSULT WITH YOUR FINANCIAL AND LEGAL ADVISORS WHO ARE ADVISING YOU IN CONNECTION WITH THIS POTENTIAL INVESTMENT (AND ONLY SO LONG AS HE AGREES TO HOLD THIS INFORMATION CONFIDENTIAL AND NOT USE IT FOR PURPOSES OTHER THAN ADVISING YOU IN CONNECTION HEREWITH). ANY OTHER REPRODUCTION OR DISTRIBUTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, OR THE DISCLOSURE OF ITS CONTENTS, WITHOUT THE PRIOR WRITTEN CONSENT OF THE MANAGER, IS PROHIBITED. BY ACCEPTING THIS MEMORANDUM, EACH RECIPIENT AGREES TO THE FOREGOING.

# TABLE OF CONTENTS

PAGE

I.    EXECUTIVE SUMMARY ........................................................................ 1

II.    ABOUT THE INVESTMENT ................................................................ 2

III.   MANAGEMENT AND PRIOR EXPERIENCE.................................... 5

IV.   FINANCIAL ANALYSIS ...................................................................... 12

V.    SUMMARY OF PRINCIPAL TERMS................................................ 14

VI.   TAX AND LEGAL CONSIDERATIONS.......................................... 20

VII.  RISK FACTORS ................................................................................. 25

VIII. ADDITIONAL INFORMATION........................................................ 32

| EXHIBIT A: | PROPOSED COMPANY LOAN: | Office Condominium Project, Chicago Suburbs, Illinois |
|---|---|---|
| EXHIBIT B: | PROPOSED COMPANY LOAN: | Monroe Place Mixed Use Project (Phoenix, Arizona) |
| EXHIBIT C: | PROPOSED COMPANY LOAN: | Portales Residential Luxury Condominium Project (Scottsdale, Arizona) |
| APPENDIX A | NOTE PURCHASE AGREEMENT | |

## I.   EXECUTIVE SUMMARY

Solomon Capital, Inc. is proud to present a new opportunity for qualified investors to participate with us in *Building Wealth Through Real Estate*, through the purchase of promissory notes (the "*Notes*") issued by Luxury Development Fund, LLC, a Delaware limited liability company (the "*Company*").

The Company will be formed for the sole purpose of providing up to $20 million of subordinated financing (the "*Loans*") in connection with real estate projects (the "*Projects*") owned by single asset entities formed for the sole purpose of acquiring and developing the Project (the "*Project Owners*"). The Company expects to make approximately 3-5 Loans over its term. Three of the Projects for which the Company plans to make a Loan are designated and described in the Appendices to this Offering Memorandum. The Company has not yet identified the Projects for which other Loans by the Company may be made, and is not likely to do so prior to the closing date of this offering.

The Company will be managed by Solomon Capital, Inc., a Nevada corporation (the "*Manager*" or "*Solomon Capital*")), of which Ron Buchholz and Charice Buchholz are principals.

In order to participate in this opportunity, each investor will commit to purchase Notes (their "*Capital Commitments*"). Notes will be issued to investors whose subscriptions are accepted by the Company ("*Noteholders*") in series ("*Note Series*") in connection with each Loan as called by the Manager. A Note Series will be allocated among Noteholders *pro rata* in accordance with their relative Capital Commitments. Each Note issued to a Noteholder will bear simple interest at one of the following annual rates, depending upon the aggregate Capital Commitment of such Noteholder, regardless of the Note Series in which it was issued:

- o   $25,000 - $100,000 aggregate Capital Commitment = 16%

- o   >$100,000 - <$200,000 aggregate Capital Commitment = 18%

- o   $200,000 or greater aggregate Capital Commitment = 20%

The Notes will have a three year term, commencing upon the date of the Note Series in which they are issued, subject to a one year extension in the discretion of the Company. Payment of principal and accrued interest will be deferred, in the discretion of the Company, until the due date of the Note, although accrued interest and principal may be prepaid, in that order, at any time without penalty.

The Noteholders will not own an equity, profit sharing or other direct interest in the Company or be admitted to the Company as members.

In addition to capital raised for Loans, the Company may raise capital from the sale of Notes to pay its expenses, including organizational expenses, to reimburse the Manager for certain expenses, and to pay the Manager compensation, as more particularly described in the Summary of Principal Terms in this Offering Memorandum.

## II.    ABOUT THE INVESTMENT

### Organization

The following chart illustrates the general organization of the Company and a typical Loan, although the structure may vary depending upon the requirements of the Project:



TYPICAL LOAN STRUCTURE
LUXURY DEVELOPMENT FUND, LLC

### The Company

The Manager will oversee the daily operations of the Company and make all decisions in connection with the identification of the Projects and the terms of the Loans. In consideration of its services, the Manager will be paid a placement fee equal to one percent (1%) of the aggregate principal of Notes purchased at each capital call and a monthly management fee equal to one twenty-fourth of one percent (1/24%) per month (equal to 1/2% percent per year) of the total funds under management. In addition, the Company will pay or will reimburse the Manager for organizational expenses of the Company and this offering not to exceed an aggregate of $150,000, (ii) operating expenses of the Company, which are expected to be limited, and (iii) the direct and out-of-pocket costs of the Manager with respect to such expenses. *Please see Section V Summary of Principal Terms for a more detailed description of the Manager's compensation.*

The Company's capital, targeted at approximately $20 million, in the discretion of the Manager, will be raised primarily through the sale of the Notes. Capital from the sale of Notes will fund the Company's Loans and provide reserves for its operating expenses, including the payment of management compensation and Company expenses. However, the payment of management compensation, operating and organizational expenses is not expected to be an economic burden on the Noteholders if the Company's portfolio Loans are paid in full, since the repayment of the principal and accrued interest on the Notes is a fixed obligation and expense of the Company. Payment of the management fees and expenses of the Company will reduce capital available for distributions of Company income and profits to its equity owner, RNC Holdings, LLC ("**_RNC Holdings_**").

As noted, the Noteholders will not be members of the Company. The sole member of the Company is RNC Holdings, formed by Ron Buchholz and Charice Buchholz to hold their ownership interest in the Company and in other investments, and such other affiliated or non-affiliated members as the Manager may admit. RNC Holdings is not expected to make a material capital contribution to the Company. Although the Manager may in its discretion distribute the Company's income and profits to RNC Holdings or any other members from time to time, such distribution shall not be made unless projected revenues from outstanding Loans are sufficient to pay all unpaid accrued interest and principal of outstanding Notes, as well as the other expenses of the Company, as described herein.

**The Loans**

The Loans will be made either directly to a Project Owner or indirectly through one or more intermediate investment entities or vehicles.  These intermediate investment entities will be affiliated with, and managed by, Ron and Charice Buchholz, as principals of Solomon Capital, and/or Jonathan Vento and Donald Zeleznak, as the principals of Grace Communities, LLC ("**_Grace_**"), or their affiliates.

Payment to the Company of principal and interest in connection with the Loans is expected  to provide revenues sufficient to pay accrued interest and principal on the Notes to Noteholders. After payment of the Company's other expenses, the balance of such revenues shall be distributed to RNC Holdings, and any other members of the Company, in connection with their members interests in the Company.

**The Projects**

The Projects will be managed either by Ron Buchholz or Charice Buchholz, as principals of Solomon Capital, and/or Jonathan Vento  and Donald Zeleznak, as the principals of Grace, or their affiliated entities, who will oversee the acquisition, construction, development and sale of the Projects. Solomon Capital, Ronald Buchholz and Charice Buchholz, or their affiliated entities will also own an incentive interest in the Projects.

Three of the projects have already been identified, and detailed descriptions are included in Exhibits A, B and C as the Illinois Office Condominium Project, the Monroe Place Mixed Use Project, and the Portales Residential Luxury Condominium Project, respectively. The Illinois

Office Condominium Project properties are located in the greater Chicago, Illinois area, in the suburbs of Naperville, Hoffman Estates and Itasca. The Monroe Place Mixed Use Project and the Portales Residential Luxury Condominium Project are located in Arizona, in the cities of Phoenix and Scottsdale. These projects are in various stages of development. Each project will be approximately 80% financed by institutional lenders, secured by senior liens on the Projects. The Company will provide additional development capital in the form of the Loan. Each Loan will be evidenced by a promissory note, and its repayment will be guaranteed. Repayment of the Loan may be subordinated to senior financing and interest will be charged to the Project Owner at a rate to be determined by the Manager.

The Project Owner will enter into agreements to pay certain development and construction fees to one or more of the Managers or its affiliates or principals, including RDB Development, LLC and/or Grace Communities, LLC. Ronald Buchholz is also a principal of RDB Development LLC and will continue to oversee development, construction and other such services to the Project Owner in connection with the Project development. Additionally, Jonathan Vento and Donald Zeleznak have ownership interest in the Project Owners and will enter into agreements to receive real estate brokerage fees, development and construction management fees from the Project Owners. In addition, certain of the Managers, its affiliates or principals may personally guarantee one or more acquisition or construction loans in connection with the Projects.

**Capital Commitments and Notes**

At each capital call, the Manager will call only the capital needed to fund current Loan obligations and any necessary Company reserves and expenses. The Manager expects to make between three and five capital calls, with the final capital call anticipated to occur in the Fall of 2005. A new Note Series will be issued in connection with each capital call. Since Notes will have a term of three years, the Fund anticipates repaying all principal and accrued interest in connection with all issued Notes Series by the end of 2008. Principal and accrued interest on Notes will be repaid *pro rata* within Note Series, in the order of the Note Series in which they were issued with priority to the Series with the earliest maturity date.

Regardless of the Note Series in which they are issued, the interest rate at which a Note is issued will be determined by the aggregate Capital Commitment of the Noteholder, as follows:

| Noteholder Aggregate Capital Commitment | Interest Rate (annual) |
|---|---|
| $25,000 – less than $100,000 | 16% |
| $100,000 – less than $200,000 | 18% |
| $200,000+ | 20% |

Payment of accrued interest may be deferred in the discretion of the Company, provided, however, that unpaid accrued interest and principal shall be payable on or before the maturity date of the Note. In the discretion of the Manager, the maturity date with respect to a Note Series may be extended for a period of up to one year. Payment of the Notes shall be secured by a security interest in the assets of the Company.

*Please review <u>Section VII Risk Factors,</u> as well as the full terms and conditions of the Note Purchase Agreement attached as Appendix C, prior to a decision to purchase Notes.*

## III.   MANAGEMENT AND PRIOR EXPERIENCE

Solomon Capital was founded as a solution for real estate investors that want to maximize their upside profit potential and earn the returns that are available to savvy investors, while minimizing risk through partnership with knowledgeable practitioners. Ron Buchholz had been actively investing on his own and with partners for many years and received countless requests from investors that wanted to participate with him in projects. He and his sister, Charice Buchholz, formed Solomon Capital in order to provide a way to facilitate these transactions and help investors reach their goals. In their careers, they have formed 19 pooled investment entities to fund projects in various states, including Hawaii, California, Nevada, Arizona and Illinois.

**Management Team**

The Company will be managed exclusively by the Manager. The Manager will make all investment decisions on behalf of the Company. The Manager's management team includes the following:

Ronald Buchholz ~ Director

Ron and his wife, Sherry, have been married for six years. They currently reside in Henderson, Nevada with their two children, Delaney (3) and Chase (1).

Ron began managing construction and development projects in the mid-1990s and started his first company, RDB Home and Office Improvements, in 1996, specializing in residential and commercial new construction and renovation. Currently, Ron is the President of Solomon Capital, Inc, a real estate investment company, and RDB Development, a real estate development company. He is responsible for structuring and acquiring real estate investments and often serves as the Development Manager and Construction Manager on development projects.

Ron has owned, financed, developed, built and sold a variety of real estate products throughout the United States, including single family residential, multi-family residential, traditional office, office condominium, infrastructure lot development, retail and industrial. These projects have a combined total value in excess of $200 million and total over 2 million square feet, with another 1.5 million in the pipeline. He has developed over 50 projects in a variety of marketplaces, including California, Arizona, Nevada, and Illinois.

In 2002, Ron co-founded Equity Enterprises, the predecessor to Solomon Capital, and serves as its President.

Ron has a passion for his work and enjoys using his abilities to help individuals and charitable organizations. He has served as an advisor for various local churches and community organizations and is a mentor to many individual real estate investors.

Charice Buchholz ~ Director

In the late 1990s, Charice began working at a local Silicon Valley start-up company to support herself while attending Santa Clara University and studying Finance, International Business and Spanish. She handled business development and marketing of their enterprise-level financial

reporting solutions and helped the company partner with major players in the marketplace. She went on to earn a Masters of Business Administration (MBA) with a specialization in Business Strategy and Finance.

Prior to forming Solomon Capital, Charice was in the banking industry and worked with young companies on Specialty Financing, helping them utilize assets to achieve cash flow. She left the banking industry to help found Equity Enterprises, Inc., the predecessor of Solomon Capital. For Equity Enterprises, she managed the Finance and Operations, as well as developing Investor Relations. Currently, she is a principal of Solomon Capital and serves as the Chief Financial Officer for both Solomon Capital and RDB Development. She is actively involved in managing the development projects through her independent consulting firm, Alabanza, Inc.

Charice is a leader in her local church and has worked with all age groups and demographics. She founded a group for young adults, in which she is still actively involved. She has been a guest speaker at a variety of events and also sings in one of the church bands. Charice has a passion for people and her hobbies include most sports, travel and music.

Guy Berry ~ Legal & Compliance

Guy has been a licensed agent and real estate broker for almost 30 years and is an expert in real estate law and contracts. He has managed large real estate offices including Coldwell Banker and Fox & Carskadon and has worked on almost every type of real estate transaction, including new construction, residential, commercial, industrial and retail. He is a commercial Mediator (Fla. Circuit Court Certification - *1991)* and has mediated over 200 cases related to real estate transactions.

Guy has served on the California Association of Realtors Board of Directors and is a respected educator in the industry. In all, more than 20,000 real estate agents across the state have attended his courses, including one of his California Department of Real Estate classes in Contract, Risk Reduction, Condo/PUD law and others. He has conducted *"standard of care"* workshops for various real estate boards, organizations and companies, including Coldwell Banker, Alain Pinel, RE/MAX, Prudential, Century 21, Contempo, Realty World and others. Guy has developed various training courses for agents regarding all aspects of residential and residential income property sales and transactions and is a guest lecturer at DeAnza College, Foothill College and West Valley College. Guy had done appraiser training in residential and residential income property and taught a consumer course at UC Berkeley to the public entitled, *"Buyer Beware."*

Currently, Guy is responsible for compliance and risk management at Solomon Capital. His experience and knowledge contribute to the company's ability to reduce risk to the investors and create smooth and accurate transactions.

Bob Malouf ~ Project Management

After graduation from Westmont College in 1964, Bob worked for his father in the shopping center business. His first assignment was to be Project Manager for the construction of an enclosed mall regional shopping center in Mesa, Arizona.

In 1968 Bob joined with his brother Rick to form Malouf Bros. Development Co. During the years they were together, they developed 30 subdivisions with lot and home sales in excess of $330 Million. They developed homes ranging from small townhomes at $16,990 to one-of-a-kind custom homes in excess of $2,500,000, as well as developing a number of successful commercial properties. The company handled all phases of real estate development, including land acquisition, zoning, entitlements, coordinating engineering consultants, home construction, sales and marketing. Bob holds both a General Contractor and Real Estate Broker license, and has a deep involvement in the legal and accounting aspects of the business.

For six years, from 1991-1997, Bob was Director of Real Estate developments at the Boulders Community in Carefree Arizona. The Boulders is a luxury 5 Star Resort, which was set in the midst of 600 acres of developable land. During that time, with a team of 8 people, he oversaw the development of housing subdivisions, custom lot subdivisions, commercial property development, three homeowners associations, and a sewer company.

After another six years building very high end luxury custom homes, Bob was asked to direct the infrastructure development of a 600 acre community in Maricopa, Arizona. The Villages at Ranch El Dorado consists of 14 subdivisions all of which were constructed at the same time, by eight national and regional homebuilders. The community is one of the fastest growing developments in Arizona, a state which leads the nation in new home starts.

Bob has been asked to join the team at RDB Development to oversee all of the developments in Arizona and Nevada.

He and his wife, Mary, have been married over 40 years. They have two grown sons and four grandchildren. When he is not developing land and homes, Bob enjoys the weekly teaching of a large adult class at Scottsdale Bible Church, at which he and Mary have been members for 30 years. His hobby is cooking. He is a Life Member of the Board of Directors and past president of the Central Arizona Homebuilders Association and has been a featured public speaker at numerous civic and religious events. For 28 years he has been on the Board of Directors for OC International, which is a missionary organization currently operating in 27 foreign countries. In addition, he and his wife have both been involved in Young Life of Arizona for 40 years, during much of that time at Arcadia High School in Phoenix. Bob now serves as Chairman of the Regional Committee.

Jan Edbrooke ~ Consultant

Jan Edbrooke is assisting Solomon Capital in several consulting capacities, including acquisition, financing and construction management. Jan is a seasoned real estate investor, with commercial and residential property holdings in over seven countries and in several parts of the US. As a graduate in Business Administration and Computer Science, Jan has spent most of his career in various high-tech technical, marketing and sales positions in both Europe and the US, with the bulk of his time in the product marketing and project management field.

Jan has been an investor or co-investor with Solomon Capital in other projects for nearly two years, with significant investments in ten projects.

*Grace Capital and Grace Communities*

Grace Communities was formed by **Donald Zeleznak** and **Jonathon Vento** in January of 2004. These principals have combined experience of more than 40 years in the real estate and construction industries. Grace Communities' vision for their developments is to bring an upscale, urban lifestyle to metropolitan Phoenix. One of their advertising tag lines is *"It is not about purchasing a place to live it is about purchasing a lifestyle".* Additional information is available on their website at www.gracecommunities.net.

Jonathon Vento ~ Principle, Grace Communities

Jonathon has been married to his wife Lori for 16 years and together they have one daughter, Kylie, 12. Jonathon and his family currently reside in Scottsdale, Arizona.

Throughout the early 1980's Jonathon worked construction in order to support himself while attending the University of Michigan and Eastern Michigan University majoring in Business and Real Estate Finance. A Principal of Grace Capital, he is responsible for overseeing the development and construction of all projects incorporating high rise residential lofts, townhomes, and retail, along with several office condo projects in Phoenix, Las Vegas, Chicago, and Maui.

Previously, a Principal of Shea Commercial, he was responsible for the development and construction of over 2 million square feet of office condo product throughout the country.

Prior to working at Shea he served as President of DFD CornoyerHedrick, a large multi-disciplinary design firm in Phoenix, Arizona, specializing in commercial, retail and residential architecture.

Sold in 2000, Jonathon served as the President and Co-founder of Onyx Manufacturing, a precision rubber roller and fabrication facility in Chicago, Illinois, which served a wide variety of clients throughout North America.

From 1992 to 1995, Jonathon served as President and COO of Abba Rubber International. Jonathon was responsible for the day-to-day operations of this elastomeric manufacturing firm that serviced clients worldwide.

As Vice President of Birtcher Campbell, Laguna Niguel, California, from 1988 to 1992, Jonathon managed all day-to-day development activities for several projects in Southern California, Nevada and Arizona. Here he was responsible for over $200 million in office, industrial, and retail. He facilitated a variety of historic preservation projects in which he utilized $25 million in federal and state grant funds.

Jonathon has a spirit for giving and community awareness, he is involved in several local charities and Christian based charities with an emphasis on community rejuvenation. Jonathon is on the Board of Directors for Habitat for Humanity, Valley of the Sun and Neighborhood Ministries. His family strongly supports charities for women and children and those that promote spiritual awareness.

His hobbies are traveling, racquetball and spending time with his family.

8.

Donald Zeleznak ~ Principle, Grace Communties

Don has been married to his wife Shirl for 35 years and they have two children. Their son Ryan works with Don, running their new home sales division. Their daughter, Kristine, is a licensed psychologist.

Don graduated from Morningside College in Sioux City, Iowa in 1969. He received his master's degree in business from Winona State University in 1971. He has been recognized on a local, state and national level for his high sales volume and closed transactions in the residential real estate industry.

Don brings over thirty years of commercial and residential real estate sales and development experience to Southwest-Arizona, which is his central focus.

Don currently directs the sales, marketing and development of residential and commercial real estate under a Keller Williams franchise in Scottsdale, Arizona. He has sold more than 1,000 homes using creative financing. Over the last two years Don has closed over $300,000,000 of residential property. He was ranked 17th Top Realtor in the Nation by Realtor Magazine. He is also an owner of the Keller Williams Southwest Region representing over 3,000 agents in 30 offices in Arizona, Nevada and Utah.

Don extends widely into the commercial arena. He has developed and completed ten office condo projects with over 1,500,000 square feet in the past 4 years, and currently has fifteen additional projects under development in metropolitan Phoenix, Las Vegas and Chicago.

Don and his partner won three awards in 2002 from the Arizona Chapter of the National Association of Industrial and Office Properties (NAIOP) including Developer of the year, Low-Rise Office Building of the Year and Impact Developer of the Year. Their most recent office condo project in Las Vegas was named NAIOP office building of the year for 2003.

He assembled and planned a 1,200 acre 2,500-unit master planned golf community in Kingman, Arizona. He currently is developing 3 tower residential projects in downtown Phoenix with over 320 residences, 2 residential projects in downtown Scottsdale representing over $190,000,000 of condos. His suburban division represents an additional 525 homes/condos.

He was recently named to the Board of Directors of Morningside College. Don and Shirl are strongly involved in church and community. Don is on his church board and gives to charities such as Barrows Neurological Institute, Andre House, Habitat for Humanity, and others. Every month Don and Shirl seek out a family or individual that needs help in some way (food, clothing, rent) and help them with whatever need it might be.

Don has a passion for real estate but in his spare time he enjoys golf, tennis, and spending time with family.

Ryan Zeleznak

Ryan Zeleznak attended Northern Arizona University; Flagstaff, Arizona where he majored in Criminal Justice and was on the Board for the Sigma Alpha Epsilon Fraternity.

Ryan obtained his Arizona Real Estate License in 1998 and immediately began a career with Keller Williams. As part of The Zeleznak Group with Keller Williams, he specializes in residential sales and has led a seven person team to national recognition. Sales volume was $77,000,000 in 2001; $82,000,000 in 2002; and $120,000,000 in 2003. Keller Williams has over 35,000 agents nationally. The Zeleznak Group rated #1 in the nation with Keller Williams in 2001 and 2003.

Zeleznak has been ranked #1 by Phoenix "The Business Journal" for 2001, 2002 and 2003.

He is currently overseeing Sales and Marketing for The Zeleznak Group consisting of a sales force of 14 sales agents. Current projects involve the sale and marketing of twelve residential subdivisions for multiple builders in the Phoenix metropolitan area.

He has also been instrumental in equity-raising for development projects of Grace Capital. Ryan was responsible for raising $20,000,000 in equity for office condo and residential projects (2001 – 2004).

In 2002, Ryan co-founded IPN (Integrated Professional Networks), a Qwest master agent telecommunications company. He is also a partner in several office condos in Arizona, Nevada and Chicago. In addition, Ryan is a Principal in Alpha Home Loans (a joint venture with Wells Fargo) and a Principal in Omega Title Agency in Arizona.

In 2004 he became a partner of Grace Capital and is involved in residential land acquisition on behalf of Grace Capital.

Ryan has resided in Arizona for the past 22 years and has actively supported various charities throughout the Valley.

Susan Pierce

Susan Pierce, Certified Public Accountant (CPA), is a native of Iowa who moved to Arizona in fall, 2004, specifically to design and implement financial and accounting systems for Grace Communities and function as both CFO and COO of the company.

Susan received her undergraduate and graduate degrees from the University of Iowa in 1977 in accounting and public policy. She spent much of her adult life serving in a variety of high profile positions in the state of Iowa, initially employed as the CEO of a public policy watchdog organization where she used her technical accounting skills and knowledge of government to draft and lobby for the passage of several legislative initiatives to lighten the tax burden on businesses and bring greater efficiencies to government.

In 1994, she founded a consulting firm known as Pierce and Associates which specialized in market research and special projects consulting. Her clients included Gateway 2000, Terra Chemical, the Chamber of Commerce, the Sioux City Community School District, various state and local government agencies, candidates for public office and referendum campaigns.

Ms. Pierce has been an active community leader serving on various local, state and national boards. She has both served on and been an officer of the Chamber of Commerce, United Way,

St. Lukes Regional Health Center, the Sioux City Diocesan Board of Directors, the St.Lukes College of Nursing and Health Sciences, Leadership Iowa, the Susan B Komen Breast Cancer Foundation and the Junior League of Sioux City. She has served on the national board of Junior League, was founder of the Siouxland Chapter of Compassionate Friends, was chosen by her peers to receive the "Woman of Excellence" Award in the category of "women pursuing truth", was placed on the Des Moines Register's list of "Iowa's Up and Comer's", and has earned placement in America's directory of "Who's Who Among American Professional Women."

Susan is married to Dean Pierce and the mother of four sons, Aaron, Scott, Andrew, and Matthew.