UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| YU-SZE YEN, et al.,<br><br>               Plaintiffs,<br>    v.<br><br>RONALD BUCHHOLZ, et al.,<br><br>              Defendants. | Case No. C-08-03535 RMW<br><br>ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF KWEI CHOONG'S FOURTH AMENDED COMPLAINT<br><br>**[Re Docket No. 202]** |

Pursuant to Federal Rule of Civil Procedure 56, defendants William Buchholz ("Pastor Buchholz") and Family Community Church ("FCC") (collectively "defendants") move for summary judgment on the three claims asserted against them by plaintiff Kwei "Kelli" Choong's in plaintiffs' Fourth Amended Complaint (Breach of Fiduciary Duty, Misrepresentation and Concealment, and Constructive Fraud). On July 20, 2012, the court held a hearing on defendants' motion. Having considered the papers submitted by the parties and the arguments of counsel, and for the reasons set forth below, the court grants defendants' motion for summary judgment as to the claims by Choong.

## I.  BACKGROUND

This case concerns several real estate-related investment opportunities in which plaintiffs claim they were fraudulently induced to invest. As relevant to the present motion, plaintiff Kwei "Kelli" Choong ("plaintiff" or "Choong") claims that she was induced by Pastor Buchholz to invest with his children, Ron and Charice, to her detriment. Although Choong in her opposition has

introduced evidence of facts bearing on the alleged inducement of other investors, the court limits its summary and analysis to the facts relevant to Choong's claims against Pastor Buchholz and FCC.

Choong first met Pastor Buchholz when she began attending FCC in 2001. Dkt. No. 203-5 (Dep. of Kwei "Kelli" Choong ("Choong Dep.")) at 8:19-21. Choong's involvement with FCC was mainly limited to attending sermons, with the exception of her additional participation in the singles ministry. *Id.* at 8:22-9:8. In connection with her singles ministry work, Choong had numerous conversations with Pastor Buchholz. *Id.* at 9:9-15.

Beginning in January 2003, Pastor Buchholz delivered a four-part sermon series on Tithing and Christian Stewardship, called "Dollars and Sense." Dkt. No. 202-2 (Affid. of William E. Buchholz ("Buchholz Affid.")) ¶ 17; Dkt. No. 202-5. Following this sermon series, Pastor Buchholz invited parishioners to attend a variety of educational workshops about estate planning, investment, and retirement planning that were designed and led by outside professionals. Buchholz Affid. ¶ 18. Flyers for one of the workshops, signed "Pastor Bill," stated: "While there is no guarantee that anyone can make on being able to achieve a 10% consistent return, it is important to bring education to our people in practical areas of stewardship that have the potential to realize substantial investment growth. Equity Enterprises has a strong record of helping people invest wisely so we felt it would be a service to our membership to bring this seminar to our campus for convenience' sake." *Id.* Choong, however, does not claim to have read the flyer, or attended any of the workshops that followed the "Dollars and Sense" sermon series.

Beginning in December 2003 and continuing through May 2004, Pastor Buchholz engaged in limited email correspondence with Steve Pruitt, the pastor of Gateway Church, about investing with Solomon Capital, a company affiliated with Ron and Charice. Dkt. No. 203-4, Ex. 52. Pastor Buchholz testified that Pastor Pruitt initiated the conversation: "[He] had asked me about my son and about possible ways to be able to get connected to him. We were at a luncheon meeting, at a ministers meeting, and he came up and asked me about it." Dkt. No. 203-3 (Dep. of William E. Buchholz ("Buchholz Dep.")) at 67:9-15. On May 25, 2004, following several previous emails, Pastor Pruitt indicated that he had heard some troubling "rumors" about Solomon Capital:

> One question—when I discussed this with my Board after I had lunch with Ron, one

2

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF KWEI CHOONG'S FOURTH AMENDED COMPLAINT—Case No. C-08-03535 RMW

of the guys said that he had "heard" that people at FCC had mortgaged their houses to invest and had never gotten their money back.  I know, that usually in these "rumors" there is a lot more to it, or wires are crossed and may not be applicable to what Ron does at all.  But I wanted to give Ron a "head's up" so he will not be blindsided.

Dkt. No. 203-4, Ex. 52.  Pastor Buchholz did not respond to Pastor Pruitt's email, later explaining that "[t]here was no response for me to have to it.  I didn't know what he was talking about and I had not heard that . . . I never heard anything more about it."  Buchholz Dep. at 70:5-13.

In 2005, plaintiff approached Pastor Buchholz to ask for a realtor recommendation.  Choong Dep. at 11:16-12:4.  Pastor Buchholz suggested that plaintiff speak with his son, Ron, or daughter, Charice, given their involvement in the real estate business.  *Id.* at 12:5-16.  Following this conversation, over the course of approximately a two-week period, Pastor Buchholz and plaintiff exchanged a number of emails on the subject:  On July 28, 2005, plaintiff thanked Pastor Buchholz for taking the time to talk with her, and indicated that she wanted to peruse Ron and Charice's company website before looking at a prospectus.  Dkt. No. 203-4, Ex. 59.

The next day, in an email to Anna Keirstead of Solomon Capital, Inc., Pastor Buchholz requested the Luxury Development prospectus for "another potential investor for you that is a single gal at our church with some $$$ to invest."  *Id.*  Keirstead advised that the company could not provide a prospectus until the potential investor completed an Investor Information Form.  *Id.*  Subsequent to this exchange, Pastor Buchholz emailed plaintiff a copy of the Investor Information Form, with instructions that she must fill it out and mail it to Solomon Capital to determine her eligibility to invest.  *Id.*  In the same email, Pastor Buchholz stated: "FYI, Melody and I have invested in several of these Solomon Capital projects and so have other churches with great satisfaction."  *Id.*  On Saturday, July 30, 2005, Pastor Buchholz sent an additional email to plaintiff, in which he said, "This is probably your best way to go to get long term gain . . . . Melody and I have had several projects we have invested in and done very well.  So have at least 20 other individuals at FCC + 3 churches in Silicon Valley.  The 3 churches have invested over $700,000 in Ron's projects and when their projects were completed and profits paid they reinvested the entire amounts again."  *Id.*  Pastor Buchholz explained that he described real estate investment to plaintiff as the "best way to go to get long term gain" because, during their initial conversation, plaintiff had indicated that "she would really prefer to get into something where she didn't have to have hands on."  Buchholz

3

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF KWEI CHOONG'S FOURTH AMENDED COMPLAINT—Case No. C-08-03535 RMW

1  Dep. at 93:12-21. Pastor Buchholz did not share with plaintiff the "rumors" that Pastor Pruitt related
2  to him in May 2004. *See id.* at 70:16-71:6 ("I don't remember doing anything because he called
3  them rumors. And I've heard a lot of rumors in my day and, if I responded to all the rumors, I'd
4  never get anything done."); Dkt. No. 203-1 ("Choong Decl.") ¶¶ 14-17.

Following the July 30 exchange, there was a lapse in plaintiff and Pastor Buchholz's correspondence, until plaintiff sent an email on Thursday, August 11. Dkt. No. 203-4, Ex. 59. In this email, plaintiff thanked Pastor Buchholz for the referral to Ron and Charice, and then inquired about whether or not Solomon Capital makes any exceptions to the requirement that an investor have at least one million dollars in net worth. *Id.* Pastor Buchholz responded later that afternoon with a simple question: "How much are you trying to invest?" *Id.* Plaintiff replied (also on August 11) that she intended to invest approximately fifty thousand dollars. *Id.* Following these emails, there is no evidence of additional communication between plaintiff and Pastor Buchholz regarding plaintiff's decision to invest in Solomon Capital. Pastor Buchholz declares that he never gave any investment materials to Choong and did not learn that she had invested until the initiation of this lawsuit. Dkt. No. 207 (Buchholz decl. ¶ 11).

Some of Pastor Buchholz's investments with Ron and Charice were lost, including approximately $342,000 he invested in Solomon Towers. Dkt. No. 203-3 (Buchholz Dep.) at 98:2-99:7; Dkt. No. 207-1, Ex. G (chart showing Pastor Buchholz's investments and when, or if, they paid out). However, Pastor Buchholz asserts he did not lose money in Solomon Towers until mid-2007, long after he had communicated with Choong about investing. Dkt. No. 207 at 17 ¶ 7. Mark Putney, formerly a consultant for Solomon Capital, testified that he learned after leaving FCC in fall 2006 that "the money invested was lost, at specific projects," although he could not identify which projects. Dkt. No. 203-6 (Dep. of Mark Putney) at 123:10-124:21. There is no evidence that Pastor Buchholz informed Choong of his losses, but there is no evidence that he had suffered any loss at the time of his communications with Choong.

## II.     ANALYSIS

### A.     Claims for Breach of Fiduciary Duty and Constructive Fraud

Plaintiff's claims for breach of fiduciary duty and constructive fraud both require a showing that defendants owed and breached a fiduciary duty to plaintiff. *Pellegrini v. Weiss*, 165 Cal. App. 4th 515, 524 (2008) ("The elements of a cause of action for breach of fiduciary duty are: 1) the existence of a fiduciary duty; 2) a breach of the fiduciary duty; and 3) resulting damage."); *Gold v. Los Angeles Democratic League*, 49 Cal. App. 3d 365, 373 (1975) ("'Constructive fraud' arises from a breach of duty by one in a confidential or fiduciary relationship to another which induces a justifiable reliance by the latter to his prejudice.").

Defendants argue that plaintiff cannot establish that they owed her a fiduciary duty because there is no evidence of her vulnerability to Pastor Buchholz. Both sides focus their discussion on *Richelle L. v. Roman Catholic Archbishop of San Francisco*, 106 Cal. App. 4th 257 (2003), which concerned a tort action against a priest for sexual misconduct. The court's analysis in *Richelle L.* began with a general discussion of fiduciary and confidential relationships. The court first noted that "'fiduciary' and 'confidential' have been used synonymously to describe any relation existing between parties to a transaction wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party." *Id.* at 270 (citations omitted). The court went on to note, however, that there are "significant differences" between the two kinds of relationships. *Id.* at 271. "[F]iduciary relationships arise out of certain canonical relationships that are legally defined and regulated," including guardian and ward, trustee and beneficiary, principal and agent, attorney and client, and conservator and conservatee. *Id.* at 270-72. In contrast, "confidential relationships do not fall into well-defined categories of law and depend heavily on the circumstances" and "may be founded on a moral, social, domestic, or merely personal relationship as well as on a legal relationship." *Id.*

Focusing on confidential relationships, the court identified the "essential elements" as follows: "1) The vulnerability of one party to the other which 2) results in the empowerment of the stronger party by the weaker which 3) empowerment has been solicited or accepted by the stronger party and 4) prevents the weaker party from effectively protecting itself." *Id.* at 272 (quoting

*Langford v. Roman Catholic Diocese of Brooklyn*, 677 N.Y.S.2d 436, 438 (1988)). The court further found that "[t]he vulnerability that is the necessary predicate of a confidential relation, and which the law treats as 'absolutely essential' [citation] usually arises from advanced age, youth, lack of education, weakness of mind, grief, sickness, or some other incapacity." *Id.* at 273.

Next, the court in *Richelle L.* discussed the First Amendment implications of imposing tort liability on members of the clergy for breach of fiduciary duty to a parishioner. The court ultimately concluded that such a claim was possible

> *provided* the alleged injurious conduct was not dictated by a sincerely held religious belief or carried out in accordance with established beliefs and practices of the religion to which the pastor belongs, and there is no other reason the issues cannot be framed for the trier of fact in secular rather than sectarian terms.

*Id.* at 279.

Notwithstanding its finding that tort liability could be imposed in certain situations, the court concluded that the plaintiff in *Richelle L.* had failed to plead her claim in two respects. First, she failed to allege that "[the priest's] exploitation of her alleged vulnerability arose in the context of a counseling relationship." *Id.* at 280. The court noted that the cases imposing a fiduciary duty on a pastor "all involved situations in which the pastor was providing the parishioner marital, family or financial counseling." *Id.* at 280 & n.14. Second, instead of alleging any of the conventional reasons for vulnerability, the plaintiff relied only on her piety. *Id.* at 280. For example, the plaintiff claimed that she was "deeply religious" and her ability to resist the priest's advances was "substantially compromised by her religious faith and trust." *Id.* The court found that this rendered the claim constitutionally impermissible, as "[a]ppellant's claim that the depth of her religious faith rendered her vulnerable to [the priest] could not be adjudicated without reference to the nature of her religious beliefs and the doctrines of her church." *Id.* at 281-82.

Plaintiff acknowledges that a pastor-parishioner relationship alone is insufficient to establish a fiduciary duty but disputes that vulnerability is necessary. Plaintiff argues that a fiduciary duty is established by a pastor-parishioner relationship plus vulnerability "*or* something else," namely the pastor taking on another role outside of the ecclesiastical relationship. Plaintiff apparently relies on the portion of *Richelle L.* that required the plaintiff to allege a counseling relationship; plaintiff cites

no other California authority to support her contention that this additional counseling role is sufficient to establish a fiduciary duty.

*Richelle L.* is abundantly clear that *both* a counseling relationship *and* vulnerability are required. First, in stating the applicable standards, *Richelle L.* twice refers to vulnerability as "essential" and calls it "the necessary predicate of a confidential relation." 106 Cal. App. 4th at 272-73. Moreover, after finding that the plaintiff failed to allege a counseling relationship, the court noted that it might have allowed the plaintiff an opportunity to amend the complaint except there was a further deficiency: the plaintiff's reliance on her piety to show that she was vulnerable. *Id.* at 280-81. The court found the plaintiff could not amend to avoid this second problem: "omitting the assertion that her religiosity rendered her vulnerable to [the priest] . . . would defeat her assertion that they stood in a confidential relation" and she could not "replace the constitutionally impermissible vulnerability with a different disability" because she could not disavow her previous allegations. *Id.* at 282. Thus, the *Richelle L.* plaintiff's claim was dismissed without leave to amend because of her inability to allege vulnerability, notwithstanding the possibility that she could have amended to allege a counseling relationship. Similarly here, plaintiff's claim fails because she does not assert any basis for finding that she was vulnerable to Pastor Buchholz. Thus, summary judgment is granted on plaintiff's claims for breach of fiduciary duty and constructive fraud.

### B. Claim for Misrepresentation and Concealment

#### i. Misrepresentation

The elements of a claim for misrepresentation are: (1) misrepresentation of material fact; (2) no reasonable ground for believing the truth of the representation; (3) intent that the plaintiff rely on the representation; (4) plaintiff's justifiable reliance; and (5) causation and damages. *Home Budget Loans, Inc. v. Jacoby & Meyers Law Offices*, 207 Cal. App. 2d 1277, 1285 (1989).

Defendants argue that there was no misrepresentation on which plaintiff could have justifiably relied. Plaintiff responds, *inter alia*, that "[m]isrepresentation of material facts is established by [Pastor Buchholz's] overselling opportunities with his children, his returns, and returns of others." Dkt. No. 203 at 21. However, plaintiff must demonstrate that such "overselling" meets the requirements of an actionable misrepresentation, including that it is a representation of

7

1  past or existing fact, not a representation of opinion. *See* 5 Witkin, *Summary of California Law*,
2  Torts § 774, p. 1123 (10th ed. 2005) ("Representations of opinion are ordinarily not actionable. . . .
3  Moreover, the representation must ordinarily be about past or existing facts; predictions about future
4  events, or statements about future action by some third party, are deemed opinions, and not
5  actionable fraud."). While plaintiff's briefing exhaustively recounts various communications
6  involving Pastor Buchholz, her papers do not specifically identify what statements Pastor Buchholz
7  made to Choong that she contends were false when made. At the hearing, plaintiff's counsel relied
8  on the statements in Pastor Buchholz's July 29-30, 2005 correspondence. Thus, the court examines
9  whether plaintiff has adduced sufficient evidence for one to infer that those statements were false
10 when made.

11 In his July 29 email, Pastor Buchholz wrote to Choong: "Melody and I have invested in
12 several of these Solomon Capital projects and so have other churches with great satisfaction." Dkt.
13 No. 203-4, Ex. 59. In his July 30 email, Pastor Buchholz similarly wrote: "This is probably your
14 best way to go to get long term gain. . . . . [¶] Melody and I have had several projects we have
15 invested in and done very well. So have at least 20 other individuals at FCC + 3 churches in Silicon
16 Valley. The 3 churches have invested over $700,000 in Ron's projects and when their projects were
17 completed and profits paid they reinvested the entire amounts again." *Id.*

18 At the hearing, plaintiff's counsel argued that Pastor Buchholz falsely referred to "several"
19 projects when, as of the end of July 2005, he had received only a single payout, *see* Dkt. No. 207-1,
20 Ex. G. The same evidence shows that Pastor Buchholz had already invested in at least nine projects
21 at the time of his emails to Choong, so he was apparently truthful in stating he had invested in
22 "several" projects. Although the meaning of his statement that he and Melody "have had several
23 projects we have invested in and done very well" is not entirely clear, a reasonable interpretation is
24 that Pastor Buchholz's statements referred to the projects in the aggregate. The payout they had
25 received at the time had been very favorable. If the statement was intended to mean that each of the
26 projects had been successful, the statement may have been false, but the evidence is not clear as to
27 what Pastor Buchholz knew about each project at the time. Even if Pastor Buchholz may have
28 misrepresented the number of his then-successful investments, however, there is no evidence that the

misrepresentation was material. Plaintiff asserts that the factors significant to her decision to invest were that everything Pastor Buchholz said and did came across as a recommendation; Pastor Buchholz never indicated that there were any problems with his or others' investments or that investing with Ron and Charice would be anything but safe and profitable; and her faith and trust in Pastor Buchholz. Dkt. No. 203 at 20-21; *see* Choong Decl. ¶¶ 10, 14-19. None of these factors would change if Pastor Buchholz had instead told Choong that he had done very well in one project and had invested in several other projects that had yet to pay out. Such a statement, with the rest of the email, would still convey that Pastor Buchholz and others had repeatedly invested with Ron and Charice, and that both Pastor Buchholz and others had had good results. Notably, there is no evidence that the lack of a payout by July 2005 indicated that any other project was going poorly. Thus, an accurate statement about the status of Pastor Buchholz's investments would not have changed the general impression of optimism and satisfaction he conveyed.

Plaintiff does suggest in her papers that Pastor Buchholz's statements were also false because he lost approximately $342,000 in the Solomon Towers project. However, there is no evidence that, in June 2005, this loss had already occurred or Pastor Buchholz could reasonably have foreseen the loss. The evidence indicates that Pastor Buchholz had first invested in Solomon Towers on February 28, 2005, just months before he told Choong about his investments. Dkt. No. 207-1, Ex. G. Pastor Buchholz's testimony—the only evidence as to timing—is that the loss did not occur until mid-2007. Dkt. No. 207 at 17 ¶ 7. Thus, there is no evidence that Pastor Buchholz was aware of any cause for dissatisfaction at the time he made his statements to Choong in June 2005.

Because plaintiff has not identified a false statement of material fact, the court grants summary judgment on plaintiff's claim for misrepresentation. Even if Pastor Buchholz withheld information that might have undermined the positive impression he conveyed, such nondisclosure more properly supports a concealment claim, not a misrepresentation claim. Thus, the court now turns to plaintiff's claim for concealment.

### ii. Concealment

The elements of a concealment claim are: (1) the defendant must have concealed or suppressed a material fact; (2) the defendant must have been under a duty to disclose the fact to the

plaintiff; (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff; (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact; and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage. *Lovejoy v. AT&T Corp.*, 92 Cal. App. 4th 85, 95 (2001).

Plaintiff claims that Pastor Buchholz failed to disclose the rumor he heard from Pastor Pruitt in May 2004 regarding other FCC members losing money on their investments with Solomon Capital. As discussed above, plaintiff also suggests that Pastor Buchholz concealed the fact that some of his investments lost money. Plaintiff claims that "once he began talking, [Pastor Buchholz] had a duty to talk about everything." Dkt. No. 203 at 22:4-5. However, plaintiff does not explain what circumstances gave rise to Pastor Buchholz's duty to disclose, and fails to cite any authority that would support the finding of such a duty.

California courts have identified four instances in which nondisclosure or concealment may be actionable as fraud: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representation but also suppresses some material facts." *Wilkins v. Nat'l Broad. Co., Inc.*, 71 Cal. App. 4th 1066, 1082 (1999) (quoting *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336-37 (1997)). "Putting aside a fiduciary relationship, each of the other three circumstances in which nondisclosure may be actionable *presupposes the existence of some other relationship between the plaintiff and defendant in which a duty to disclose can arise . . . [S]uch a relationship can only come into being as a result of some sort of transaction between the parties*." *Id.* (internal quotations omitted and emphasis added).

As discussed above, there was no fiduciary relationship between plaintiff and Pastor Buchholz. Thus, in order for Pastor Buchholz to have a duty to disclose, such that his failure to divulge the contents of the May 2004 email constituted concealment, he must have been engaged in "some sort of transaction" with plaintiff. Circumstances giving rise to a "transaction" include: "the relationship between seller and buyer, employer and prospective employee, doctor and patient, or

10
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF KWEI CHOONG'S FOURTH AMENDED COMPLAINT—Case No. C-08-03535 RMW

parties entering into any kind of contractual agreement." *LiMandri*, 52 Cal. App. 4th at 337 (1997). Here, there is no evidence that plaintiff entered into any kind of contractual relationship or transaction with Pastor Buchholz or FCC. Plaintiff argued at the hearing that Pastor Buchholz undertook the role of financial advisor to his congregation as a whole, but, even if this were true, there is no evidence that plaintiff was exposed to any of the relevant conduct. In addition, plaintiff admitted at her deposition that she did not ask Pastor Buchholz to act as her financial advisor, did not have any agreement with him for him to be her financial advisor, and did not expect him to be her financial advisor. Dkt. No. 203-5 (Choong Dep.) at 30:11-16. Thus, plaintiff has not established that Pastor Buchholz had a duty to disclose, and the court grants summary judgment on plaintiff's claim for concealment.

### III. ORDER

For the foregoing reasons, the court grants defendants' motion for summary judgment on plaintiff Kwei Choong's claims against Pastor Buchholz and FCC.

Dated: March 20, 2013

_____
RONALD M. WHYTE
United States District Judge